## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

POLICY AND RESEARCH, LLC,
     8434 Oak Street
     New Orleans, LA 70118,

PROJECT VIDA HEALTH CENTER,
     3607 Rivera Ave.
     El Paso, TX 79905,

SEXUAL HEALTH INITIATIVES
FOR TEENS NORTH CAROLINA,
     3710 University Drive, Suite 310
     Durham, NC 27707,

and

SOUTH CAROLINA CAMPAIGN
TO PREVENT TEEN PREGNANCY,
     1331 Elmwood Ave., Suite 140
     Columbia, SC 29201,

                Plaintiffs,

                v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
     200 Independence Ave. SW
     Washington, DC 20201,

and

ALEX AZAR, Secretary,
Department of Health and Human Services,
     200 Independence Ave. SW
     Washington, DC 20201,

                Defendants.
_____

Civil Action No. 18-CV-346

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1.      The Teen Pregnancy Prevention Program (TPPP) is a congressionally mandated program that funds evidence-based programs to prevent teen pregnancy. When created by statute in 2009, TPPP was a major shift away from the abstinence-only approach to pregnancy prevention that had been federal policy for decades and towards an evidence-based approach focused on funding programs that could demonstrate success, regardless of methodology.

2.      Plaintiffs are among the recipients of 81 five-year TPPP grants awarded in 2015 by the Office of Adolescent Health (OAH), an office within the Department of Health and Human Services (HHS). In May 2017, HHS announced that it wanted to terminate the TPPP in the next fiscal year and sought no funding for the program in its 2018 budget request to Congress. HHS then informed all TPPP grantees that their grants would be terminated effective June 2018—two years ahead of the scheduled end dates. Despite HHS's request to zero-out funding for the TPPP, Congress has not cancelled the program, which continues to be funded through the Continuing Appropriations Act, 2018, and subsequent acts extending it, from October 1, 2017 to the present.

3.      HHS's failure to provide a reasoned basis for the termination of plaintiffs' grants, and termination of the grants in a manner contrary to HHS regulations, constitutes final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act (APA). Furthermore, HHS's decision to terminate the TPPP grants constitutes an unlawful impoundment of appropriated funds, in violation of the Continuing Appropriation Acts, 2018, and subsequent acts extending it, the Congressional Budget and Impoundment Control Act, and the Anti-Deficiency Act.

4.      Plaintiffs are replicating proven evidence-based pregnancy prevention programs and engaged in empirical research of new and innovative pregnancy prevention programs. The unlawful termination of plaintiffs' grants threatens the viability of their programs, including by

1

preventing them from completing their research, and will harm the communities they serve. Plaintiffs thus bring this action to enjoin HHS from terminating their grants and the TPPP.

## JURISDICTION AND VENUE

5.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

6.     This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1361, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

## PARTIES

7.     Plaintiff Policy and Research, LLC, which operates under the name the Policy & Research Group (PRG), is a leader in rigorous efficacy research at the program level. Established in 2004, PRG produces scientifically rigorous research and evaluations for housing, behavioral health, education, social welfare, and economic development projects, funded by grants from federal government agencies and foundations. PRG has a staff of twenty-five full-time evaluation professionals who bring a combined 80 years of experience in program evaluation; seventeen have MA/MPH degrees, and two have PhDs. PRG has particular expertise in data collection efforts involving hard-to-reach populations, including adolescents. PRG's research has helped inform program and policy decisions at non-profits such as the American Public Health Association, AARP, and the W.K. Kellogg Foundation. PRG has also served as the evaluator for over fifty federally funded projects, including programs funded by the Department of Education, the Department of Labor, and, within HHS, Centers for Disease Control and Prevention (CDC), Health Resources and Services Administration, Substance Abuse and Mental Health Services Administration, the Administration for Children and Families, and the Office of Minority Health.

PRG principals have presented findings at national conferences and published in peer-reviewed journals.

8.      PRG is the recipient of two five-year TPPP grants for $934,643 and $808,286 annually. HHS awarded PRG the grants to implement and conduct high-quality rigorous evaluations of two innovative pregnancy prevention programs, Plan A and Practice Self-Regulation (PS-R).

