# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| POLICY AND RESEARCH, LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 18-CV-346-KBJ |
| ) | |
| v. ) | |
| ) | |
| DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, et al., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF COMBINED MOTION FOR PRELIMINARY INJUNCTION AND FOR EXPEDITED SUMMARY JUDGMENT

Sean M. Sherman (D.C. Bar No. 1046357)
Allison M. Zieve (D.C. Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

February 23, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.  Congress's creation and funding of the Teen Pregnancy Prevention Program .................. 2

II.  HHS's administration of the TPPP from 2010 through 2016 ............................................ 6

    A.  The first cohort of TPPP grants: 2010–2015 ........................................................... 7

    B.  The second cohort of TPPP grants: 2015–2020 ....................................................... 10

III.  HHS's decision to terminate the TPPP and all TPPP grants ........................................... 14

IV.  The effects of the early termination of plaintiffs' TPPP grants on
      plaintiffs and their respective communities ................................................................... 17

STANDARD OF REVIEW ................................................................................................. 23

ARGUMENT ....................................................................................................................... 24

I.  Defendants' termination of plaintiffs' grants was unlawful. ............................................. 24

    A.  The termination of plaintiffs' grants without explanation was arbitrary,
        capricious, and contrary to HHS regulations. ......................................................... 24

    B.  Defendants' action constitutes a refusal to spend funds appropriated for
        the TPPP, in violation of the APA. ......................................................................... 30

        1.  Defendants' action violates the Continuing Appropriations Act, 2018. ... 30

        2.  Defendants' action violates the Impoundment Control Act
            and the Anti-Deficiency Act. ..................................................................... 34

II.  HHS should be enjoined to continue plaintiffs' grants, including by accepting and
      processing plaintiffs' fourth-year non-competing continuation applications. .................. 36

    A.  Plaintiffs have a strong likelihood of success on the merits. ............................... 36

    B.  Plaintiffs will suffer irreparable harm absent a preliminary injunction. .............. 37

    C.  The balance of equities strongly weighs in plaintiffs' favor,
        and the public interest favors an injunction. ......................................................... 39

III.  To obtain meaningful relief, plaintiffs request expeditious consideration
      of their motion for summary judgment. .......................................................................... 41

CONCLUSION ..................................................................................................................... 42

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AIG Annuity Insurance Co. v. Law Offices of Theodore Coates, P.C.,*
   No. 07 Civ. 1908, 2008 WL 4543422 (D. Colo. Oct. 10, 2008) ......................................40

*In re Aiken County,*
   725 F.3d 255 (D.C. Cir. 2013) .........................................................................................33

*Byrd v. Raines,*
   956 F. Supp. 25 (D.D.C.),
   *vacated on other grounds*, 521 U.S. 811 (1997)...............................................................33

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).....................................................................................................22, 23

*\*City of Kansas City v. HUD,*
   923 F.2d 188 (D.C. Cir. 1991) ....................................................................................24, 25

*City of New Haven v. United States,*
   634 F. Supp. 1449 (D.D.C. 1986), *aff'd*
   809 F.2d 900 (D.C. Cir. 1987) .........................................................................................34

*City of New Haven v. United States,*
   809 F.2d 900 (D.C. Cir. 1987) ...................................................................................33, 34

*Fitzgerald v. Hampton,*
   329 F. Supp. 997 (D.D.C. 1971) ......................................................................................40

*Guadamuz v. Ash,*
   368 F. Supp. 1233 (D.D.C. 1973) ....................................................................................31

*Hedgeye Risk Management, LLC v. Heldman,*
   196 F. Supp. 3d 40 (D.D.C. 2016) ...................................................................................23

*Independence Institute v. FEC,*
   70 F. Supp. 3d 502 (D.D.C. 2014),
   *rev'd on other grounds*, 816 F.3d 113 (D.C. Cir. 2016)...................................................40

*James Madison Ltd. by Hecht v. Ludwig,*
   82 F.3d 1085 (D.C. Cir. 1996) .........................................................................................2

*Kelly v. United States,*
   34 F. Supp. 2d 8 (D.D.C. 1998) .......................................................................................29

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................... 22, 36, 38, 39

*Local 2677 American Federation of Government Employees v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973) ................................................................... 30, 32

*Marinette Marine v. United States Coast Guard*,
    973 F. Supp. 1 (D.D.C. 1997) ................................................................... 23

*\*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual*
    *Automobile Insurance Co.*,
    463 U.S. 29 (1983) ................................................................... 23, 24, 28

*National Association for Fixed Annuities v. Perez*,
    217 F. Supp. 3d 1 (D.D.C. 2016) ................................................................... 23

*National Environmental Development Associates Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ................................................................... 23, 25

*\*National Council of Community Mental Health Centers, Inc. v. Weinberger*,
    361 F. Supp. 897 (D.D.C. 1973) ................................................................... 30, 32, 35

*Northern Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................... 40

*\*Open Communities Alliance v. Carson*,
    No. CV 17-2192 (BAH), 2017 WL 6558502 (D.D.C. Dec. 23, 2017) ..................... *passim*

*Patriot, Inc. v. HUD*,
    963 F. Supp. 1 (D.D.C. 1997) ................................................................... 39

*Rigdon v. Perry*,
    962 F. Supp. 150 (D.D.C. 1997) ................................................................... 23

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................... 25

*San Luis Obispo Mothers for Peace v. Hendrie*,
    502 F. Supp. 408 (D.D.C. 1980) ................................................................... 40

*State Highway Commission of Missouri v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ................................................................... 31

*Teva Pharmaceuticals USA, Inc. v. FDA*,
    441 F.3d 1 (D.C. Cir. 2006) ................................................................... 23

*Texas Children's Hospital v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014)................................................................38

*Virginians Against Corrupt Congress v. Moran*,
    No. CIV. A. 92-2120-LFO, 1992 WL 321508 (D.D.C. Oct. 21, 1992)...........................40

*Youngstown Sheet & Tube v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................31

**Statutes**

2 U.S.C. § 631 ...............................................................................13

2 U.S.C. § 683 ...............................................................................35

2 U.S.C. § 683(a) ............................................................................33

2 U.S.C. § 683(b) ............................................................................33

5 U.S.C. § 706(1) ............................................................................29

5 U.S.C. § 706(2)(A).......................................................................23, 29

28 U.S.C. § 1657(a) ..........................................................................40

31 U.S.C. § 665(c)(2)........................................................................34

31 U.S.C. § 1512(c)(1).....................................................................34, 35

An Act to Amend the Homeland Security Act of 2002 to require the Secretary of
    Homeland Security to issue Department of Homeland Security-wide guidance
    and develop training programs as part of the Department of Homeland Security
    Blue Campaign, and for other purposes, Pub. L. No. 115-96 (2017) ...............................6

Bipartisan Budget Act of 2018, Pub. L. No. 115-123.....................................................6

Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 681....................33, 24

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117 (2009)......................................3, 4

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31............................................. *passim*

Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster
    Relief Requirements Act, 2017, Pub. L. No. 115-56 (2017) ...................................... *passim*

Federal Register Printing Savings Act of 2017, Pub. L. No. 115-120...........................................6

Making Further Continuing Appropriations for Fiscal Year 2018, and for other purposes,
        Pub. L. No. 115-90 (2017)...........................................................6

**Legislative Materials**

120 Cong. Rec. 7658 (1974)...........................................................34

H.R. Rep. No. 111-366 (2009) (Conf. Rep.)...........................................................2, 4

H.R. Rep. No. 111-220 (2009)...........................................................2

S. Rep. No. 111-66 (2009)...........................................................2, 4

**Rules and Regulations**

45 C.F.R. § 75.372(a)...........................................................25

45 C.F.R. § 75.372(b)...........................................................26

Fed. R. Civ. P. 56(a)...........................................................22

Fed. R. Civ. P. 56(c)...........................................................23

Fed. R. Civ. P. 65(a)...........................................................22, 23

OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements
        for Federal Awards, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013)...................................26

**Miscellaneous**

Ascend Press Release, *President Trump's Budget Supports Sexual Risk Avoidance (SRA)
        Education* (May 30, 2017), https://us1.campaign-archive.com/
        ?u=e71e76ba0a0760415775e4352&id=4d4dd966ef ...........................................14

Commission on Evidence-Based Policymaking, *Final Report: The Promise of Evidence-
        Based Policymaking* 94 (Sept. 7, 2017),
        https://www.cep.gov/content/dam/cep/report/cep-final-report.pdf ...............................8, 39

Paige Winfield Cunningham & Juliet Eilperin, *Antiabortion activist abruptly steps down
        as head of HHS's family planning division*, Wash. Post (Jan. 13, 2018),
        https://www.washingtonpost.com/news/powerpost/wp/2018/01/12/antiabortion-

activist-to-step-down-as-head-of-hhss-family-planning-division/?utm_term=
.5b4a30306275 ................................................................................................14

Amy Feldman Farb & Amy L. Margolis, *The Teen Pregnancy Prevention Program
(2010-2015): Synthesis of Impact Findings*, 106 Am. J. Pub. Health S9
(Sept. 2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/
PMC5049454/pdf/AJPH.2016.303367.pdf ................................................8, 9, 28

Gov't Accountability Off., B-329092, *Impoundment of the Advanced Research Projects
Agency-Energy Appropriation Resulting from Legislative Proposals in the
President's Budget Request for Fiscal Year 2018* 5 (2017),
https://www.gao.gov/assets/690/688941.pdf ....................................................33

Robert Gordon & Ron Haskins, *Trump Team Doesn't Understand Evidence-Based
Policies Regarding Social Problems*, Brookings (Aug. 10, 2017),
https://www.brookings.edu/opinions/trump-team-doesnt-understand-evidence-
based-policies-regarding-social-problems/ ............................................9, 28, 39

HHS, *About the Review*, *Teen Pregnancy Prevention Evidence Review*,
https://tppevidencereview.aspe.hhs.gov/ReviewProtocol.aspx ...........................7

HHS Justification of Estimates for Appropriations Committee for FY 2018, *General
Departmental Management* (May 2017), https://web.archive.org/web/
20180202164531/https://www.hhs.gov/about/budget/index.html ........................13, 14, 32

HHS, Office of the Assistant Secretary for Health, *Valerie Huber*,
https://www.hhs.gov/ash/about-ash/leadership/valerie-huber/index.html ........................14

Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy
Prevention Funding*, CNN (Aug. 17, 2017 8:58 am),
https://www.cnn.com/2017/08/17/health/teen-pregnancy-prevention-programs-
funding/index.html ................................................................................16, 27, 32

Valerie Huber, *$1 Billion on Sex Ed—Is it Promoting Sex or Health?*, The Hill
(Apr. 3, 2017), http://thehill.com/blogs/pundits-blog/healthcare/327031-1-billion-
on-sex-ed-is-it-promoting-sex-or-health ..............................................................14