9.      Plan A is a brief stand-alone sexual health video designed for African-American and Latina women age 18-19 seeking care at reproductive health clinics. The video is designed to increase viewers' perceived risk of pregnancy and sexually transmitted infections at a "teachable moment" in the lives of young women, just prior to visiting with a health care provider. PRG is conducting an individual randomized control study of the efficacy of Plan A in ten different clinics in five different regions in California.

10.      PS-R is designed for youth age 14-19 who have experienced trauma and are receiving outpatient counseling services. It is composed of ten structured, one-on-one therapy-education sessions delivered by a therapist over a 16-week period. PS-R aims to decrease risky sex behaviors by increasing knowledge of sexual health and the impact of trauma on sexual decision making, readiness to change risky sexual behavior, ability to manage impulsive behavior, confidence in ability to negotiate safe sex, and intentions to practice safe sex. It also enables participants to explore the effect of previous trauma on their behavior more generally. PRG is conducting an individual randomized control study of the efficacy of PS-R in California, New Mexico, Michigan, Maine, and Louisiana.

11.      Plaintiff Project Vida Health Center (PVHC) is a non-profit organization founded in 2003 and based in El Paso, Texas. PVHC is the recipient of a five-year TPPP grant for $796,297

annually. PVHC uses the grant to implement three evidence-based teen pregnancy prevention programs—Making a Difference!, Positive Prevention PLUS: Sexual Health Education, and Teen Health Project—in middle schools, high schools, communities, and faith settings. PVHC's programs reach 1,600 youth annually in two communities in southeast El Paso County that have high teen birth rates and are predominately rural, Hispanic, and lacking in resources. The programs focus on creating a culture that supports healthy behavior, positive life decisions, and educational success.

12.     Plaintiff Sexual Health Initiatives For Teens North Carolina (SHIFT NC) is a nonprofit based in North Carolina. For thirty years, SHIFT NC has worked to improve adolescent and young adult sexual health by increasing awareness, disseminating data, improving policy, supplying professional development, and providing leadership. In 2010, SHIFT NC was one of eight demonstration projects funded by the CDC and the Office of Adolescent Health with a five-year grant to implement a community-wide initiative to reduce teen pregnancy in Gaston County, North Carolina. The program, Gaston Youth Connected, aimed to reduce the county's teen pregnancy rate by ten percent or more by 2015 and to develop infrastructures that could support evidence-based pregnancy prevention strategies, including program services that are integrated with clinical service. Three years into the project, Gaston County's teen pregnancy rate had fallen by more than forty percent. OAH modeled a category of TPPP funding (known as Tier 1B) on Gaston Youth Connected and the other seven demonstration programs, and directed applicants to build on specific successes and lessons learned in those programs.

13.     SHIFT NC is the recipient of two five-year TPPP grants to replicate evidence-based pregnancy prevention programs. One grant, for $736,766 annually, is for a project called Every Teen Counts, which is aimed at building capacity of select systems to integrate prevention

programming. Through Every Teen Counts, SHIFT NC works with NC LINKS, North Carolina's system for serving youth in foster care, and with juvenile detention centers, to help professionals in these systems implement two specially tailored, evidence-based curricula for youth in foster care and juvenile detention: Making Proud Choices: An Adaptation for Youth in Out-of-Home Care, and Sexual Health and Adolescent Risk Prevention (SHARP). Every Teen Counts also aims to create linking and referral networks to help youth access supportive health care services.

14.     SHIFT NC has received a second grant for $1,749,000 annually. That grant is not at issue in this litigation.

15.     Plaintiff South Carolina Campaign to Prevent Teen Pregnancy (SC Campaign) was founded in 1994 to combat increasingly high rates of teen pregnancy in South Carolina. Since that time, the SC Campaign has partnered with funders and youth-serving professionals across the state to address the issue.