Evelyn M. Kappeler, *Historical Context for the Creation of the Office of Adolescent
Health and the Teen Pregnancy Prevention Program*, 54 J. Adolescent Health S3
(2014), http://www.jahonline.org/article/S1054-139X(13)00778-7/pdf ........................3, 7

Jane Kay, *Trump Administration Suddenly Pulls Plug on Teen Pregnancy Programs*,
Reveal (July 14, 2017), https://www.revealnews.org/article/trump-administration-
suddenly-pulls-plug-on-teen-pregnancy-programs/ ....................................15, 32

Letter from members of the United States House of Representatives to Secretary Price
(July 25, 2017), https://teddeutch.house.gov/uploadedfiles/final.house.
tppp_letter.pdf ...................................................................................................16

Letter from members of the United States Senate to Secretary Price (July 21, 2017),
https://www.help.senate.gov/imo/media/doc/071817%20Teen%20Pregnancy
%20Program%20letter%20FINAL.pdf ....................................................................16, 40

Letter from members of the United States Senate to Acting Secretary Hargan
(Nov. 29, 2017), https://www.help.senate.gov/imo/media/doc/20171129_
TPPP%20letter.pdf.................................................................................................16

Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls
Funding*, Wired (July 19, 2017 7:00 am), https://www.wired.com/story/teen-
pregnancy-researchers-regroup-after-trumps-hhs-pulls-funding/..........................15, 27, 32

OAH, *Digital Town Hall on Preventing Teen Pregnancy* (May 11, 2016),
https://www.hhs.gov/ash/oah/sites/default/files/digital-town-hall-webinar.PDF..............12

OAH, *Evidence-Based Teen Pregnancy Prevention Program at a Glance*
(updated July 2017), https://www.hhs.gov/ash/oah/sites/default/files/ebp-
chart1.pdf ..............................................................................................................7

OAH, *Guidance for Preparing a Non-Competing Continuation Grant Application*
(Nov. 2016), https://www.hhs.gov/ash/oah/sites/default/files/noncompete-
grantapp-2016.pdf..............................................................................................37, 38

OAH Press Release, *HHS Awards Teen Pregnancy Prevention Program Grants*
(July 6, 2015), https://wayback.archive-it.org/3926/20170128061559/
https://www.hhs.gov/about/news/2015/07/06/hhs-awards-teen-pregnancy-
prevention-program-grants ...................................................................................11, 12

OAH, *SC Campaign Grantee Details*,
https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-
program-tpp/current-grantees/south-carolina-campaign-to-prevent-teen-
pregnancy-1b/index.html ......................................................................................21

OAH, *Teen Pregnancy Prevention Replication Study*,
https://www.hhs.gov/ash/oah/evaluation-and-research/federal-led-
evaluation/teen-pregnancy-prevention-program-replication-study/index.html.............9, 28

OAH, *TPP Program Grantees (FY2010-2014)*,
https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-
program-tpp/about/tpp-cohort-1/index.html .............................................................4, 8, 9

OAH, *TPP Successful Strategies*,
https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-
program-tpp/successful-strategies/index.html. ........................................................10, 28

Sarah E. Oberlander & Lisa C. Trivits, *Building the Evidence to Prevent Adolescent
Pregnancy: Contents of the Volume*, 106 Am. J. Pub. Health S1 (Sept. 2016)..................3

Suzanne Perry, *Teen Pregnancy Prevention Program Findings Show Benefits,
Challenges of Evidence-Based Programming*, Social Innovation Research
Center (Sept. 22, 2016), http://ajph.aphapublications.org/doi/pdf/10.2105/
AJPH.2016.303442 ..........................................................................................................10

Carmen Solomon-Fears, Cong. Research Serv., R40618, *Teenage Pregnancy Prevention:
Background and Proposals in the 111th Congress* (June 2, 2009), *available at*
https://www.everycrsreport.com/files/20090602_R40618_e3d89f5b8d8a74d2
ef0e178b4a69abf8c8051e81.pdf ........................................................................................3

Carmen Solomon-Fears, Cong. Research Serv., RS20301, *Teenage Pregnancy
Prevention: Statistics & Programs* (Jan. 15, 2016), *available at*
https://fas.org/sgp/crs/misc/RS20301.pdf ..................................................................5, 6, 7

U.S. Gov't Accountability Office Report, GAO-16-818, *Tiered Evidence Grants*
(Sept. 2016), https://www.gao.gov/assets/680/679917.pdf ................................7, 9, 10, 28

Daniel Stid et al., *What Does it Take to Implement Evidence-Based Practices? A Teen
Pregnancy Prevention Program Shows the Way*, The Bridgespan Group
(Nov. 2013), https://www.bridgespan.org/bridgespan-files/e7/e77db957-54cc-
46d9-879e-7b63f5ad48d5.pdf........................................................................................8, 39

White House, FY 2019 Budget of the U.S. Government,
https://www.whitehouse.gov/wp-content/uploads/2018/02/budget-fy2019.pdf...............32

## INTRODUCTION

The Teen Pregnancy Prevention Program (TPPP) is a congressionally mandated program that funds evidence-based interventions to prevent teen pregnancy. Plaintiffs are among the recipients of 81 five-year TPPP grants awarded in 2015 by the Department of Health and Human Services (HHS) that were awarded to continue through June 2020. In May 2017, HHS announced that its intent was to terminate the TPPP in the next fiscal year and sought no funding for the program in its 2018 budget request to Congress. HHS then informed the 81 grantees that their grants would be terminated at the end of the third year, on June 30, 2018—two years ahead of schedule. Despite HHS's request to zero-out funding for the TPPP, Congress has not cancelled the program, which continues to be funded into the fourth grant year.

HHS's failure to provide a reasoned basis for terminating plaintiffs' grants and its termination of the grants in a manner contrary to HHS regulations constitute final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act (APA). Moreover, HHS's termination of the TPPP grants despite continued appropriations constitutes agency action not in accordance with law and unlawfully withheld, in violation of the Continuing Appropriations Act, 2018, the Impoundment Control Act, and the Anti-Deficiency Act.

Plaintiffs accordingly seek a preliminary injunction enjoining HHS to continue the TPPP, including by accepting and processing plaintiffs' non-competing continuation applications, to the same extent and in the same manner as previously. Plaintiffs are carrying out evidence-based pregnancy prevention programs and are engaged in empirical research of new and innovative pregnancy prevention programs. Without expedited judicial intervention, plaintiffs' grants will terminate prematurely on June 30, 2018, causing substantial harm to plaintiffs' programs and the communities they serve, and rendering their research incomplete and largely ineffectual. Further,

the continuation of plaintiffs' grants is contingent on plaintiffs' submission and HHS's processing of non-competing continuation applications, which in prior years HHS has required them to submit by April 4. Because HHS has unlawfully terminated plaintiffs' grants, HHS is not currently soliciting continuation applications. Absent HHS's acceptance and processing of plaintiffs' non-competing continuation applications during the pendency of this litigation, and continuing administration of the TPPP grants, plaintiffs face a significant risk of irreparable harm.

Plaintiffs also request expedited consideration of their summary judgment motion because a decision by this Court on a regular schedule will likely come too late to afford plaintiffs effective relief. Plaintiffs' ability to operate their programs is impeded by uncertainty about whether the programs will exist beyond June 30, 2018, and plaintiffs are making operational and staffing decisions in the near future that will shortly become irreversible. Further, plaintiffs cannot make staffing decisions, formulate work plans, or decide whether to expend funds on their projects when those decisions would inherently be tentative and subject to reversal (and potential recoupment) until final judgment.

## STATEMENT OF FACTS[1]

### I.    Congress's creation and funding of the Teen Pregnancy Prevention Program

In 2009, alarmed that teenage birth rates had begun to rise after years of decline, Congress mandated the creation of the TPPP, an evidence-based initiative to reduce teen

---

[1] Plaintiffs allege unlawful agency action in violation of the APA. *See* Compl. pp. 20-23. Pursuant to Local Rule 7(h)(2), plaintiffs' memorandum in support of their combined motion for a preliminary injunction and for expedited summary judgment includes this statement of facts with specific references to the administrative record—the information that was "before the agency at the time the decision was made," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotation marks and citation omitted)—as well as background information about the TPPP and the events surrounding the termination of plaintiffs' grants.

pregnancy. *See* H.R. Rep. No. 111-366, at 1042-43 (2009) (Conf. Rep.); H.R. Rep. No. 111-220, at 176 (2009); S. Rep. No. 111-66, at 160 (2009). The TPPP was a major shift away from the abstinence-only approach to pregnancy prevention that had been federal policy for decades and towards an evidence-based approach focused on funding programs that could demonstrate success, regardless of methodology. *See* Carmen Solomon-Fears, Cong. Research Serv., R40618, *Teenage Pregnancy Prevention: Background and Proposals in the 111th Congress* 1, 8-10 (June 2, 2009), *available at* https://www.everycrsreport.com/files/20090602_R40618_e3d89f 5b8d8a74d2ef0e178b4a69abf8c8051e81.pdf.

The goal of the program is to "maximize the impact of federal dollars by funding programs that have demonstrated evidence of effectiveness, while also funding and evaluating new programs to continue building the evidence base." Sarah E. Oberlander & Lisa C. Trivits, *Building the Evidence to Prevent Adolescent Pregnancy: Contents of the Volume*, 106 Am. J. Pub. Health S1, S6 (Sept. 2016) (Sherman Decl. Ex. A); *see* Evelyn M. Kappeler, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. Adolescent Health S3 (2014) (noting that the program is a part of "what many consider the greatest opportunity for rigorous evidence to shape social policy in the history of the U.S. government.") (Sherman Decl. Ex. B).[2]

Congress initiated the program through the Consolidated Appropriations Act, 2010, which appropriated $110 million to HHS for the TPPP for fiscal year 2010 and mandated that the funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal

---

[2] For the Court's convenience, URLs for exhibits available online are included in the table of authorities, as well as in the Sherman Declaration.

costs associated with administering and evaluating such contracts and grants." Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). Congress directed HHS to spend the appropriated funds across two "tiers" of grants:

- **Tier 1:** Congress mandated that "not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." *Id.*

- **Tier 2:** Congress mandated that "not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.*

Congress further specified that "any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities," and that "$4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches." *Id.*

As suggested by the description of Tiers 1 and 2, a key aspect of the TPPP is rigorous evaluation of the funded programs to determine whether they are effective. The two-tiered approach allows experimentation with innovative programs to prevent teen pregnancy (Tier 2) and replication of those programs that proved to be effective (Tier 1), along with continuing evaluation of Tier 1 programs to confirm the existing evidence. *See* OAH, *TPP Program Grantees (FY2010-2014)* (Sherman Decl. Ex. C).