16.     SC Campaign is the recipient of two five-year grants under the TPPP. First, HHS awarded SC Campaign a TPPP grant of $1,498,990 annually, to work with local organizations in the three counties (Aiken, Anderson, and Orangeburg) in South Carolina with the highest teen birth rates to implement evidence-based teen pregnancy prevention programs. Over the course of the five-year project, a minimum of 28,000 youth will have the opportunity to participate in multiple evidence-based teen pregnancy prevention programs. The SC Campaign's program is being evaluated by the Center for Health Services and Policy Research at the University of South Carolina using an online data collection and reporting system.

17.     SC Campaign's second five-year grant, for $716,000 annually, is for a project aimed at building capacity at sixteen youth-serving organizations located throughout South Carolina that currently provide programs and services to youth in juvenile justice or foster care but

do not have capacity to deliver evidence-based teen pregnancy prevention programs. Over the course of the project, four cohorts consisting of four youth-serving organizations will receive fifteen months of intensive capacity building assistance. Each of the organizations will develop an HIV/STD/teen pregnancy prevention plan that includes implementation of evidence-based teenage pregnancy prevention programs, referrals to quality teen-friendly healthcare services, and educational offerings for parents and caregivers. The project is designed to reach over 3,300 youth age 13-19 in juvenile detention or foster care.

18.     Defendant HHS is the agency of the federal government of the United States responsible for administering the TPPP. HHS is an agency within the meaning of the APA.

19.     Defendant Alex Azar is the Secretary of HHS and the agency's highest-ranking official. Plaintiffs sue Secretary Azar in his official capacity.

## BACKGROUND

**Congress's Creation of the TPPP**

20.     In 2009, alarmed that teenage pregnancy rates had begun to rise after years of decline, Congress mandated the creation of the TPPP, an evidence-based initiative to reduce teen pregnancy. Specifically, in the Consolidated Appropriations Act, 2010, Congress appropriated $110 million to HHS for fiscal year 2010 and mandated that the funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants." Pub. L. No. 111-117, div. D, tit. II, 123 Stat. 3034, 3253.

21.     Congress specified that HHS must expend the appropriated funds across two "tiers" of grants:

- **Tier 1:** Congress mandated that "not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."

- **Tier 2:** Congress mandated that "not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."

*Id.*

22.     Congress specified that "any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities," and that "$4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches." *Id.*

23.     Congress directed the program to be administered within the Office of the Assistant Secretary of Health by OAH. OAH is responsible for implementing and administering the program and coordinates its efforts with the Administration for Children and Families, CDC, and other appropriate HHS offices and operating divisions. Conference Rep. No. 111-366, at 1043 (2009).

24.     From 2009 through the present, Congress has mandated the continuation of the TPPP and has appropriated funds to HHS to administer the program for each fiscal year using similar appropriations language. Congress appropriated funds as follows:

| Fiscal Year | TPPP Funding | Evaluation Funds |
| --- | --- | --- |
| 2010 | $110M | $4.5M |
| 2011 | $104.8M | $4.4M |
| 2012 | $104.8M | $8.5M |
| 2013 | $98.4M | $8.5M |
| 2014 | $101M | $8.5M |

| 2015 | $101M | $6.8M |
|------|-------|-------|
| 2016 | $101M | $6.8M |
| 2017 | $101M | $6.8M |

25.     In 2017, Congress directed that the appropriated funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants." Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536. Congress further directed that "not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.*

26.     In the Continuing Appropriations Act, 2018, and subsequent acts extending it, Congress appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017." Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, § 101, 131 Stat. 1129, 1139-40; *see* Bipartisan Budget Act of 2018, Pub. L. No. 115-123 (amending Continuing Appropriations Act, 2018, to extend appropriations through March 23, 2018). Congress mandated that such

appropriations "shall be available to the extent and in the manner that would be provided by the [Consolidated Appropriations Act, 2017]." *Id.* § 103.

**HHS's Administration of the TPPP from 2010 through 2016**

27.     Consistent with Congress's mandate and appropriations, in 2010, HHS, through OAH, prepared to provide $75 million in funding to Tier 1 programs that aim to replicate evidence-based programs and $25 million to Tier 2 programs that aim to develop new and innovative evidence-based programs.