Congress specified that the TPPP would be administered within HHS's Office of the Assistant Secretary of Health by the newly funded Office of Adolescent Health (OAH). H.R. Rep. No. 111-366, at 1043 (2009) (Conf. Rep.) (adopting Senate position explained in S. Rep. No. 111-66, at 160 (2009)). OAH is responsible for implementing and administering the program and coordinates its efforts with the Administration for Children and Families, Centers

for Disease Control and Prevention, and other appropriate HHS offices and operating divisions.
*Id.*

Each year since the program's inception, Congress has mandated the continuation of the TPPP and has appropriated funds to HHS to administer the program for each fiscal year using similar appropriations language. For fiscal years 2014–2017, Congress each year appropriated $101 million in grant funding and an additional $6.8 million to fund evaluations.[3] In 2017, as before, Congress directed the appropriated funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants." Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536. Congress further directed that, of that amount, "not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.*

In the Continuing Appropriations Act, 2018, Congress appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable

---

[3] *See* Carmen Solomon-Fears, Cong. Research Serv., RS20301, *Teenage Pregnancy Prevention: Statistics & Programs* 23-24 (Jan. 15, 2016), *available at* https://fas.org/sgp/crs/misc/RS20301.pdf (chart showing annual funding); *see also* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536.

appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017." Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017 (Continuing Appropriations Act, 2018), Pub. L. No. 115-56, 131 Stat. 1129, 1139-40. Congress mandated that such appropriations "shall be available to the extent and in the manner that would be provided by the [Consolidated Appropriations Act, 2017]." *Id.* Several subsequent acts have amended the Continuing Appropriations Act, 2018, to extend appropriations at existing levels through March 23, 2018.[4] Thus, the Continuing Appropriations Act, 2018, and subsequent acts amending it, provide HHS with 173 days of funding for the TPPP grants. Because the notices of award provide for HHS to fund the TPPP grants through five "budget periods" that begin on July 1 of each year of the five-year grant, *see infra* pp. 11-13, the Act has appropriated to HHS TPPP funding through December 21, 2018.

## II.    HHS's administration of the TPPP from 2010 through 2016

Consistent with Congress's mandate and appropriations, in 2010, HHS, through OAH, prepared to provide $75 million in funding to Tier 1 programs that aim to replicate evidence-based programs and $25 million to Tier 2 programs that aim to develop new and innovative evidence-based programs. Prior to awarding the first Tier 1 grants replicating evidence-based programs, HHS undertook an intensive evidence review process to identify programs that had documented positive impacts on teen pregnancy prevention, and would thus be eligible for TPPP

---

[4] *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123; Federal Register Printing Savings Act of 2017, Pub. L. No. 115-120; An Act to Amend the Homeland Security Act of 2002 to require the Secretary of Homeland Security to issue Department of Homeland Security-wide guidance and develop training programs as part of the Department of Homeland Security Blue Campaign, and for other purposes, Pub. L. No. 115-96 (2017); Making Further Continuing Appropriations for Fiscal Year 2018, and for other purposes, Pub. L. No. 115-90 (2017).

funding. *See* Solomon-Fears, *Teenage Pregnancy Prevention: Statistics & Programs*, *supra*, at 12 n.52. Under a contract with HHS, Mathematica Policy Research conducted an independent, systematic review of the evidence base on teen pregnancy, sexually transmitted infections, and sexual risk behaviors. *See id.* This review defined the criteria for the quality of an evaluation study and the strength of evidence for a particular intervention. *See id.* Based on these criteria, HHS defined a set of rigorous standards for a program to be considered "effective based on rigorous evaluation." *Id.*; *see generally* HHS, *About the Review*, *Teen Pregnancy Prevention Evidence Review*, https://tppevidencereview.aspe.hhs.gov/ReviewProtocol.aspx (last visited Feb. 8, 2018); Kappeler, *supra*, at S5 (Sherman Decl. Ex. B).

Based on the review, HHS compiled a list of evidence-based program models that met those standards. *See* Solomon-Fears, *Teenage Pregnancy Prevention: Statistics & Programs*, *supra*, at 12 n.52; Kappeler, *supra*, at S5 (Sherman Decl. Ex. B). The list included programs that use a number of approaches—sexual health education, youth development, abstinence-based, and programs for delivery in clinical settings and for special populations. *See* OAH, *Evidence-Based Teen Pregnancy Prevention Program at a Glance* (updated July 2017) (Sherman Decl. Ex. D).

### A.  The first cohort of TPPP grants: 2010–2015

In 2010 and again in 2015, HHS awarded grants to Tier 1 and Tier 2 programs for five-year project periods. In April 2010, HHS, through OAH, issued two separate Funding Opportunity Announcements (FOAs) for Tier 1 and Tier 2 cooperative agreements. *See* 2010 Tier 1 FOA (Sherman Decl. Ex. E); 2010 Tier 2 FOA (Sherman Decl. Ex. F). A cooperative agreement is an award instrument with substantial collaboration between the awarding agency and the recipient. *See, e.g.*, 2010 Tier 1 FOA, at 13 (Sherman Decl. Ex. E). OAH chose to use

cooperative agreements to provide for close collaboration with recipients, ensure adherence to project aims, enable review and approval of curricula and educational materials, and assist with ongoing technical assistance and troubleshooting. *See* Kappeler, *supra*, at S4 (Sherman Decl. Ex. B); U.S. Gov't Accountability Office, GAO-16-818, *Tiered Evidence Grants* 28 (Sept. 2016), https://www.gao.gov/assets/680/679917.pdf. In this first cohort of grants, awarded for the five-year project period from September 2010 to August 2015, OAH funded 102 projects that reached approximately half a million youth, trained more than 6,800 professionals, and established partnerships with over 3,800 community-based organizations across the United States. *See* OAH, *TPP Program Grantees (FY2010-2014)* (Sherman Decl. Ex. C).

A critical aspect of the rigorous evidence-based replication programming embodied in the TPPP model is continued learning and adaptation from both "positive" and "negative" results. *See* Amy Feldman Farb & Amy L. Margolis, *The Teen Pregnancy Prevention Program (2010-2015): Synthesis of Impact Findings*, 106 Am. J. Pub. Health S9, S14 (Sept. 2016) (Sherman Decl. Ex. G). "Positive findings from a single study does not indicate 'it works,' just as null findings from a single study should not be interpreted as 'it doesn't work.' Each study is another critical piece of evidence adding to the body of evidence to be considered when making decisions about which programs to implement where." *Id.* Positive results confirm what researchers believe they already know, and negative results, while never desirable, are indispensable to the development of an understanding of what programs can reduce teen pregnancy. *See id.* at S14 ("Null and negative findings, most importantly in replication studies, are extremely important to report and publish."). Notably, the TPPP has been recognized as an outstanding example of how to build evidence and administer a high quality evidence-based program. *See* Comm'n on Evidence-Based Policymaking, *Final Report: The Promise of*

8

*Evidence-Based Policymaking* 94 (Sept. 7, 2017), https://www.cep.gov/content/dam/cep /report/cep-final-report.pdf; Daniel Stid et al., *What Does it Take to Implement Evidence-Based Practices? A Teen Pregnancy Prevention Program Shows the Way*, The Bridgespan Group (Nov. 2013) (Sherman Decl. Ex. H).

Accordingly, as part of the evaluation of the first cohort of grants, HHS funded 41 independent evaluation studies to assess where, when, and with whom programs are most effective. *See* OAH, *TPP Program Grantees (FY2010-2014)* (Sherman Decl. Ex. C). Of the 41 programs evaluated, HHS found four of the Tier 1 evidence-based programs to be effective in changing behavior when they were applied in new settings or with new populations, and many more programs reported changing participants' knowledge, attitudes, and intentions to avoid risky behaviors. *See id.* HHS also found that eight of the Tier 2 new and innovative programs showed an impact on behaviors that prevent teen pregnancy and met the criteria to be considered an HHS evidence-based program in the future, including Positive Prevention PLUS, one of the programs implemented by plaintiff Project Vida Health Center. *See id.*; *see infra* p. 19. The ratio of evaluations that produced positive results exceeded what experts typically expect from rigorous replications of social programs. *See* Farb & Margolis, *supra*, at S13 (Sherman Decl. Ex. G); Robert Gordon & Ron Haskins, *Trump Team Doesn't Understand Evidence-Based Policies Regarding Social Problems*, Brookings (Aug. 10, 2017) (Sherman Decl. Ex. I).

In addition, HHS conducted its own complementary evaluation activities. One of the federal evaluation studies, the TPPP Replication Study, examined whether program models that were commonly chosen by TPPP grantees and widely used in the field could achieve impacts with different populations and settings. *See* OAH, *Teen Pregnancy Prevention Replication Study* (Sherman Decl. Ex. J). Of particular relevance here, interim findings released in 2016 concluded

that a program called Reducing the Risk is effective at changing attitudes toward contraception. *See id.*; *see also* GAO-16-818, *supra*, at 11. Reducing the Risk is among the evidence-based programs that plaintiff SC Campaign is implementing through its TPPP grant. *See infra* p. 21.

Based on the first round of evaluation results, OAH encouraged grantees to shift to the models shown to be more effective in the first cohort, and added several innovative Tier 2 programs shown to be effective to Tier 1 to allow for replication and further evaluation. *See* OAH, *TPP Successful Strategies* (Sherman Decl. Ex. K); Suzanne Perry, *Teen Pregnancy Prevention Program Findings Show Benefits, Challenges of Evidence-Based Programming*, Social Innovation Research Ctr. (Sept. 22, 2016) (Sherman Decl. Ex. L); *see* GAO-16-818, *supra*, at 26 n.34. Thus, the models that current grantees are implementing are different and stronger than the mix of models used in the first cohort.

### B. The second cohort of TPPP grants: 2015–2020

In early 2015, HHS, through OAH, issued FOAs for a second cohort of five-year cooperative agreements, this time further specializing the FOAs within the two tiers.[5] As mandated by Congress, the Tier 1 FOAs sought applicants for grants to replicate evidence-based programs that HHS previously determined had been proven effective and the Tier 2 FOAs sought applicants for grants to develop, replicate, refine, and test additional models and innovative strategies for preventing  teenage pregnancy:

- **Tier 1A – Capacity Building to Support Replication of Evidence-Based Teen Pregnancy Prevention Programs**: "The goal of this FOA is to fund intermediary organizations to provide capacity building assistance (CBA) to at least 3 youth-

---

[5] As of February 21, 2018, the four 2015 FOAs were available on OAH's website. *See* https://www.hhs.gov/ash/oah/grant-programs/funding-opportunities/index.html.    Relevant portions of these lengthy FOAs have been provided as exhibits to the attached Declaration of Sean M. Sherman. *See* Tier 1A FOA (Sherman Decl. Ex. M); Tier 1B FOA (Sherman Decl. Ex. N); Tier 2A FOA (Sherman Decl. Ex. O); Tier 2B FOA (Sherman Decl. Ex. P).

serving organizations to replicate evidence-based TPP programs in a defined service area with demonstrated need." Tier 1A FOA, at 3-4 (Sherman Decl. Ex. M).

- **Tier 1B – Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need**: "The goal of this FOA is to have a significant impact on reducing rates of teen pregnancy and existing disparities by replicating evidence-based TPP programs to scale in at least 3 settings in communities and with populations at greatest need." Tier 1B FOA, at 3 (Sherman Decl. Ex. N).