28.     Prior to awarding the first Tier 1 grants replicating evidence-based programs, HHS undertook an intensive evidence review process to identify programs that had documented positive impacts on teen pregnancy prevention and other associated factors, and would thus be eligible for TPPP funding. Under a contract with HHS, Mathematica Policy Research conducted an independent, systematic review of the evidence base on teen pregnancy, sexually transmitted infections, and sexual risk behaviors. This review defined the criteria for the quality of an evaluation study and the strength of evidence for a particular intervention. Based on these criteria, HHS defined a set of rigorous standards an evaluation must meet in order for a program to be considered "effective based on rigorous evaluation."

29.     Based on the review, HHS compiled a list of evidence-based program models that it deemed to have met those standards. The list included programs that use a number of approaches—sexual health education, youth development, abstinence-based, and programs for delivery in clinical settings and for special populations. Under the TPPP, federal funding moved from being focused on a particular type of sex education based on a certain ideology to evidence-based programs that included a variety of approaches determined to be "effective based on rigorous evaluation."

30.     Since the program's inception, HHS has provided funding to Tier 1 and Tier 2 programs for five-year project periods.

31.     In April 2010, HHS, through OAH, issued two separate Funding Opportunity Announcements (FOAs) for Tier 1 and Tier 2 cooperative agreements. A cooperative agreement is an award instrument with substantial collaboration between the awarding agency and the recipient. OAH stated that it chose to use cooperative agreements to provide for close collaboration with recipients, ensure adherence to project aims, enable review and approval of curricula and educational materials, and assist with ongoing technical assistance and troubleshooting.

32.     In this cohort, between FY 2010 and FY 2014 (September 2010 to August 2015), HHS funded 102 grant projects that reached approximately half a million youth, trained more than 6,800 professionals, and established partnerships with over 3,800 community-based organizations across the United States.

33.     The SC Campaign was among the grant recipients in the first cohort awarded in 2010, when OAH awarded it a five-year Tier 1 grant of $1,469,480, to replicate an evidence-based teen pregnancy prevention program in a new setting and to determine its effectiveness.

34.     A key aspect of the TPPP is rigorous evaluation of the funded programs to determine whether the replicated evidence-based models (Tier 1) and the new, innovative strategies (Tier 2) are effective. As part of the evaluation of the first cohort of grants, HHS funded 41 independent evaluation studies to assess where, when, and with whom programs are most effective. Of the 41 programs evaluated, HHS found four of the Tier 1 evidence-based programs to be effective in changing behavior when they were applied in new settings or with new populations than where they first showed behavioral impact, and many more programs reported changing participants' knowledge, attitudes, and intentions to avoid risky behaviors. HHS also

found that eight of the Tier 2 new and innovative programs showed an impact on behaviors that prevent teen pregnancy and met the criteria to be considered an HHS evidence-based program in the future. The ratio of evaluations that produced positive results exceeded what experts typically expect from rigorous replications of social programs.

35.     In addition, HHS conducted its own complementary evaluation activities. One of the federal evaluation studies, the TPPP Replication Study, examined whether program models that were commonly chosen by TPPP grantees and widely used in the field could achieve impacts with different populations and settings. Of particular relevance here, interim findings released in 2016 concluded that a program called Reducing the Risk is effective at changing attitudes toward contraception. Reducing the Risk is among the evidence-based programs that SC Campaign is implementing through one of its TPPP grants.

36.     As part of the first cohort, PRG worked under a TPPP grant conducting randomized controlled trials of two different evidence-based interventions. PRG maintained high follow-up rates for both studies and received the highest rating quality from the HHS Evidence Review. PRG published a series of five peer-reviewed articles based on these studies. Further, Mathematica, the evaluation technical assistance contractor for HHS, later shared PRG's evaluation plans and final reports with other grantees as an example for them to follow.