- **Tier 2A – Supporting New or Innovative Approaches**: "The overall goal of this FOA … is to enable and support early innovation to advance adolescent health and prevent teen pregnancy." Tier 2A FOA, at 4 (Sherman Decl. Ex. O).

- **Tier 2B – Rigorous Evaluation of New or Innovative Approaches**: "The purpose of this FOA is to increase the number of evidence-based TPP interventions available by rigorously evaluating new or innovative approaches for preventing teen pregnancy and related high-risk behaviors." Tier 2B FOA, at 3 (Sherman Decl. Ex. P).

Like the first cohort, the FOAs provided that the five-year project periods for the grants would be funded in annual increments (budget periods), and that funding for all budget periods beyond the first year of the grant would be "contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of Federal funds." *See, e.g.*, Tier 1B FOA, at 39 (Sherman Decl. Ex. N); *see also* 2010 Tier 1 FOA, *supra*, at 13 (Sherman Decl. Ex. E). The FOAs further provided that grantees would be required to submit non-competing applications in each year of the approved project period providing progress reports for the current budget period, work plans, budgets, and budget justifications for the upcoming budget period. *See, e.g.*, Tier 1B FOA, at 83 (Sherman Decl. Ex. N).

In July 2015, after reviewing nearly 500 applications, HHS awarded 81 five-year grants to fund Tier 1 and Tier 2 projects. OAH Press Release, *HHS Awards Teen Pregnancy Prevention*

*Program Grants* (July 6, 2015) (Sherman Decl. Ex. Q).[6] Combined, the chosen programs were designed to serve more than 1.2 million youth across 39 states over the five-year grant period. *See* OAH, *Digital Town Hall on Preventing Teen Pregnancy* (May 11, 2016), https://www.hhs.gov/ash/oah/sites/default/files/digital-town-hall-webinar.PDF. HHS awarded eight Tier 1A grants to help communities build capacity to implement and evaluate programs for populations with teen birth rates well above the national average and with organizations serving youth in juvenile detention and foster care or who are homeless or young parents. *See* OAH Press Release, *supra* (Sherman Decl. Ex. Q). It awarded fifty Tier 1B grants to replicate evidence-based programs in multiple settings in communities where teen birth rates are significantly higher than the national average. *See id.* The approved programs operate in a variety of settings, including schools, clinics, and community-based settings in both urban and rural areas, and with the objective of reaching especially vulnerable youth, including youth in foster care, youth in juvenile detention, expectant and parenting teens, and older youth. *See id.* The programs are designed to provide medically accurate, age appropriate, evidence-based programs to the youth in the communities where the programs operate. *See id.*

Two organizations received Tier 2A grants to support early innovation to prevent teen pregnancy, with one focused on technology-based innovations and one focused on program innovations. *See id.* Each grantee would hold a national competition to select between five to fifteen innovators who would receive funding to develop, test, and refine innovative products,

---

[6] In addition to these 81 grants, OAH in October 2015 awarded three additional grants under Tier 2C: "New Approaches for Young Males." For this reason, HHS documents and articles sometimes refer to 84 grants in the second cohort, rather than 81. Because plaintiffs received their grants from the original 81, and the Tier 2C grantees were on a slightly different schedule, plaintiffs generally refer in this memorandum to 81 grants when describing the TPPP grants awarded in 2015.

programs, and/or processes to advance adolescent health and prevent teen pregnancy. *See id.* Twenty-one organizations received Tier 2B grants to rigorously evaluate new or innovative approaches for preventing teen pregnancy and related risk behaviors, focusing especially on developing interventions that will fill gaps in the existing evidence and work to reduce disparities. *See id.*

As stated in the FOAs, the initial notices of award for the second cohort of grantees stated that the "project period" for each of the grants was five years, from July 1, 2015, through June 30, 2020. *See, e.g.* Jenner Decl. Exs. A, B; *see also, e.g.*, Tier 1B FOA, at 38 (Sherman Decl. Ex. N). Within the project period, the grants are funded in annual "budget periods," running from July 1 to June 30 of the following year. *See, e.g.*, Tier 1B FOA, at 39 (Sherman Decl. Ex. N). The budget periods for TPPP grants are not aligned with the federal fiscal year. *See* 2 U.S.C. § 631. Thus, the appropriation for HHS's fiscal year, which begins annually on October 1, funds TPPP grants for budget periods that begin annually on July 1 of the following calendar year.

Here, consistent with the FOAs, the first notice of award to each plaintiff stated that the "project period" would run from July 1, 2015 through June 30, 2020, and the notice provided the funding for the budget period from July 1, 2015, through June 30, 2016. *See, e.g.* Jenner Decl. ¶ 9, Exs. A-B; Baird Decl. ¶ 8, Ex. A; Schlesinger Decl. ¶ 5, Ex. A. The second notice of award was for the budget period from July 1, 2016, through June 30, 2017. *See, e.g.* Jenner Decl. ¶ 10, Exs. C-D; Baird Decl. ¶ 9, Ex. B. Like the 2015 notice, the 2016 notice of award stated that the project period was through June 30, 2020. Jenner Decl. ¶ 10, Exs. C-D; Baird Decl. ¶ 9; Schlesinger Decl. ¶ 6, Ex. B.

### III.    HHS's decision to terminate the TPPP and all TPPP grants

On May 5, 2017, the President signed the Consolidated Appropriations Act, 2017, which, as described above, fully funded the TPPP grants for the third budget period, running from July 1, 2017, to June 30, 2018. *See supra* p. 5. Later that month, as part of the annual budgeting process, HHS submitted its budget request to Congress for fiscal year 2018. In that request, HHS stated that "[t]he FY 2018 President's Budget does not request funds for this [TPPP] program" and "HHS will not make amounts available for Teenage Pregnancy Prevention activities in FY 2018." HHS Justification of Estimates for Appropriations Committee for FY 2018, *General Departmental Management* (May 2017), at 15 (Sherman Decl. Ex. R). The request summarized the decision as follows: "The FY 2018 President's Budget request is $0.00, a decrease of $100,808,000 from [] FY 2017 …. The Budget eliminates the TPP program. The teenage pregnancy rate has declined significantly over recent years, but it does not appear this program has been a major driver in that reduction." *Id.* at 91.

On June 5, 2017, Valerie Huber was appointed chief of staff to the Assistant Secretary for Health, who oversees the OAH, and, in turn, the TPPP. *See* HHS, Office of the Assistant Secretary for Health, *Valerie Huber* (Sherman Decl. Ex. S).[7] From 2007 until her appointment to HHS, Huber served as president and CEO for Ascend, formerly known as the National Abstinence Education Association. *See id.* She previously served as abstinence education coordinator for the state of Ohio. *See id.* In April 2017, Huber wrote an editorial arguing that the

---

[7] In January 2018, Huber was appointed acting deputy assistant secretary for the HHS Office of Population Affairs, which does not oversee the TPPP. *See* Paige Winfield Cunningham & Juliet Eilperin, *Antiabortion activist abruptly steps down as head of HHS's family planning division*, Wash. Post (Jan. 13, 2018), https://www.washingtonpost.com/news/powerpost/wp/2018/01/12/antiabortion-activist-to-step-down-as-head-of-hhss-family-planning-division/?utm_term=.5b4a30306275.

TPPP was a failure that wasted taxpayer money while promoting teenage sex. *See* Valerie Huber, *$1 Billion on Sex Ed—Is it Promoting Sex or Health?*, The Hill (Apr. 3, 2017) (Sherman Decl. Ex. T). In May 2017, after the administration released its proposed budget, Ascend issued a press release calling TPPP "an approach that typically normalizes teen sex and which government research revealed was an abject failure," and quoted Huber as praising the President's request that Congress maintain funding for abstinence education while terminating the TPPP. *See* Ascend Press Release, *President Trump's Budget Supports Sexual Risk Avoidance (SRA) Education* (May 30, 2017) (Sherman Decl. Ex. U).

In early July 2017, the Tier 1 and Tier 2 grantees received their notices of award for their third budget periods. In a sentence, the notices informed the grantees that their TPPP project periods would terminate two years early, on June 30, 2018: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year." Jenner Decl. ¶ 16, Ex. J, K; Schlesinger Decl. ¶ 11, Ex. F; Baird Decl. ¶ 14, Ex. E; De Santis Decl. ¶ 16, Exs. I, J.

Several reports indicated that the decision to terminate the TPPP was made by HHS leadership in the Office of the Assistant Secretary for Health. One report stated that, when a grantee contacted OAH about the early termination, staff in the OAH "were extremely shocked and still trying to find out who made the decision and how this came about." Jane Kay, *Trump Administration Suddenly Pulls Plug on Teen Pregnancy Programs*, Reveal (July 14, 2017) (Sherman Decl. Ex. V). Similarly, in a phone call with a member of OAH staff after the termination decision was made, the staff member told staff at plaintiff Project Vida Health Center that HHS leadership had terminated the grant because they did not believe that the TPPP met the vision of the new administration. *See* Zuniga Decl. ¶ 3.

On July 17, 2017, a spokesperson for the Office of the Assistant Secretary for Health confirmed in an email to a reporter that HHS was terminating the TPPP grants based on a policy preference to eliminate the program: "[T]he President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout." Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding*, Wired (July 19, 2017 7:00 am) (Sherman Decl. Ex. W). On August 17, 2017, HHS released a statement to CNN stating, "The poor evaluation results [from the first cohort of grants] were the reason that the Trump Administration, in its FY 2018 budget proposal, did not recommend continued funding for the TPP program and HHS hit the pause button on it." Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN (Aug. 17, 2017 8:58 am) (Sherman Decl. Ex. X).

In late July 2017, 148 members of the House and thirty-four Senators sent letters to then-Secretary Price inquiring into HHS's decision to terminate all of the TPPP grants despite ongoing congressional funding for the program. *See* Letter from members of the United States Senate to Secretary Price (July 21, 2017) (Sherman Decl. Ex. Y); Letter from members of the United States House of Representatives to Secretary Price (July 25, 2017) (Sherman Decl. Ex. Z). After the Department provided an incomplete response, 27 Senators wrote again to Acting Secretary Hargan to express their concerns. *See* Letter from members of the United States Senate to Acting Secretary Hargan (Nov. 29, 2017) (Sherman Decl. Ex. AA).

As described above, Congress, through the Continuing Appropriations Act, 2018, and subsequent acts amending it, so far has appropriated funds for the TPPP for 173 days into the fourth budget period. *See supra* pp. 5-6.