37.     In early 2015, HHS, through OAH, issued new FOAs for a second five-year cohort of cooperative agreements, this time further specializing the FOAs within the two tiers. As mandated by Congress, the Tier 1 FOAs sought applicants for grants to replicate evidence-based programs that HHS previously determined had been proven effective and the Tier 2 FOAs sought applicants for grants to develop, replicate, refine, and test additional models and innovative strategies for preventing  teenage pregnancy:

- **Tier 1A – Capacity Building to Support Replication of Evidence-Based Teen Pregnancy Prevention Programs**: "The goal of this FOA is to fund intermediary organizations to provide capacity building assistance (CBA) to at least 3 youth-serving organizations to replicate evidence-based TPP programs in a defined service area with demonstrated need." Tier 1A FOA, at 3-4, https://www.hhs.gov/ash/oah/sites/default/files/tier1a-foafile.pdf.

- **Tier 1B – Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need**: "The goal of this FOA is to have a significant impact on reducing rates of teen pregnancy and existing disparities by replicating evidence-based TPP programs to scale in at least 3 settings in communities and with populations at greatest need." Tier 1B FOA, at 3, https://www.hhs.gov/ash/oah/sites/default/files/tier1b-foafile.pdf.

- **Tier 2A – Supporting New or Innovative Approaches**: "The overall goal of this FOA … is to enable and support early innovation to advance adolescent health and prevent teen pregnancy." Tier 2A FOA, at 4, https://www.hhs.gov/ash/oah/sites/default/files/tier2a-foafile.pdf.

- **Tier 2B – Rigorous Evaluation of New or Innovative Approaches**: "The purpose of this FOA is to increase the number of evidence-based TPP interventions available by rigorously evaluating new or innovative approaches for preventing teen pregnancy and related high-risk behaviors." Tier 2B FOA, at 3, https://www.hhs.gov/ash/oah/sites/default/files/tier2b-foafile.pdf.

38.     The FOAs provided that the five-year project periods for the grants would be funded in annual increments (budget periods) and that funding for all budget periods beyond the first year of the grant would be "contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of Federal funds." The FOAs further provided for grantees to submit noncompeting applications in each year of the approved project period, providing progress reports for the current budget year, work plans, budgets, and budget justifications for the upcoming year. *See, e.g.*, Tier 1B FOA, at 39, https://www.hhs.gov/ash/oah/u sites/default/files/tier1b-foafile.pdf.

39.     After reviewing nearly 500 applicants, in July 2015, HHS awarded grants to 81 organizations across Tiers 1 and 2. Combined, the chosen programs were designed to serve more

than 1.2 million youth across 38 states over the five-year grant period. In October 2015, HHS awarded three additional grants under Tier 2C: "New Approaches for Young Males."

40.     Eight organizations received Tier 1A grants to help communities build capacity to implement and evaluate programs for populations with teen birth rates well above the national average and with organizations serving youth in juvenile detention and foster care or who are homeless or young parents. Plaintiffs SC Campaign and SHIFT NC are among the Tier 1A grantees.

41.     Fifty organizations received Tier 1B grants to replicate evidence-based programs in multiple settings in communities where teen birth rates are significantly higher than the national average. The approved programs were implemented in multiple settings, including schools, clinics, and community-based settings in both urban and rural areas, and with the objective of reaching especially vulnerable youth, including youth in foster care, youth in juvenile detention, expectant and parenting teens, and older youth. The programs were designed to provide medically accurate, age appropriate, evidence-based programs to the youth in the communities where the programs operate. Plaintiffs PVHC and SC Campaign are among the Tier 1B grantees.

42.     Two organizations received Tier 2A grants to support early innovation to prevent teen pregnancy, with one focused on technology-based innovations and one focused on program innovations. Each grantee would hold a national competition to select between five to fifteen innovators who would receive funding to develop, test, and refine innovative products, programs, and/or processes to advance adolescent health and prevent teen pregnancy.

43.     Twenty-one organizations received Tier 2B grants to rigorously evaluate new or innovative approaches for preventing teen pregnancy and related risk behaviors, focusing

especially on developing interventions that will fill gaps in the existing evidence and work to reduce disparities. Plaintiff PRG received two Tier 2B grants.

44.     Consistent with the FOAs, plaintiffs' initial notices of award provided that the "project period" for each of their grants was five years, from July 1, 2015, through June 30, 2020. Within the project period were five "budget periods," running from July 1 to June 30 of the following year. The first notice of award was for the budget period from July 1, 2015, through June 30, 2016.