**IV.    The effects of the early termination of plaintiffs' TPPP grants on plaintiffs and their respective communities**

Plaintiffs are among the recipients of Tier 1A, 1B, and 2B five-year TPPP grants, and each is implementing or evaluating evidence-based programs designed to reduce teen pregnancy. Plaintiffs have each complied with TPPP requirements throughout the project period. Jenner Decl. ¶ 11; Schlesinger Decl. ¶ 7; Baird Decl. ¶ 10; De Santis Decl. ¶ 11. Consistent with program requirements, each year, plaintiffs implemented their programs, submitted the required reports, and completed non-competing continuation applications for the next budget period. Schlesinger Decl. ¶ 7; Baird Decl. ¶ 10; Jenner Decl. ¶ 11; De Santis Decl. ¶ 11. Through the present, OAH's reviews of plaintiffs' progress reports and continuation applications have included many commendations for their work. Jenner Decl. ¶ 12, Exs. E-H; Schlesinger Decl. ¶ 8, Exs. C-E; Baird Decl. ¶ 11, Exs. C-D; De Santis Decl. ¶ 12, Exs. E-H. For example, in response to PRG's annual progress report for 2016 with respect to PS-R, HHS's generally positive feedback concluded with a strong endorsement of PRG's work: "Congratulations again on a successful first grant year. Thank you for all that you and your team do to improve the lives of adolescents." Jenner Decl. Ex. G. Similarly, HHS's response to PVHC's year-end progress report for its second grant year included several commendations, and congratulated PVHC on the "huge accomplishment" of getting certified as a leader in LGBT healthcare, noting that PVHC has "taken inclusivity incredibly serious[ly] and has implemented it not only as part of their TPP programming but has integrated it within their organizational culture." Schlesinger Decl. Ex. E.

To the extent the reviews included recommendations for improvements moving forward, plaintiffs incorporated the recommendations into their programs. *See* Jenner Decl. ¶ 12; Baird Decl. ¶ 11; Schlesinger Decl. ¶ 8; De Santis Decl. ¶ 12. Aside from a statement by OAH staff to Project Vida Health Center in a telephone call, *see* Zuniga Decl. ¶ 3, no plaintiff was given an

17

explanation for the termination of its grant(s), *see* Jenner Decl. ¶ 17; Baird Decl. ¶ 17; Schlesinger Decl. ¶ 13; De Santis Decl. ¶ 18. None of the plaintiffs have been able to obtain alternative sources of funding to offset the loss of funding from the TPPP grants. *See* Jenner Decl. ¶ 21; Schlesinger Decl. ¶ 16; Baird Decl. ¶ 20; De Santis Decl. ¶ 21. Each of the plaintiffs must make programmatic decisions in the near future, before June 30, 2018, that depend on continuation of their grants past June 30, 2018. *See* Jenner Decl. ¶¶ 24-25; Baird Decl. ¶¶ 21-23; Schlesinger Decl. ¶¶ 18-22; De Santis Decl. ¶¶ 22-27.

**Policy and Research, LLC**, which operates under the name the Policy & Research Group (PRG), is a New Orleans-based research organization. PRG is the recipient of two five-year Tier 2B TPPP grants for $934,643 and $808,286, annually, to implement and conduct high-quality rigorous evaluations of two new and innovative pregnancy prevention programs, called Plan A and Practice Self-Regulation (PS-R). Jenner Decl. ¶¶ 1-2, 5. Plan A is a brief stand-alone sexual health video designed for African-American and Latina women age 18-19 seeking care at reproductive health clinics. *Id.* ¶ 6. PS-R is designed for youth age 14-19 who have experienced trauma and are receiving outpatient counseling services. *Id.* ¶ 7. PS-R is composed of ten structured, one-on-one therapy-education sessions delivered by a therapist over a 16-week period. *Id.* The two interventions, if found to be effective, could fill important gaps in current TPPP programming—a low-resource, brief intervention for older teens, 18-19 year old Latina and African American women, and an in-depth therapeutic intervention for youth who have experienced trauma to understand how that trauma influences their sexual health decision making. *Id.* ¶ 26.

PRG is in the middle of two five-year individual randomized controlled trials for Plan A and PS-R. *Id.* ¶ 22. For both studies, sample enrollment and baseline data collection began in

June 2016 and sample enrollment was designed to end in October 2018. *Id.* Without additional funding, PRG will need to stop enrolling participants in its studies in April 2018, to allow sufficient time for the first-round of follow-up data to be collected prior to the end of the grant. *Id.* ¶ 24. The remaining years of the grants were designed to collect follow-up data from participants, conduct implementation and impact evaluation analysis, reporting, and dissemination efforts, and finalize a complete electronic package of the implementation-ready interventions. *Id.* ¶ 22. The termination of PRG's grants will render the past three years of its work largely useless, with insufficient sample size and incomplete follow-up data. *Id.* ¶ 23. PRG's fifth year was designated for finalizing and analyzing the data collected over grant years two through four. *Id.* Without funding for years four and five, PRG will not have sufficient data to conduct impact evaluations of the interventions studied, and will lack the resources to conduct follow-up, data analysis, and evaluations. *Id.* If funding is discontinued, PRG will also need to eliminate ten study-funded positions. *Id.* ¶ 25.

By April 1, 2018, PRG will need to begin to close-down the study, end contracts with over 100 implementation sites, let staff go, and work with the Institutional Review Board to notify the 1,363 study participants of the early end to the study. *Id.* ¶ 24.

**Project Vida Health Center (PVHC).** PVHC, a federally qualified health center located in Texas, works to "[f]oster fully integrated primary and preventive care that is culturally and personally welcoming, evidence based, and patient empowering." Schlesinger Decl. ¶ 2. PVHC is the recipient of a five-year Tier 1B TPPP grant for $796,297, annually. *Id.* ¶ 3. It uses the grant to implement three evidence-based teen pregnancy prevention programs—Making a Difference!, Positive Prevention PLUS: Sexual Health Education, and Teen Health Project—in middle schools, high schools, communities, and faith settings. *Id.* PVHC's programs reach 1,600 youth

annually in two communities (Socorro and Montana Vista) in southeast El Paso County. *Id.* The communities have high teen birth rates and are predominately rural, Hispanic, and lacking in resources. *Id.* The focus of the three programs is creating a culture that supports healthy behavior, positive life decisions, and educational success. *Id.*

PVHC had planned in year four to expand its program to additional campuses and to focus on program sustainability in the program communities after the conclusion of the fifth grant year. *See id.* ¶ 17. The termination of PVHC's TPPP grant will force it to abandon the planned expansion and to reduce staff. *See id.* ¶¶ 17, 22. PVHC is focusing on keeping the program sustainable in the area currently offered, but the shorter project period makes that difficult. *See id.* ¶¶ 17-18.

HHS's early termination of the TPPP grant has forced PVHC to begin downsizing and sun-setting its community mobilization efforts. *See id.* ¶ 19.  Further, because PVHC's partner schools solidify their fall programming schedules in the spring, PVHC must know within the next two months whether its TPPP grants will continue in order to have its programs in the schools in the fall. *See id.* ¶ 21.

**SHIFT NC (Sexual Health Initiatives For Teens North Carolina).** SHIFT NC's mission is to "lead North Carolina to improve adolescent and young adult sexual health." Baird Decl. ¶ 2. In pursuit of that mission, SHIFT NC is the recipient of a five-year Tier 1A TPPP grant for $736,766, annually, for a project called Every Teen Counts, which is aimed at building capacity of select systems to integrate prevention programming. *Id.* ¶ 5. Through Every Teen Counts, SHIFT NC works with NC LINKS, North Carolina's system for serving youth in foster care, and with juvenile detention centers to help professionals in these systems build their capacity to help youth avoid unplanned pregnancies. *Id.* More specifically, Every Teen Counts

helps these systems implement two specially tailored, evidence-based curricula for these young people: Making Proud Choices: An Adaptation for Youth in Out-of-Home Care, and Sexual Health and Adolescent Risk Prevention (SHARP). *Id.* Every Teen Counts also aims to create linking and referral networks to help youth access supportive health care services. *Id.*

SHIFT NC designed the second and third grant years for the establishment and implementation of these programs, and designed the fourth and fifth grant years to focus on sustainability after the project period concluded. *See id.* ¶ 21. Without continued TPPP funding, the programs that SHIFT NC has spent the past three years designing and implementing may be unsustainable. *See id.* The termination of funding for SHIFT NC's grant will have adverse consequences for the local communities and vulnerable populations that SHIFT NC's programs serve. *See id.* The loss of TPPP funds has already halted some grant activities. *See id.* ¶ 22. Both data collection for certain program outcomes and work with court counselors who serve youth in the juvenile justice system are on hold until SHIFT NC can confirm that the resources necessary for this work are available. *See id.* SHIFT NC has also been forced to halt plans to extend professional development services to foster care parents and guardians ad litem that were scheduled to start during the third project year. *See id.*

In addition, the termination of the TPPP grant in June 2018 will cause SHIFT NC to lose or terminate staff, reducing the expertise in the organization and negatively affecting the organization's ability to provide support to institutions throughout the state. *See id.* ¶ 22.

**South Carolina Campaign to Prevent Teen Pregnancy (SC Campaign).** SC Campaign's mission is "[t]o improve the health and economic well being of individuals, communities, and the state of South Carolina by preventing teen pregnancy." De Santis Decl. ¶ 2. SC Campaign is the recipient of two five-year grants under the TPPP, a Tier 1B grant of

$1,498,990, annually, and a Tier 1A grant of $716,000, annually. *Id.* ¶¶ 5, 7. Through SC Campaign's Tier 1B grant, SC Campaign works with local organizations to implement evidence-based teen pregnancy prevention programs in three counties (Aiken, Anderson, and Orangeburg) that, at the time the grants were awarded, had among the highest volume of teen births in South Carolina. *Id.* ¶ 7; *see* OAH, *SC Campaign Grantee Details* (Sherman Decl. Ex. BB). Over the course of the five-year project, a minimum of 28,000 youth will have the opportunity to participate in multiple evidence-based teen pregnancy prevention programs, including Reducing the Risk. *Id.*; *see supra* p. 9.

SC Campaign's Tier 1A five-year grant funds a project aimed at building capacity at 16 youth-serving organizations located throughout South Carolina that provide programs and services to youth in juvenile justice or foster care but do not have capacity to deliver evidence-based teen pregnancy prevention programs. *Id.* ¶¶ 5-6. Over the course of the project, four cohorts consisting of four youth-serving organizations will receive 15 months of intensive capacity building assistance. *Id.* ¶ 5. Each of the organizations will develop an HIV/STD/teen pregnancy prevention plan that includes implementation of evidence-based teenage pregnancy prevention programs, referrals to quality teen-friendly healthcare services, and educational offerings for parents and caregivers. *Id.* The project is designed to reach over 3,300 youth ages 13-19 in juvenile detention or foster care. *Id.*

The loss of TPPP funding will impede SC Campaign's ability to serve the highest risk youth in South Carolina, those in the foster care and juvenile justice systems. *See id.* ¶¶ 22-24, 27. Further, SC Campaign will have to cut off a program designed to bring sustainable reproductive health education for school children in three large counties in the midst of its implementation, undermining the program's sustainability. *See id.* ¶¶ 22-23, 25-27.