45.     In June 2016, plaintiffs each received a notice of award of the funds for the budget period from July 1, 2016, through June 30, 2017. Like the 2015 notices, the 2016 notices of award provided that the project period was through June 30, 2020.

46.     In early July 2017, plaintiffs each received notices of award providing the full funding that had been appropriated in fiscal year 2017 for their third grant years.

47.     Consistent with program requirements, each year of the project period of their grants, plaintiffs submitted non-competing continuation applications for the next budget period and required progress reports.

48.     Plaintiffs have each complied with TPPP requirements throughout the project period of the grants.

49.     Through the present, OAH's reviews of plaintiffs' progress reports and continuation applications included many commendations for their work. To the extent the reviews included recommendations for improvements moving forward, plaintiffs incorporated the recommendations into their programs.

**HHS's Decision to Terminate the TPPP**

50.    Shortly after the election of President Trump in November 2016, advocates for abstinence-only education to prevent teen pregnancy expressed their hope that the new administration would focus exclusively on abstinence-only education, as opposed to the TPPP's evidence-based programs with diverse methodologies.

51.    On May 5, 2017, the President signed the Consolidated Appropriations Act, 2017, which fully funded the TPPP grants for the third grant year, from July 1, 2017, to June 30, 2018.

52.    In May 2017, as part of the annual budgeting process, HHS submitted its budget request to Congress for the next fiscal year. In that request, HHS stated that "[t]he FY 2018 President's Budget does not request funds for this program" and "HHS will not make amounts available for Teenage Pregnancy Prevention activities in FY 2018." The request summarized the decision as follows: "The FY 2018 President's Budget request is $0.00, a decrease of $100,808,000 from [] FY 2017 …. The Budget eliminates the TPP program. The teenage pregnancy rate has declined significantly over recent years, but it does not appear this program has been a major driver in that reduction."

53.    On June 5, 2017, Valerie Huber was appointed chief of staff to the Assistant Secretary for Health, who oversees the OAH and, in turn, the TPPP. From 2007 until her appointment to HHS, Huber served as president and CEO for Ascend, formerly known as the National Abstinence Education Association. She previously served as abstinence education coordinator for the state of Ohio. In April 2017, Huber wrote an editorial arguing that the TPPP was a failure that wasted taxpayer money while promoting teenage sex. In May 2017, after the administration released its proposed budget, Ascend issued a press release calling TPPP "an approach that typically normalizes teen sex and which government research revealed was an abject

15

failure," and quoted Huber as praising the President's request that Congress maintain funding for abstinence education while terminating the TPPP. In January 2018, Huber was appointed acting deputy assistant secretary for the HHS Office of Population Affairs, which does not oversee the TPPP program.

54.     In early July 2017, when plaintiffs received their notices of award for their third grant years, HHS informed them that their TPPP funding would terminate two years early, on June 30, 2018. The notices included only a single sentence informing them that their awards were being terminated: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year."

55.     In October 2017, the three Tier 2C project grantees received similar notices indicating the shortening of their five-year project periods to three years.

56.     HHS did not give the grantees prior notice that the awards would be prematurely terminated.

57.     On July 17, 2017, a spokesperson for the Office of the Assistant Secretary for Health confirmed in an email to a reporter that the TPPP grants had been terminated based on President's fiscal year 2018 budget request to eliminate the program: "[T]he President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout." Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding*, Wired (July 19, 2017 7:00 am), https://www.wired.com/story/teen-pregnancy-researchers-regroup-after-trumps-hhs-pulls-funding/.

58.     On August 17, 2017, HHS released a statement to CNN stating, "The poor evaluation results [from the first cohort of grants] were the reason that the Trump Administration, in its FY 2018 budget proposal, did not recommend continued funding for the TPP program and HHS hit the pause button on it." Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN (Aug. 17, 2017 8:58 am), https://www.cnn.com/2017/08/17/health/teen-pregnancy-prevention-programs-funding/index.html.