## STANDARD OF REVIEW

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65(a), the moving party must "make a clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks and citations omitted); *see Open Cmtys. All. v. Carson*, No. CV 17-2192 (BAH), 2017 WL 6558502, at *8 (D.D.C. Dec. 23, 2017).

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries that initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition must consist of competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.[8]

---

[8] Courts in this district have considered motions for preliminary injunctions and summary judgment jointly. *See, e.g.*, *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 58 (D.D.C. 2016); *Hedgeye Risk Mgmt., LLC v. Heldman*, 196 F. Supp. 3d 40, 47 (D.D.C. 2016); *Rigdon v. Perry*, 962 F. Supp. 150, 157 (D.D.C. 1997); *see also* Fed. R. Civ. P. 65(a)(2) (authorizing consolidated hearing of preliminary injunction and trial on the merits); *Teva Pharm. USA, Inc. v. FDA*, 441 F.3d 1, 3 (D.C. Cir. 2006) (reviewing district court's consolidated decision on preliminary and permanent injunction); *Marinette Marine v. U.S. Coast Guard*, 973

## ARGUMENT

I.    **Defendants' termination of the TPPP grants was unlawful.**

A.  **The termination of plaintiffs' grants without explanation was arbitrary, capricious, and contrary to HHS regulations.**

The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "It is axiomatic … that an agency is bound by its own regulations," and "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Assocs. Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted). Further, an agency must give reasons for its actions. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner"). The agency must provide a sufficient explanation for a court to be able to conclude that its action "was the product of reasoned decisionmaking." *Id.* at 51. A court will set aside final agency action where the explanation provided does not demonstrate that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

F. Supp. 1, 2 (D.D.C. 1997) (consolidating request for preliminary injunction and motion for summary judgment).

agency expertise." *Id.* at 43; *see Open Cmtys. All.*, 2017 WL 6558502, at *8. And when an agency provides no contemporaneous "reasoned explanation" for its decision to terminate a grant, the action is arbitrary and capricious. *See City of Kansas City v. HUD*, 923 F.2d 188, 189, 194 (D.C. Cir. 1991).

Here, HHS's termination of plaintiffs' grants without explanation was contrary to HHS regulations and to the *State Farm* requirements for non-arbitrary agency decisionmaking, for several reasons. To begin with, in terminating plaintiffs' grants, HHS did not give any reason. Rather, without explanation, HHS simply informed plaintiffs, and every other TPPP grantee, "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year." *See, e.g.*, Jenner Decl. Exs. J, K; Baird Decl. Ex. E; Schlesinger Decl. Ex. F; De Santis Decl. Exs. I, J. No plaintiff has received an explanation from HHS for the termination of the grants. *See* Jenner Decl. ¶ 17; Baird Decl. ¶ 17; Schlesinger Decl. ¶ 13; De Santis Decl. ¶ 18. "To judge the adequacy of agency decisionmaking, [the Court] must look to the agency decisions themselves." *Kansas City*, 923 F.2d at 193-94. Yet none of HHS's notices states a reason for its decision "nor refers to them in any way as the basis for the agency action." *Id.* (stating that if the agency terminated grants based on substantive deficiencies, "then that fact should have been made plain in the agency decisions"). HHS's failure to offer any contemporaneous explanation for its decision, much less a reasoned one, renders its decision arbitrary and capricious.

In addition, HHS regulations enumerate the grounds on which a grant "may be terminated in whole or in part": "(1) if the [grantee] fails to comply with the terms and conditions of the award;" "(2) for cause"; "(3) with the consent of the [grantee]"; or "(4) by the [grantee]." 45 C.F.R. § 75.372(a)(1)-(4). The regulation defines "termination" as "the ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance," *id.*

§ 75.2, and states that "period of performance" is synonymous with "project period," *id.* In terminating the grants prior to the planned end of the five-year project period, HHS did not invoke any of these grounds. Because the propriety of its action must be judged by the grounds it invoked at the relevant time, and because HHS did not even pretend that its decision was based on a ground allowed under its own regulation, the termination was arbitrary, capricious, and contrary to law. *See Nat'l Envtl. Dev. Assocs. Clean Air Project*, 752 F.3d at 1009-11; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

Moreover, HHS cannot reasonably claim that its action was authorized under the regulation. Not only is "a *post hoc* rationalization" inadequate to show reasoned decisionmaking, *Kansas City*, 923 F.2d at 194, but none of the reasons for termination permitted under the HHS regulation applies with respect to any of the four plaintiffs. First, no plaintiff failed to "comply with the terms and conditions" of its grant. *See* Jenner Decl. ¶¶ 11-12; Schlesinger Decl. ¶¶ 7, 14; Baird Decl. ¶¶ 10-11, 18; De Santis Decl. ¶¶ 11-12, 18. Each plaintiff completed all required reports and filings, and was in good standing with OAH prior to the termination. *See* Jenner Decl. ¶¶ 11-12, Exs. E-H; Schlesinger Decl. ¶¶ 7, 14, Exs. C-E; Baird Decl. ¶¶ 10-11, Exs. C-D; De Santis Decl. ¶¶ 11-12, 18, Exs. E-H. Further, agency regulations require that terminations for noncompliance be reported to a government-wide database, 45 C.F.R. § 75.372(b), and the termination notification sent to the terminated grantee must state that the termination was reported to the database, *id.* § 75.373(b). Here, there is no indication that such a report was filed, and no plaintiff received a notification that the termination was reported to a government database. *See* Jenner Decl. ¶ 17; Baird Decl. ¶ 18; Schlesinger Decl. ¶ 14; De Santis Decl. ¶ 18.

Second, HHS had no basis to terminate any of plaintiffs' grants "for cause"—and did not purport not do so. In the OMB guidance on which HHS modeled its regulation, OMB explained that the "for cause" provision addresses circumstances "beyond the Federal agency's … control" that may require awards to be terminated, for example, "situations like those encountered during implementation of the Recovery Act or Sequestration, where congressional mandates encouraged expedited performance, or changes to appropriated amounts require modifications to programs." *See* OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013). Here, neither in July 2017 nor now has a comparable situation beyond the agency's control required early termination of plaintiffs' grants.

HHS's subsequent conflicting statements about the termination further demonstrate that the decision was not based on any of the grounds set forth in the HHS regulation. PVHC's staff was told that HHS leadership had terminated the grant because it did not believe that the TPPP met the vision of the new administration. *See* Zuniga Decl. ¶ 3. On July 17, 2017, a spokesperson for the Office of the Assistant Secretary for Health said in a statement to the press that the grants had been terminated based on the President's FY 2018 budget request to eliminate the program. *See* Molteni, *supra* (Sherman Decl. Ex. W). And on August 17, 2017, HHS released a statement providing that "poor evaluation results" from the first cohort of grants was the reason for HHS's request to eliminate the TPPP, and the reason that HHS "hit the pause button" on the program by terminating plaintiffs' grants. Howard, *supra* (Sherman Decl. Ex. X). HHS has never claimed the terminations were for noncompliance or because of something extraordinary and out of agency control.

27

As for HHS's later statement that it terminated the TPPP grants because of "poor evaluation results" from the first cohort (which ended in 2015), *id.*, that reason, even if true, would be neither a valid basis under the regulations for terminating existing grants, nor reflect reasoned decisionmaking. HHS has provided no explanation of why negative results from a materially different subset of programs can be extrapolated to plaintiffs' programs. In this way, HHS's statement resembles the agency decision recently struck down by this Court in *Open Communities Alliance*. There, the Department of Housing and Urban Development had sent letters informing more than 200 public housing authorities (PHAs) that the Secretary had determined to suspend a final rule for two years. In litigation, the agency asserted that the delay was based on adverse interim findings in a pilot program that involved seven different PHAs. 2017 WL 6558502, at *18. The district court entered an order preliminarily enjoining HUD's decision delaying the final rule, concluding that because "the 7 pilot PHAs and the 200+ Rule-affected PHAs essentially do not overlap," and because HUD had "identified no basis to conclude" that the findings from the interim report "could be extrapolated from the [pilot PHAs] to the Rule-affected PHAs," HUD's decision to suspend the rule as to the 200 PHAs based on the interim report findings for the 7 PHAs was arbitrary and capricious. *See id.* at *14, *18.

Likewise, HHS has provided no basis to conclude that the programs that received negative evaluations in the first cohort can be extrapolated to the programs plaintiffs are implementing with their grants, and any "poor evaluation results" from a subset of interventions evaluated in the first cohort have no bearing on the efficacy of plaintiffs' programs or their compliance with the terms of their grants. Rather, among the programs SC Campaign is implementing with its Tier 1B grant is Reducing the Risk, De Santis Decl. ¶ 7, which HHS's own replication study determined was effective, OAH, *Teen Pregnancy Prevention Replication*

*Study* (Sherman Decl. Ex. J). Similarly, PVHC is implementing a program called *Positive Prevention PLUS*, Schlesinger Decl. ¶ 3, which was previously a Tier 2 program that was shifted to Tier 1 in 2016 because of evidence of its efficacy, *see* GAO-16-818, *supra*, at 27 n.34. PRG is evaluating new and innovative approaches that did not exist during the first cohort. Jenner Decl. ¶ 5. And SC Campaign and SHIFT NC's Tier 1A grant funding supports partner organizations implementing adaptations of evidence-based programs that were not evaluated by any of the evaluations conducted during the first cohort. *See* Baird Decl. ¶ 5; De Santis Decl. ¶ 6.

Further, HHS's belated explanation "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, because the evaluation results from the first cohort were not "poor." The independent evaluations of the first cohort of grants produced positive results that exceeded what experts typically expect from rigorous replications of social programs. *See* Farb & Margolis, *supra*, at S13 (Sherman Decl. Ex. G); Gordon & Haskins, *supra* (Sherman Decl. Ex. I). Indeed, HHS continues to tout TPPP "Successful Strategies" on its website from the first cohort of grants. *See* OAH, *TPP Successful Strategies* (Sherman Decl. Ex. K). Even putting that aside, however, HHS's reliance on some "poor" results demonstrates its "fail[ure] to consider an important aspect" of the TPPP, *State Farm*, 463 U.S. at 43, by ignoring an important goal of the program—to enable HHS and those implementing programs to learn from the results, both positive and negative. *See supra* pp. 8-10.

Finally, HHS's statement to the press that plaintiffs' grants were terminated because of its budget request to eliminate the program is circular, merely reiterating that HHS disagrees with Congress's policy decision to create and fund the program. Until Congress cancels the funding, HHS's decision terminating the grants it awarded and committed to fund through June 2020 is arbitrary and capricious. *See Kelly v. United States*, 34 F. Supp. 2d 8, 13-14 (D.D.C. 1998)

(concluding that agency's reliance on budgetary considerations was arbitrary and capricious where the agency made no factual findings about its actual budget situation). Congress's continued funding of the TPPP further demonstrates that HHS's hope that funding would be cut was not a reasoned basis for its decision to terminate the TPPP grants. *See infra* at I.B. (explaining that terminating grants for which Congress has appropriated funds is contrary to law).