59.     Congress expressly provided that the purpose of the TPPP is to replicate evidence-based programs and develop innovative approaches, conduct studies of those programs and approaches to determine which are effective, and then use the knowledge from those studies to inform current and future projects. Conference Rep. No. 111-366, at 1042-43 (2009); H.R. Rep. No. 111-220, at 176 (2009); S. Rep. No. 111-66, at 160 (2009). In seeking to terminate the existing grants, HHS has thwarted Congress's objective of enabling HHS to learn from the results of the programs, both positive and negative.

60.     Based on the first round of evaluation results, OAH encouraged grantees to shift to the more effective models. Thus, the models that current grantees are implementing are different and stronger than the mix of models used in the first cohort.

61.     TPPP has been recognized by bipartisan experts as an outstanding example of how to build evidence and administer a high-quality evidence-based program.

62.     In late July 2017, 148 members of the House and thirty-four Senators sent letters to then-Secretary Price inquiring into HHS's decision to shorten all of the TPPP grants despite ongoing congressional funding for the program. After HHS provided an incomplete response, in late November 2017, 27 Senators wrote again to Acting Secretary Hargan to express their concerns.

63.     On February 12, 2018, the President released his budget for fiscal year 2019. The budget in brief for HHS includes no funding for the TPPP, and further provides that "[t]he Budget does not include funding for new grants in the Office of the Assistant Secretary for Health." *See* FY 2019 Budget in Brief, at 115, https://www.hhs.gov/sites/default/files/fy-2019-budget-in-brief.pdf.

**Effect of Termination on Plaintiffs' Projects**

64.     Plaintiffs have been unable to obtain alternative sources of funding to offset the loss of funding from the TPPP grants.

65.     Without the TPPP grants, plaintiffs will be unable to continue or complete the funded programs.

66.     Plaintiff PRG is in the middle of two five-year individual randomized controlled trials for Plan A and PS-R. For both studies, sample enrollment and baseline data collection began in June 2016, and sample enrollment was designed to end in October 2018. The remaining years of the grants were designed to collect follow-up data from participants, conduct implementation and impact evaluation analysis, reporting, and dissemination efforts, and finalize a complete electronic package of the implementation-ready interventions. The termination of PRG's grants will render the past three years of its work largely useless, with insufficient sample size and incomplete follow-up data. PRG's fifth year was designated for finalizing and analyzing the data collected over grant years two through four. Without funding for years four and five, PRG will not have sufficient data to conduct impact evaluations of the interventions studied, and will lack the resources to conduct follow-up, data analysis, and evaluations. The two interventions, if found to be effective, could fill important gaps in current TPPP programming.

67.     Plaintiff PVHC has been forced to scale back its program because of the termination of its TPPP grant. PVHC had planned to use grant years three and four to expand its program to additional campuses and to focus on program sustainability in the program communities after the conclusion of the fifth grant year. The termination of PVHC's grant forced it to revise its work plan and abandon the planned expansion. PVHC is instead focusing on keeping the program sustainable in the area currently offered, although the shortened project period makes that effort difficult. In addition, an external evaluator was evaluating PVHC's programs to prepare an impact study during year five. That study will not be possible if the program is terminated early.

68.     Plaintiff SHIFT NC is in the midst of a five-year grant designed to establish sustainable evidence-based programs with partner organizations in the targeted communities. It designed the second and third grant years for the establishment and implementation of these programs, and designed the fourth and fifth grant years to focus on sustainability after the project period concluded. Without continued TPPP funding, the programs that SHIFT NC has spent the past three years designing and implementing – including those that serve youth in foster care and the juvenile justice system – will be difficult to sustain. SHIFT NC, as a result of the early termination of its TPPP grant, has already had to scale back implementation. In addition, SHIFT NC has already lost one staff member because of the loss in job security due to the shortened project period. The termination of the TPPP grant in June 2018 will cause SHIFT NC to lose or be required to terminate additional staff, reducing the expertise in the organization and negatively affecting the organization's ability to provide support to institutions throughout the state.