### B. Defendants' action constitutes a refusal to spend funds appropriated for the TPPP, in violation of the APA.

The APA authorizes a reviewing court to hold unlawful and set aside agency action found to be "not in accordance with law" and to "compel agency action unlawfully withheld." 5 U.S.C. §§ 706(1), (2)(A). In the Continuing Appropriations Act, 2018, and the acts amending it, Congress has to date appropriated funding for the TPPP grants' fourth budget period, through December 21, 2018. HHS's termination of the TPPP grants based on its request that Congress terminate the TPPP before the fourth budget period, and its refusal to expend appropriated funds and reinstate the grants despite the continued congressional appropriation, constitutes the unlawful impoundment of appropriated funds, in violation of the Continuing Appropriations Act, 2018, the Impoundment Control Act, and the Anti-Deficiency Act. This Court should compel the agency to cease its unlawful refusal to operate the TPPP program by honoring the terms of the 2015 grants.

### 1. Defendants' action violates the Continuing Appropriations Act, 2018.

Courts have consistently held that the Executive Branch cannot refuse to expend appropriated funds for reasons not contemplated by Congress in authorizing the respective programs. For example, in *National Council of Community Mental Health Centers, Inc. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973), the Department of Health, Education and Welfare

had refused to expend funds appropriated by Congress for grants under the Community Mental Health Centers Act in fiscal year 1973. *Id.* at 899-900. Despite the funding, the agency announced that, based on the President's budget and spending priorities, the agency would cease processing grant applications. *Id.* at 899, 901. The court concluded that because "[m]oney has been appropriated to achieve the purposes of the Act," the agency was required to expend the appropriated funds "for grants that meet the … lawful criteria embodied in rules and regulations promulgated to achieve the purposes of the Act." *Id.* at 901-03.

Similarly, in *Local 2677 American Federation of Government Employees v. Phillips*, 358 F. Supp. 60 (D.D.C. 1973), the court held unlawful the executive branch's effort to zero out funding for the Office of Economic Opportunity and to terminate all funding for community action agencies that Congress had funded for the rest of the fiscal year based on the President's budget request to Congress for no funding. *Id*. at 65, 70. The court explained that "the Executive must continue to operate an authorized program until the funds expire or Congress declares otherwise. … An administrator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on." *Id.* at 78. The court further warned that while "Congress, of course, may itself decide to terminate a program, …. [u]ntil that time, historical precedent, logic, and the text of the Constitution itself obligate the defendant to continue to operate the … programs as was intended by the Congress, and not terminate them." *Id.* at 75-76 *see also Guadamuz v. Ash*, 368 F. Supp. 1233, 1241-42 (D.D.C. 1973) ("Money has been appropriated by the Congress to achieve the purposes of [the] programs and the Executive has no residual constitutional power to refuse to spend these appropriations") (citing *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952)).

And in *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973), the plaintiff challenged the refusal of the Department of Transportation and Office of Management and Budget to expend federal highway funds authorized for obligation by the Federal-Aid Highway Act. Although the funds were not yet the subject of a contractual obligation, the Eighth Circuit held that the action was unlawful. The court explained that, even for funds that had not yet been contractually obligated, the agencies could not refuse to spend appropriated funds based on their inflation concerns—a reason not authorized by the Act. *See id.* at 1103-04, 1110.

These cases dictate the outcome here. In the Consolidated Appropriations Act, 2017, Congress continued the TPPP program and appropriated funds to HHS for the program, mandating that the funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy" and further directed that "75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." Pub. L. No. 115-31, 131 Stat. 135, 536. This Act appropriated to HHS funds for the TPPP grants' third budget period, which began on July 1, 2017.

In the Continuing Appropriations Act, 2018, and subsequent acts amending it, Congress appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year

2017." Continuing Appropriations Act, 2018, Pub. L. No. 115-56, § 101, 131 Stat. 1129, 1139-40. Congress has further mandated that such appropriations "shall be available to the extent and in the manner that would be provided by the [Consolidated Appropriations Act, 2017]." *Id.* § 103.

Thus, in the Continuing Appropriations Act, 2018, Congress provided funding to HHS for the TPPP for nearly six months of this fiscal year. If HHS had not terminated the grants, that funding would be provided to the grantees for the budget period beginning on July 1, 2018, providing funding through December 21, 2018.

HHS terminated the grants because it wanted to eliminate the TPPP and has refused to expend appropriated funds despite the congressional mandate that the TPPP continue. Like the agencies in *Phillips* and *National Council*, HHS submitted a budget request to Congress to terminate the TPPP (Sherman Decl. Ex. R), soon thereafter terminated all of the TPPP grants, and issued public statements linking its decision to terminate the grants with its budget request to terminate the program (Sherman Decl. Exs. V-X). *See supra* pp. 13-16. In the Continuing Appropriations Act, 2018, Congress has continued the program and continued to appropriate funds for the TPPP grants. Nonetheless, HHS has not altered its decision terminating the program.[9] HHS's action is contrary to this Act, in violation of the APA.

---

[9] On February 12, 2018, the President released his budget for fiscal year 2019. *See* White House, FY 2019 Budget of the U.S. Government, https://www.whitehouse.gov/wp-content/ uploads/2018/02/budget-fy2019.pdf. The budget in brief for HHS included no proposed funding for the TPPP, and stated that "[t]he Budget does not include funding for new grants in the Office of the Assistant Secretary for Health." FY 2019 Budget in Brief, at 115, https://www.hhs.gov/sites/default/files/fy-2019-budget-in-brief.pdf. Thus, HHS continues to seek to eliminate the TPPP as a matter of policy.

2.  **Defendants' action violates the Impoundment Control Act and the Anti-Deficiency Act.**

Frustrated that President Nixon repeatedly impounded congressionally appropriated funds for federal agencies for unrelated policy reasons, *see supra* I.B.1. (discussing three examples), Congress passed the Congressional Budget and Impoundment Control Act of 1974 (the Impoundment Control Act), 2 U.S.C. § 681 *et seq.*, to require federal agencies to spend appropriation funds as directed by Congress. *See City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987); *Byrd v. Raines*, 956 F. Supp. 25, 29 (D.D.C.), *vacated on other grounds*, 521 U.S. 811 (1997). The Impoundment Control Act confirms that "the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Under the Act, if the President does not want to spend funds that Congress has appropriated for a program, the President must transit a special message to Congress detailing his request not to spend the money. 2 U.S.C. § 683(a). Even then, the President is permitted not to spend the funds available for obligation only if both houses of Congress pass a bill rescinding the funding within 45 days. *Id.* § 683(b). As both the Office of Management and Budget and the Government Accountability Office have recognized, agency withholdings of appropriated funds based on budget proposals to eliminate programs "constitute impoundments that agencies may make only after the President transmits a special message to Congress." *See* Gov't Accountability Off., B-329092, *Impoundment of the Advanced Research Projects Agency-Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018* 5 (2017), https://www.gao.gov/assets/690/688941.pdf, (citing OMB Circular No. A-11, pt. 3, § 112.2 (updated July 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/assets/a11_current_year/a11_2017.pdf).

The Impoundment Control Act also amended the Anti-Deficiency Act "to preclude the President from relying on that Act as authority for implementing policy impoundments." *City of New Haven*, 809 F.2d at 906, 906 n.18. Prior to its amendment, the Anti-Deficiency Act permitted the President to 'apportion' funds where justified by 'other developments subsequent to the date on which such appropriation was made available.'" *City of New Haven v. United States*, 634 F. Supp. 1449, 1455 n.8 (D.D.C. 1986) (quoting 31 U.S.C. § 665(c)(2) (1970) *amended by* Impoundment Control Act, Pub. L. No. 93–344, Tit. X, § 1002, 88 Stat. 297, 332), *aff'd*, 809 F.2d 900 (1987). After President Nixon "attempted to use the Act as an instrument for shaping fiscal policy," *City of New Haven*, 809 F.2d at 906 n.18, Congress amended it "to prohibit the use of apportionment as an instrument of policy-making." *City of New Haven*, 634 F. Supp. at 1455 n.8. The amendment "preclude[s] the President from invoking the Act as authority for implementing 'policy' impoundments, while preserving the President's authority to implement routine 'programmatic' impoundments." *City of New Haven*, 809 F.2d at 906 n.18 (citing 120 Cong. Rec. 7658 (1974) (statement of Sen. Muskie)). The Anti-Deficiency Act now provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established *only*—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1) (emphasis added). In terminating the TPPP grants, HHS did not suggest that any of these three exceptions applied, and none does.

For the reasons described above, defendants' termination of all TPPP grants based on the budget request and policy decision to terminate the TPPP violates both the Impoundment Control Act and the Anti-Deficiency Act. Without a rescission bill from Congress, HHS's failure to make the TPPP funds available violates the Impoundment Control Act. 2 U.S.C. § 683. And because

no exception applies, HHS's establishment of a reserve from the appropriated TPPP funds

violates the Anti-Deficiency Act. 31 U.S.C. § 1512(c)(1).

II.    **HHS should be enjoined to continue plaintiffs' grants, including by accepting and processing plaintiffs' fourth-year non-competing continuation applications.**

A preliminary injunction is necessary to assure plaintiffs' continued compliance with the

terms of their grant agreements and to prevent any disruption in the grant process, as the deadline

for submission of the non-competing continuation applications is fast approaching. Plaintiffs

have a strong likelihood of success on the merits, and plaintiffs face a serious risk of irreparable

harm absent preliminary relief. The balance of the equities and public interest also weigh heavily

in favor of a preliminary injunction requiring HHS to cease its unlawful actions and continue

administering the TPPP grants, including by accepting and processing plaintiffs' non-competing

continuation applications, normally due in early April. In this situation, preliminary injunctive

relief is warranted. *See Nat'l Council*, 361 F. Supp. at 900 (granting preliminary injunction

ordering defendants "to review and fully process by normal criteria all pending applications" to

assure that unspent funds could be expended before the expiration of an appropriation while the

parties litigated whether the agency's refusal to expend funds for grants was an unlawful

impoundment).

### A.  Plaintiffs have a strong likelihood of success on the merits.

As described in detail above, HHS violated its own regulations when it terminated

plaintiffs' grants, and HHS made no effort to demonstrate a rational connection between facts

surrounding plaintiffs' grants and the termination decision. HHS's termination of the TPPP

grants without a stated basis, without invoking any of the grounds for termination authorized

under HHS regulations, and without explaining how purportedly "poor" results from earlier

programs were linked to plaintiffs' grants was arbitrary, capricious, and contrary to HHS

regulations. *See supra* I.A.; *see also Open Cmtys. All.*, 2017 WL 6558502, at *9 (preliminarily enjoining agency decision that failed to demonstrate reasoned decisionmaking). Further, HHS's termination of TPPP grants despite continued congressional funding for the TPPP constitutes the unlawful impoundment of appropriated funds, in violation of the Continuing Appropriations Act, 2018, the Impoundment Control Act, and the Anti-Deficiency Act. *See supra* I.B.