69.     Plaintiff SC Campaign is currently in the midst of two five-year programs through TPPP grants. The loss of TPPP funding will require it to end programs aimed at the highest risk youth in South Carolina, those in the foster care and juvenile justice system. Further, SC Campaign

will have to cut-off a program designed to bring sustainable reproductive health education for school children in three large counties in the midst of its implementation, undermining the program's sustainability. SC Campaign has already lost one staff member because of the loss in job security caused by the early termination, and the loss in funding will lead SC Campaign to lose or be required to terminate additional staff.

70.     Plaintiffs' non-competing continuation applications for the next budget period, required under the terms of their grants, are due in April. HHS must accept and process these materials for plaintiffs to be eligible to receive funds for the fourth year of their projects.

## FIRST CAUSE OF ACTION

(APA – Unlawful Termination of Grants)

71.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

72.     Defendants' termination of plaintiffs' grants constitutes final agency action under the APA.

73.     HHS's grant regulations set forth specific reasons why HHS may terminate an award prior to the end of the planned period: (1) "if the non–Federal entity fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of the non–Federal entity." 45 C.F.R. § 75.372(a).

74.     HHS terminated plaintiffs' grants without explanation, and that termination was contrary to HHS regulations providing the reasons for termination prior to the end of the planned period.

75.     Defendants' termination of plaintiffs' grants was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## SECOND CAUSE OF ACTION

### (APA - Unlawful Impoundment of Appropriated Funds)

76.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

77.     Since 2010, Congress has directed HHS to operate the TPPP and has appropriated funds annually that "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy."

78.     In the Consolidated Appropriations Act, 2017, Congress fully funded the TPPP grants through the third grant year. In the Continuing Appropriations Act, 2018, and subsequent acts extending it, Congress appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017." Congress mandated that such appropriations "shall be available to the extent and in the manner that would be provided by the [Consolidated Appropriations Act, 2017]." Thus, to date, Congress provided TPPP funding for at least part of the fourth grant year.

79.     Neither the Continuing Appropriations Act, 2018, nor any other law authorizes defendants to withhold appropriated funds or to terminate the TPPP.

80.     Defendants' discretion in the disbursement of grants does not give it discretion to terminate existing TPPP grants where Congress has appropriated funding.

81.     Defendants' actions with respect to plaintiffs' grants and the TPPP constitutes the unlawful impoundment of appropriated funds, contrary to the Continuing Appropriations Act, 2018, and subsequent acts extending it, in violation of the APA.

### THIRD CAUSE OF ACTION

(APA – Violation of the Impoundment Control Act)

82.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

83.     The Congressional Budget and Impoundment Control Act of 1974 (the Impoundment Control Act) requires the President to make appropriated funds "available for obligation," unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a rescission bill rescinding the funding. 2 U.S.C. § 683.

84.     The President has not transmitted a special message to Congress requesting that TPPP funding be rescinded, and Congress has not otherwise acted to rescind TPPP funding. The President is thus required by the Impoundment Control Act to expend the appropriated TPPP funding.

85.     Defendants' termination of the TPPP grants despite continued funding for the TPPP program constitutes agency action contrary to the Impoundment Control Act, in violation of the APA.

## FOURTH CAUSE OF ACTION

### (APA – Violation of the Anti-Deficiency Act)

86.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

87.     The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established *only*—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1) (emphasis added).

88.     Defendants' decision to terminate the TPPP grants and TPPP despite continued funding results in an unlawful reserve, contrary to the Anti-Deficiency Act, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(A)     Declare defendants' termination of plaintiffs' TPPP grants unlawful;

(B)     Enjoin defendants to reinstate plaintiffs' TPPP grants for the awarded five-year project period and to continue to administer the grants to the same extent and in the same manner as prior to the unlawful termination, as provided in the notices of award and HHS regulations;

(C)     Award plaintiffs their costs and reasonable attorney fees; and

(D)     Grant such other relief as this Court may deem just and proper.

Dated: February 15, 2018     Respectfully submitted,

<u>/s/ Sean M. Sherman</u>
Sean M. Sherman (D.C. Bar No. 1046357)
Allison M. Zieve (D.C. Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*