**B. Plaintiffs will suffer irreparable harm absent a preliminary injunction.**

Two showings demonstrate a likelihood of irreparable harm. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.' *League of Women Voters*, 838 F.3d at 7-8 (citations omitted). "Second, the harm 'must be beyond remediation.'" *Id.* (citation omitted); *Open Cmtys. All.*, 2017 WL 6558502, at *19 ("[A] preliminary injunction requires only a likelihood of irreparable injury, … Damocles's sword does not have to actually fall ... before the court will issue an injunction." (quoting *League of Women Voters*, 838 F.3d at 8-9)). Both showings are easily met here.

An organization has a likelihood of irreparable injury where "the 'actions taken by the defendant have perceptibly impaired the organization's programs'" and "make it more difficult for [organizations] to accomplish [their] primary mission[s]." *Open Cmtys. All.*, 2017 WL 6558502, at *20 (quoting *League of Women Voters*, 838 F.3d at 8-9). Here, plaintiffs' loss of TPPP funding will frustrate their abilities to fulfill their respective missions "to produce scientifically rigorous research," Jenner Decl. ¶ 2, to "[f]oster fully integrated primary and preventive care that is culturally and personally welcoming, evidence based, and patient empowering," Schlesinger Decl. ¶ 2, "to improve adolescent and young adult sexual health," Baird Decl. ¶ 2, and "[t]o improve the health and economic well being of individuals,

communities, and the state of South Carolina by preventing teen pregnancy," De Santis Decl. ¶ 2. Importantly, plaintiffs have been unable to obtain alternative sources of funding to offset the loss of funding from the TPPP grants. *See* Jenner Decl. ¶ 21; Schlesinger Decl. ¶ 16; Baird Decl. ¶ 20; De Santis Decl. ¶ 21. Absent relief from the Court, PRG's five-year individual randomized control studies will have insufficient data to conduct impact evaluations of the interventions studied, and PRG will not have sufficient resources to finish the research on its own. *See* Jenner Decl. ¶¶ 22-25. SC Campaign and PVHC's programs designed their fourth and fifth grant years to assure the sustainability of their programs; without continued funding, high-risk youth in their respective communities will lose access to these programs. *See* De Santis Decl. ¶¶ 22-23; Schlesinger Decl. ¶¶ 17-20. Similarly, SHIFT NC and SC Campaign each have programs dedicated to assisting youth in foster care and the juvenile justice system, and the loss of funding will cut off these young people most in-need from these important programs. *See* Baird Decl. ¶¶ 21-22; De Santis Decl. ¶¶ 22, 24. Critically, absent relief from this Court, plaintiffs will need to make decisions and to begin the process of winding down their programs as soon as early April. *See* Jenner Decl. ¶ 24; Schlesinger Decl. ¶ 21; De Santis Decl. ¶ 26.

In addition, as provided in the FOAs for plaintiffs' grants and subsequent OAH guidance to grantees on the subject, "[e]ach year of the approved project period, grantees are *required* to submit a non-competing continuation application." *See* OAH, *Guidance for Preparing a Non-Competing Continuation Grant Application* (Nov. 2016), https://www.hhs.gov/ash/oah/sites/ default/files/noncompete-grantapp-2016.pdf (emphasis added). For the past two years, the annual deadline for the submission of non-competing continuation applications was April 4. *Id.* The submission of a non-competing continuation application "is the grantee's official request to OAH for continued funding for the upcoming budget year." *Id.* In light of HHS's termination decision,

OAH has not provided plaintiffs an opportunity to submit non-competing continuation applications for the fourth budget period. *See* Jenner Decl. ¶ 18; Baird Decl. ¶ 19 Schlesinger Decl. ¶ 15; De Santis Decl. ¶ 20.

Because submission of non-competing continuation applications by April 4, 2018, may be a condition of receipt of TPPP funding for the fourth budget period, preliminary injunctive relief is needed directing HHS to continue administering plaintiffs' grants, including by accepting and processing the continuation applications. Such relief will ensure that the conditions for fourth-year funding are in place pending final relief from this Court. Absent such relief, HHS may claim that, because plaintiffs have failed to submit non-competing continuation applications, HHS has no obligation to plaintiffs for the fourth budget period of their five-year grants.

### C. The balance of equities strongly weighs in plaintiffs' favor, and the public interest favors an injunction.

Finally, in considering whether to grant a preliminary injunction, the Court should "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (citations omitted). Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12 (internal quotation marks and citation omitted). "The defendants, moreover, cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All.*, 2017 WL 6558502, at *21 (internal quotation marks and citation omitted). Requiring HHS to continue plaintiffs' grants, including by accepting and processing plaintiffs' continuation applications and preparing to make appropriated funds available to plaintiffs on July 1, 2018, would continue the status quo that would have obtained had HHS not unlawfully terminated plaintiffs' grants.

Absent a preliminary injunction requiring HHS to continue the program, the unlawful termination of plaintiffs' grants will be irremediable. *See supra* pp. 17-22, 36-38.

An injunction would also be in the public interest. As 34 Senators noted in a letter to HHS requesting information about termination of the grants, the TPPP "is making a vital contribution to building a body of knowledge of what works to prevent teen pregnancy." Letter from members of the United States Senate to Secretary Price (July 21, 2017) (Sherman Decl. Ex. Y). During the period that the TPPP has been in operation, "pregnancy rates among 15-19 year olds ha[ve]  declined by 41 percent—more than double the decline in any other six year period since rates peaked in 1991." *Id.* The program has been widely recognized as an outstanding high-quality evidence-based program that has been successful in reducing teen pregnancy. *See id.*; *see also* Gordon & Haskins, *supra* (Sherman Decl. Ex. I); Comm'n on Evidence-Based Policymaking, *supra*, at 94; Daniel Stid et al., *supra*, at 2 (concluding that the TPPP is "a model worth emulating") (Sherman Decl. Ex. H).

Moreover, "an extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12. Here, the strength of plaintiff's case on the merits strongly weighs in favor of an injunction. And "there is generally no public interest in the perpetuation of unlawful agency action." *Id.* (citations omitted); *Open Cmtys. All.*, 2017 WL 6558502, at *21. Rather, "the public interest is best served by having federal agencies comply with the requirements of federal law." *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997) (citation omitted); *see League of Women Voters*, 838 F.3d at 12 ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (citation omitted). "[W]here the likelihood of success on the merits is so high and the public interest served by an

injunction is so great, [plaintiff] ha[s] shown injury serious enough to warrant immediate injunctive relief." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 19 (D.D.C. 2009).

### III.   To obtain meaningful relief, plaintiffs request expeditious consideration of their motion for summary judgment.

Under 28 U.S.C. § 1657(a), "each court of the United States … shall expedite the consideration of any action … if good cause therefore is shown." Accordingly, district courts grant expedited consideration of motions for summary judgment where the relief sought would be "significantly less valuable" if the motion were decided without expedition. *Virginians Against Corrupt Cong. v. Moran*, No. CIV. A. 92-2120-LFO, 1992 WL 321508, at *1 (D.D.C. Oct. 21, 1992) (granting prompt hearing where plaintiff needed relief against allegedly unlawful election mailings before Election Day); *see Indep. Inst. v. FEC*, 70 F. Supp. 3d 502, 504 (D.D.C. 2014) (expediting consideration where resolution necessary before Election Day), *rev'd on other grounds*, 816 F.3d 113 (D.C. Cir. 2016); *San Luis Obispo Mothers for Peace v. Hendrie*, 502 F. Supp. 408, 409 (D.D.C. 1980) (granting expedited consideration where plaintiffs sought to prevent allegedly disqualified commissioner from ruling on pending application); *Fitzgerald v. Hampton*, 329 F. Supp. 997, 997 (D.D.C. 1971) (granting expedited consideration for summary judgment where the sealed proceedings plaintiff sought to have opened to the public "would be completed long before the court would resolve this case in the ordinary course of events"). Further, at least one court has granted expedited consideration of a motion for summary judgment where one party's income stream was dependent on the outcome of the case. *See AIG Annuity Ins. Co. v. Law Offices of Theodore Coates, P.C.*, No. 07 Civ. 1908, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Plaintiffs' grants will terminate on June 30, 2018. The impending termination deadline is already forcing plaintiffs to make programmatic alterations affecting the efficacy and

sustainability of their programs, as well as their ability to retain the staff necessary to continue those programs when the grants are reinstated. *See* Jenner Decl. ¶¶ 23-25; Schlesinger Decl. ¶¶ 17-22; Baird Decl. ¶¶ 21-23; De Santis Decl. ¶¶ 22-27; Baird Decl. ¶¶ 21-23. For several plaintiffs, by early April, those decisions will become irreversible. *See* Jenner Decl. ¶¶ 24-25; Schlesinger Decl. ¶¶ 19, 21; De Santis Decl. ¶ 26. And because of plaintiffs' need to wind down their TPPP programs if funding will be cut off on June 30, plaintiffs may soon pass the point at which they will be able to continue their programs. *See* Jenner Decl. ¶¶ 24-25; Schlesinger Decl. ¶¶ 19, 21; Baird Decl. ¶¶ 21-23; De Santis Decl. ¶ 26.

Although the preliminary injunctive relief plaintiffs seek is necessary to prevent imminent irreparable injury, it is not sufficient to avoid the harms they will face in the absence of prompt final resolution of the merits of their claims. *See* Jenner Decl. ¶¶ 22-25; Schlesinger Decl. ¶¶ 17-22; De Santis Decl. ¶¶ 22-27; Baird Decl. ¶¶ 21-23. Plaintiffs require certainty to effectively initiate work plans, staffing decisions, resource allocations, and most critically, decide whether to expend funds after June 30, 2018. *See* Jenner Decl. ¶¶ 22-25; De Santis Decl. ¶¶ 22-27; Schlesinger Decl. ¶¶ 17-22; Baird Decl. ¶¶ 21-23. Without a final judgment, plaintiffs will be in the untenable situation of attempting to plan and operate their grant programs under a sword of Damocles.

## CONCLUSION

This Court should grant plaintiffs' motion for a preliminary injunction and order defendants to continue the TPPP, including by accepting and processing plaintiffs' non-competing continuation applications, to the same extent and in the same manner as the grants were administered prior to their unlawful termination. This Court should also grant plaintiffs' motion for expedited summary judgment, declare that defendants' termination of the TPPP grants was unlawful, and order HHS to reinstate plaintiffs' grants for the awarded five-year

project period and continue funding the grants to the same extent and in the same manner as those grants were funded previously.

Dated: February 23, 2018                    Respectfully submitted,

                                            /s/ Sean M. Sherman
                                            Sean M. Sherman (D.C. Bar No. 1046357)
                                            Allison M. Zieve (D.C. Bar No. 424786)
                                            Public Citizen Litigation Group
                                            1600 20th Street NW
                                            Washington, DC 20009
                                            (202) 588-1000

                                            *Counsel for Plaintiffs*