**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| POLICY AND RESEARCH, LLC, *ET AL.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-00346-KBJ |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN | ) | |
| SERVICES, *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION
TO DISMISS OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................... 1

**BACKGROUND** ................................................................................................................ 2

    I.    Under the TPP Program, HHS Provided One-Year Grants and Retained Its Discretion To Issue Continuation or Competing Future Awards ............................................................ 2

    II.   HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards......... 6

    III.  Continuing Resolutions Banned HHS from Obligating Future TPP Funds....................... 7

**PROCEDURAL HISTORY** ............................................................................................... 9

**STANDARD OF REVIEW** ............................................................................................. 10

**DISCUSSION** .................................................................................................................. 11

    I.    Plaintiffs' "Unlawful Termination" Claim (Count I) Must Be Dismissed Because They Have No Legal Right to Continuation of Their Grants..................................................... 11

       A.   Plaintiffs' Interpretation of Their Awards Would Violate the ADA .......................... 11

       B.   Plaintiffs' Award Documents Reserve HHS's Discretion Not to Continue Future Years' Funds ............................................................................................................... 15

       C.   The Regulations Governing "Termination" Do Not Negate the Plain Terms of Plaintiffs' Award Documents ................................................................................... 17

    II.   Plaintiffs' Impoundment and ADA Claims (Counts II-IV) Must Be Dismissed.............. 22

       A.   Plaintiffs Do Not Fall Within the "Zone of Interests" Protected By the ICA and ADA........................................................................................................................... 22

       B.   HHS Has Not Taken "Final Agency Action" With Respect to TPP Funds................ 23

       C.   HHS Complied With the CAA While It Remained In Effect, and Did Not "Impound" Funds By Doing So................................................................................................... 26

    III.  HHS's Decision Was Not Arbitrary and Capricious Under the Administrative Procedures Act…………….................................................................................................................. 28

**CONCLUSION** ............................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Alan Guttmacher Inst. v. McPherson*,
    597 F. Supp. 1530 (S.D.N.Y. 1984), *aff'd*, 805 F.2d 888 (2d Cir. 1986) ................................ 21

*Apter v. Richardson*,
    510 F.2d 351 (7th Cir. 1975) ........................................................................................... 20

*Ass'n of Admin. Law Judges v. Office of Pers. Mgmt.*,
    640 F. Supp. 2d 66 (D.D.C. 2009) ................................................................................... 24

*Autonomy, Inc. v. TASC, Inc.*,
    No. 1:15-cv-505 (AJT/TCB), 2015 WL 7313380 (E.D. Va. Nov. 19, 2015) ......................... 13

*Bennett v. Spear*,
    520 U.S. 154 (1997).......................................................................................................... 24

*Block* v. *Community Nutrition Institute*,
    467 U.S. 340 (1984).......................................................................................................... 19

*California Human Dev. Corp v. Brock*,
    762 F.2d 1044 (D.C. Cir. 1985) ....................................................................................... 20

*Cessna Aircraft Co. v. Dalton*,
    126 F.3d 1442 (Fed. Cir. 1997)........................................................................................ 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971).......................................................................................................... 20

*Clarke v. Securities Industry Ass'n*,
    479 U.S. 388 (1987).......................................................................................................... 23

*Community Action of Laramie County v. Bowen*,
    866 F.2d 347 (10th Cir. 1989) ......................................................................................... 20

*Cray Research, Inc. v. United States*,
    44 Fed. Cl. 327 (1999) ............................................................................................... 13, 14

*Davis & Assocs., Inc. v. District of Columbia*,
    501 F. Supp. 2d 77 (D.D.C. 2007) .............................................................................. 12, 13

*Federal Crop Ins. Corp. v. Merrill*,
    332 U.S. 380 (1947).......................................................................................................... 14

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ........................................................ 24

*Grassetti v. Weinberger*,
  408 F. Supp. 142 (N.D. Cal. 1976) ............................................... 20

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................. 19, 20

*Hercules, Inc. v. United States*,
  516 U.S. 417 (1996) ..................................................................11,14

*Kletschka v. Driver*,
  411 F.2d 436 (2d Cir. 1969) ......................................................... 20

*Leiter v. United States*,
  271 U.S. 204 (1926) ................................................................. 12, 13

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................. 19, 20

*Local 2677, Am. Fed. Of Gov't Emp. v. Phillips*,
  358 F. Supp. 60 (D.D.C. 1973) ..................................................... 25

*Lujan v. Nat'l Wildlife Federation*,
  497 U.S. 871 (1990) ..................................................................... 22

*Maryland Dept. of Human Resources v. U.S. Dep't of Health & Human Servs.*,
  854 F.2d 40 (4th Cir. 1988) ...................................................... 11, 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................... 28

*Nat'l Ctr. For Mfg. Scis. v. United States*,
  114 F.3d 196 (Fed. Cir. 1997) ................................................... 26, 27

*National Council of Community Mental Health Centers, Inc. v. Weinberger*,
  361 F. Supp. 897  (D.D.C. 1973) .................................................. 25

*Navajo Nation v. Azar*, CV 18-0253 (DLF),
  2018 WL 1092155 (D.D.C. Feb. 28, 2018) .................................... 16

*Phila. Housing v. U.S. Dep't of Housing & Urban Development*,
  553 F. Supp. 2d 433 (E.D. Pa. 2008) ............................................ 21

iv

*Pub. Citizen v. Stockman,
    528 F. Supp. 824 (D.D.C. 1981) ......................................................................... 22, 23

RCS Enterps. v. United States,
    57 Fed. Cl. 590 (2003) .............................................................................................. 13

Rochon v. Lynch,
    139 F. Supp. 3d 394 (D.D.C. 2015) .......................................................................... 11

Rural Cellular Ass'n v. F.C.C.,
    588 F.3d 1095 (D.C. Cir. 2009) ............................................................................... 28

Sam Gray Enterps. v. United States,
    250 F.3d 755 (Fed. Cir 2000) ................................................................................... 13

San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Commin,
    789 F.2d 26 (D.C. Cir. 1986) ................................................................................... 28

Siebert v. Gene Security Network, Inc.,
    75 F. Supp. 3d 1108 (N.D. Cal. 2014) ...................................................................... 16

S. Mut. Help Ass'n, Inc. v. Califano,
    574 F.2d 518 (D.C. Cir. 1977) ................................................................................. 18

State Highway Comm'n of Missouri v. Volpe,
    479 F.2d 1099 (8th Cir. 1973) ................................................................................. 25

Thurston v. United States,
    696 F. Supp. 680 (D.D.C. 1988) .............................................................................. 23

United States ex rel. Bauchwitz v. Holloman,
    571 F. Supp. 2d 674 (E.D. Pa. 2009) ....................................................................... 18

In re Vance-Warren Comprehensive Health Plan, Inc.,
    DAB No. 2180, 2008 WL 2649498 (H.H.S. Dep't App. Bd. June 18, 2008) ............ 5

Williams v. District of Columbia,
    902 A.2d 91 (D.C. 2006) .......................................................................................... 12

In re Youth Network Council of Chicago, Inc.,
    DAB No. 1150, 1990 WL 600164 (H.H.S. Dep't App. Bd. May 3, 1990) ............... 6

## STATUTES

2 U.S.C. § 683 ............................................................................................................... 24

5 U.S.C. § 701 ......................................................................................................... 19, 20

5 U.S.C. § 704 ............................................................................................................... 23

22 U.S.C. § 2151b(d) .................................................................................................... 21

31 U.S.C. § 1341 ........................................................................................................... 11

31 U.S.C. § 1349 ........................................................................................................... 23

31 U.S.C. § 1350 ........................................................................................................... 23

31 U.S.C. § 1351 ........................................................................................................... 23

31 U.S.C. § 1512(c)(1) .................................................................................................. 24

Consolidated Appropriations Act, 2010,
   Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009) ..................................................... 2

Consolidated and Further Continuing Appropriations Act, 2016,
   Pub. L. No. 114-113, 129 Stat. 2242 (enacted Dec. 18, 2015). ................................. 7

Consolidated Appropriations Act, 2017,
   Pub. L. No. 115-31, 131 Stat. 135 (May 5, 2017) ...................................................... 3

Making Further Continuing Appropriations for Fiscal Year 2018, and for other purposes,
   Pub. L. No. 115-90, 131 Stat. 1280 (enacted Dec. 8, 2017) ...................................... 8

The Department of Homeland Security Blue Campaign, and for other purposes,
   Pub. L. No. 115-96, 131 Stat. 2044 (enacted Dec. 22, 2017) .................................... 8

Federal Register Printing Savings Act of 2017,
   Pub. L. No. 115-120, 132 Stat. 28 (enacted January 22, 2018) ................................. 8

Bipartisan Budget Act of 2018,
   Pub. L. No. 115-123, 132 Stat. 64 (enacted February 9, 2018) ................................. 8

Continuing Appropriations Act, 2018,
   Pub. L No. 115-56, 131 Stat. 1129 (enacted Sept. 8, 2017) ...................................... 7

**CONSTITUTION**

U.S. Const. Art. 1, sec. 8 ............................................................................................... 11

**RULES**

Fed. R. Civ. P. 12(b)(1) ................................................................................................. 10

Fed. R. Civ. P. 12(b)(6).................................................................................................. 10

Fed. R. Civ. P. 56 ............................................................................................................ 10

**REGULATIONS**

45 C.F.R. § 75.2 ........................................................................................................... 6, 17

45 C.F.R. § 75.309 ............................................................................................................. 6

**OTHER AUTHORITIES**

115th Congress, H.R. 1625, Consolidated Appropriations Act (March 23, 2018).......................... 9

115th Congress, H.R. 3358 (2017) ...................................................................................... 9

*2 Principles of Federal Appropriations Law,
U.S. Gov't Accountability Off. ["*GAO Red Book*"], (3d ed. 2015)…………………12, 13, 14, 27

## INDEX OF EXHIBITS

Exhibit 1:      Gerardi Declaration

Exhibit 2:      Kretschmaier Declaration

Exhibit 3:      Certified List of Contents of the Administrative Record (*see* D.D.C. L.R. 7(n)(1))

Exhibit 4:      Proposed Order

## INTRODUCTION

This case is not about the termination of an existing grant in the Teen Pregnancy Prevention Program ("TPP Program"), as no grant has been terminated.  It is about whether an awardee of a one-year grant may convert that time-limited, discretionary benefit into a multi-year grant, before Congress has even appropriated funds for the grant program and before the agency has an opportunity to decide whether it wants to renew the grant or open the award to competition.  Plaintiffs, all current grantees under the TPP Program, have asked this Court to compel the U.S. Department of Health and Human Services ("HHS") to renew their grants, even though the agency has inherent discretion not to award a grant in future years and is affirmatively precluded from obligating public funds until Congress appropriates funds for that purpose.

Plaintiffs' theory of grant awards is inconsistent both with federal law and Plaintiffs' agreements.  Each Plaintiff, in accepting funds under its grant with HHS, also accepted all of the terms of the grant, including provisions stating that Plaintiffs had no guarantee of a continuation of funds beyond the one-year "budget period."  Indeed, HHS could not have given Plaintiffs any such guarantee, as it is prohibited by law from obligating funds beyond the period of time for which it has an appropriation.  An agency's decision whether to recompete grant funds under a new appropriation, or to issue those funds on a non-competitive basis, is committed to its discretion and not subject to judicial review.  A decision to the contrary would upend the statutorily mandated system of discretionary grants under which HHS's agencies, such as the National Institutes of Health, Centers for Disease Control and Prevention, Substance Abuse and Mental Health Services Administration, and Office of the Assistant Secretary for Health, fund more than $30 billion of biomedical research, prevention and treatment projects annually.

1

Likewise, Plaintiffs' efforts to shoehorn HHS's conduct into the Anti-Deficiency Act ("ADA") and the Impoundment Control Act ("ICA") are meritless. Plaintiffs do not fall within the zone of interests protected under either statute. These statutes exist to protect Congress's control over executive spending, not to guarantee the flow of appropriated funds to would-be beneficiaries. Even if Plaintiffs could sue under these statutes, they have not identified a "final agency action" that either statute would prohibit. HHS has taken preliminary steps to recompete TPP Program funds, and it has not "impounded" those funds or created a reserve by doing so.

Plaintiffs' pleadings are long on rhetoric about the value of the TPP Program and their projects, but short on a legal theory that would obligate HHS to continue issuing grant awards to them. Accordingly, the Court should dismiss Plaintiffs' complaint with prejudice or, in the alternative, enter judgment in HHS's favor on Plaintiffs' claims.

## BACKGROUND

### I.  Under the TPP Program, HHS Provided One-Year Grants and Retained Its Discretion To Issue Continuation or Competing Future Awards

In 2010, Congress appropriated $110 million to HHS to administer the TPP Program.[1] At the time this suit was filed, this funding, with minor variations in amount, had been renewed annually through the ("FY") 2017 appropriations bill, passed in May 2017. Consolidated

---

[1] The original appropriation makes funds available for

[C]ompetitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, of which not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities: Provided further, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches.

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

Appropriations Act, 2017 [hereinafter "CAA"], Pub. L. No. 115-31, 131 Stat. 135, 536 (May 5, 2017). Congress funded the TPP Program for making "*competitive* contracts and grants." *Id.* (emphasis added).

After five years of administering the program, HHS issued new Funding Opportunity Announcements ("FOAs") for the TPP Program in 2015. The FOAs announced HHS would fund TPP awards using a one year "budget period"—that is, awarding one year of funds at a time—and a five-year "project period," subject to whether Congress funded future programs and to HHS's discretion over whether to continue awards or issue a new competition. Therefore, the FOAs did not guarantee funding for any year beyond the first year of award. Rather, the FOAs stated that for "[e]ach year of the approved project period, grantees are required to submit a noncompeting application which includes a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." (*See, e.g.*, Gerardi Decl. Ex. A, Tier 1A Funding Opportunity Announcement, Office of Adolescent Health, Dep't of Health & Human Servs., at 72 (2015)). The FOAs also explained that "recipients must comply with all terms and conditions outlined in their grant awards, the Department of Health and Human Services (HHS) Grants Policy Statement, requirements imposed by program statutes and regulations and HHS grant administration regulations, as applicable, as well as any requirements or limitations in any applicable appropriations acts." (*Id.* at 68.)

Plaintiffs, all participants in various aspects of the TPP Program, received their first notices of award in the summer of 2015, which included a budgeted award of financial assistance for one year only (July 1, 2015 to June 30, 2016), along with "recommended future support" for subsequent budget years. (*See, e.g.*, SHIFT NC 2015-16 Notice of Award, Baird Decl., Ex. A, at

3

1.)[2]  Consistent with the FOAs, the awards indicated that future years of funding were contingent

on HHS approval.  The awards did this when they stated that grantees must "comply with all

terms and conditions outlined in the grant award, including grant policy terms and conditions

contained in applicable [HHS] Grants Policy Statements," and then hyperlinked to those policies

on HHS's website.  (*Id.* at 4.)  The awards twice declared that when grantees draw down their

award money, they were accepting those terms and conditions.  (*Id.* at 1, 4.)

  In the Grants Policy Statement ("GPS") incorporated into those awards, HHS repeatedly

declares that continuation awards beyond the budget year are contingent on HHS's discretionary

decision to issue them, a decision based in part on its determination of whether government

interests have changed so that future funds should be recompeted.  When describing the "project

period" system, the GPS states that although "project periods" may "indicat[e] the [operating

division's] intention to provide continued financial support beyond the budget period," such

projections:

> are contingent on satisfactory progress, the availability of funds, and *the
> continued best interest of the Federal government*.  They are not guarantees that
> the project or program will be funded or will be funded at those levels, and they
> create *no legal obligation to provide funding beyond the ending date of the
> current budget period* as shown in the [notice of award].

(Gerardi Decl. Ex. B, Grants Policy Statement, U.S. Dep't of Health & Human Servs., at I-34

(emphasis added).)  The "Terms and Conditions" of the Grants Policy Statement further reserves

HHS's broad discretion to deny a continuation award:

> An [operating division] may decide not to make a non-competing continuation award
> within the current competitive segment for one or more of the following reasons:

---

[2] Some continuing awards issued after FY 2015 did not include a recommendation for any future support.  (*See, e.g.*, S.C. Campaign FY 2016 Tier 1A Award, De Santis Decl., Ex. C,  at 1; SHIFT NC FY 2016 Award, Baird Decl., Ex. B, at 1; Project Vida FY 2016 Award, Schlesinger Decl., Ex. B, at 1.) Awards for subsequent budget periods were explicitly denominated "Non-Competing Continuation" awards.  (*Id.*; *see also* Policy & Research LLC FY 2016 Plan A Award, Jenner Decl., Ex. C, at 1.)

> • Adequate Federal funds are not available to support the project.
> • A recipient failed to show satisfactory progress in achieving the objectives of the project.
> • A recipient failed to meet the terms and conditions of a previous award.
> • *For whatever reason, continued funding would not be in the best interests of the Federal government.*

*Id.* at II-89 (emphasis added).

Under the "project period" system, grants are accordingly "programmatically approved" for a period of up to five years, "but are funded in annual increments called budget periods." (*Id.* at I-34.) Because continuation awards are not guaranteed, each year grantees must submit an "official request to OAH for continued funding" known as a "non-competing continuation application." (Gerardi Decl. Ex. C, Guidance for Preparing a Non-Competing Continuation Grant Application, Off. of Adolescent Health, U.S. Dep't of Health & Human Servs., at 3 (Nov. 2016).)[3] If HHS approves a grantee's request for funding—whether an initial award or a continuation award—the grantee receives a "Notice of Award" that includes the "approved project period and budget period start and end dates," and distinctly, the "amount of Federal funds authorized for obligation by the recipient" within the next "budget period" in response to the grantee's application for funding. (Gerardi Decl. Ex. B at I-33.)

The discretionary character of decisions not to issue continuation awards is reinforced by HHS's position that such decisions cannot be appealed unless the denial was because the grantee failed "to meet the terms and conditions of a previous award." (*Id.* at II-89.) Where HHS makes a policy decision not to issue continuation awards, the departmental appeals board "has no power to review" the decision because such decisions "generally are matters committed to the federal

---

[3] *See also* Gerardi Decl., Ex. B, at I-16 (defining non-competing continuation application as "a request … for funding the second or subsequent budget period within an approved competitive segment"); *id.* at B-3 (defining "competitive segment" as "[t]he initial project period recommended for support (up to 5 years) or each extension of a project period resulting from a competing continuation award").

agency's discretion." *In re Vance-Warren Comprehensive Health Plan, Inc.*, DAB No. 2180, 2008 WL 2649498, at *1 (H.H.S. Dep't App. Bd. June 18, 2008); *see also In re Youth Network Council of Chicago, Inc.*, DAB No. 1150, 1990 WL 600164, at *1 (H.H.S. Dep't App. Bd. May 3, 1990).

## II.  HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards

HHS's announcement that it had reevaluated government interests and would not issue a future year of continuation awards did not "terminate" any award funding, because the past awards had not obligated any future funding.  "Termination" is a term of art in HHS regulations concerning grants; not every decision to discontinue funding constitutes a "termination," and a decision not to issue future continuation awards is not a termination at all.

HHS regulations provide several useful definitions for understanding the difference between terminating a grant and declining to issue a future continuation award.  A "termination" is "the ending of a Federal award, in whole or in part, at any time prior to the planned end of period of performance."  45 C.F.R. § 75.2.  The "period of performance" is the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award," such as "orders placed for property and services" and "contract and subawards." 45 C.F.R. § 75.2; *see also id.* § 75.309(a) ("A non-Federal entity may charge to the Federal award only allowable costs incurred during the period of performance," subject to limited exceptions for pre-award costs necessary to carry out the work approved under the award).  "Project period" is defined by cross-reference to the substantive definition of a "period of performance." *Id.*

In the context of continuation awards like the Plaintiffs', the time during which the grantee can incur new obligations—i.e., the "period of performance" during which an award

cannot be terminated except consistent with HHS regulations—is the "budget period."  Grantees

obtain funding one "budget period" at a time after submitting and obtaining HHS approval for

their detailed budgets and work plans.  As the GPS explains, the Notice of Award received by

the grantee "show[s] the amount of Federal funds *authorized for obligation*" by the grantee,

which is limited to a particular "budget period," "and any future-year commitments," which are

the funds the agency currently projects (but does not guarantee) will be awarded to the grantee in

remaining years of the "project period."  (Gerardi Decl. Ex. B at I-33.)  The reference to the

"project period" in the grant documents confers no authority on Plaintiffs to incur new

obligations beyond the "budget period" and accordingly cannot be equated with the "period of

performance" used in the regulations.  To read the grant documents otherwise would be to render

them inconsistent with the ADA's prohibition on committing funds in advance of annual

appropriations, since the term "project period," as used in the grant documents, includes future

fiscal years for which funds have yet to be appropriated by Congress.

### III. Continuing Resolutions Banned HHS from Obligating Future TPP Funds

In the past, HHS has renewed funding for TPP Program grantees during the summer

using funds appropriated for the fiscal year ending the following September.  For example, funds

for the budget period starting July 1, 2016 and ending June 30, 2017 came out of the FY 2016

appropriations, which expired September 30, 2016.  *See* Consolidated and Further Continuing

Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2617 (enacted Dec. 18, 2015).

Until a few days ago, the last time Congress renewed TPP Program funding was in May

2017, for FY 2017 only.  At the time Plaintiffs filed their complaint, Congress had approved a

series of continuing resolutions to fund the government through March 23, 2018, while

negotiating a FY 2018 budget.  Most important among the continuing resolutions was the

Continuing Appropriations Act, 2018, Pub. L No. 115-56, 131 Stat. 1129, 1139 (enacted Sept. 8, 2017).[4]  Although the CAA funded the government during FY 2018 "at a rate of operations as provided in the applicable appropriations Acts for fiscal year 2017," it contained exceptions designed to maintain the funding prerogatives of Congress and the President while a final budget was being negotiated.

       Two exceptions in the CAA are relevant here.  First, section 109 of the CAA specifically addressed the ability of agencies to award grants for programs that depend on further appropriations:

> Notwithstanding any other provision of this Act, except section 106, for those programs that would otherwise have high initial rates of operation or complete distribution of appropriations at the beginning of fiscal year 2018 because of distributions of funding to States, foreign countries, grantees, or others, such high initial rates of operation or complete distribution shall not be made, *and no grants shall be awarded for such programs funded by this Act that would impinge on final funding prerogatives*.

131 Stat. at 1141 (emphasis added).  Second, section 110 of the CAA provided that the act must be "implemented so that *only the most limited funding action* of that permitted in the Act shall be taken in order to provide for continuation of projects and activities."  *Id.* (emphasis added). Consequently, not only did the CRs not renew TPP Program funds for FY 2018, they explicitly prohibited HHS from obligating FY 2018 funds under that program.  At the time Plaintiffs filed their complaint, Congress had limited TPP Program funding to FY 2017.

---

[4] Subsequent continuing resolutions have simply modified the CAA to extend the deadline for passing a budget.  *See* Making Further Continuing Appropriations for Fiscal Year 2018, and for other purposes, Pub. L. No. 115-90 (enacted Dec. 8, 2017); An Act to Amend the Homeland Security Act of 2002 to require the Secretary of Homeland Security to issue Department of Homeland Security-wide guidance and develop training programs as part of the Department of Homeland Security Blue Campaign, and for other purposes, Pub. L. No. 115-96 (enacted Dec. 22, 2017); Federal Register Printing Savings Act of 2017, Pub. L. No. 115-120 (enacted January 22, 2018); Bipartisan Budget Act of 2018, Pub. L. No. 115-123 (enacted February 9, 2018).

## PROCEDURAL HISTORY

Funding for the TPP Program in FY 2018 (which began October 1, 2017) has been a subject of significant debate.  The President's FY 2018 budget request, announced in May 2017, recommended eliminating the program.  (*See* 2018 Budget Request for Gen. Departmental Mgmt., U.S. Dep't of Health & Human Servs., Sherman Decl., Ex. R, at 91.)  The HHS House appropriations bill would have declined to fund the program.  H.R. 3358, 115th Cong. (2017).  In response, a number of members of Congress expressed their support for the program.  (Letter to the Honorable Tom Price, M.D., from 149 House Members, July 25, 2017, Gerardi Decl., Ex. D; Letter to the Honorable Tom Price, M.D., from 37 Senators, July 21, 2017, Gerardi Decl. Ex. E.) Disagreement over the future of the TPP Program was a contributing factor to the larger budget impasse.  (*See* Jennifer Haberkorn & Sarah Ferris, "Planned Parenthood Defunding Threatens Government Spending Package," *Politico*, Mar. 7, 2018, Gerardi Decl., Ex. F (noting disagreement between Republicans and Democrats over riders that would "ax the Teen Pregnancy Prevention Program").)  On March 23, Congress finally agreed to a budget that renewed the program using the same language used in the FY 2017 appropriations bill.  H.R. 1625, 115th Cong. (March 23, 2018), *available at* https://www.gpo.gov/fdsys/pkg/BILLS-115hr1625eah/pdf/BILLS-115hr1625eah.pdf.

With the fate of the TPP Program uncertain in Congress, and having further examined the priorities and effects of previous awards under the program, HHS awarded FY 2017 funds to Plaintiffs in the summer of 2017, but announced it would not issue continuation awards beyond FY 2018.  (*See, e.g.*, Jenner Decl. Exs. J-K; De Santis Decl. Exs. I-J; Baird Decl. Ex. E; Schlesinger Decl. Ex. F.)  If Congress renewed TPP Program funding, HHS would recompete the funds by issuing a new FOA to interested parties, which could include Plaintiffs.  (Kretschmaier

Decl. ¶¶ 3-4.)  The agency announced this change in interests and priorities publicly in August

2017.  ("Teen Pregnancy Prevention Program Facts," Press Release, Office of the Assistant

Secretary for Health, U.S. Dep't of Health & Human Servs., Aug. 28, 2017, Gerardi Decl., Ex.

G.)  It also informed grantees of this decision in July 2017 in the text of their awards for the

2017-18 "budget period," which shortened the "project period" of their awards to end in 2018.

When Plaintiffs accepted and began drawing down their FY 2017 funds, they accepted

the change in project period and the underlying terms.  (Kretschmaier Decl. ¶ 2.)  Then, seven

months later—before Congress had appropriated any future funds for the TPP Program—

Plaintiffs filed this suit seeking to "reinstate plaintiffs' TPPP grants for the awarded five-year

project period and to continue to administer the grants to the same extent and in the same manner

as prior to the unlawful termination, as provided in the notices of award and HHS regulations."

Compl., ECF No. 1, at Prayer for Relief, ¶ B.

## STANDARD OF REVIEW

HHS moves to dismiss the complaint under Civil Rule 12(b)(1) or 12(b)(6), or for

summary judgment pursuant to Civil Rule 56.  Judgment under Civil Rules 12(b)(1) or 12(b)(6)

is appropriate if, assuming the truth of all well-pleaded factual allegations in the complaint,

Plaintiffs have failed either to establish this Court's jurisdiction or to state a claim upon which

relief can be granted.  Judgment under Civil Rule 56 is appropriate if the moving party "shows

there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56.  "Where, as here, a defendant maintains that the case should be

terminated either for defective pleadings or because there is no genuine issue of material fact to

be presented to a jury, the court may review the parties' arguments with respect to both of those

grounds to determine the extent to which the motion can be sustained." *Rochon v. Lynch*, 139 F.

Supp. 3d 394, 400 (D.D.C. 2015), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016) (citations omitted).

## DISCUSSION

### I. Plaintiffs' "Unlawful Termination" Claim (Count I) Must Be Dismissed Because They Have No Legal Right to Continuation of Their Grants

Plaintiffs acknowledged every time they accepted a TPP Program grant from the

government that they had no legal right to future awards within the "project period," and that

HHS could deny future continuation awards by deciding, "for whatever reason," that issuing

continuation awards was not in the federal government's interest.  (Gerardi Decl., Ex. B, at II-

89.)  HHS exercised this explicit authority, and Plaintiffs accepted that decision by drawing

down their funds for this budget period.  Plaintiffs' last-minute, creative attempt to recast their

relationship with HHS as a "five-year" grant would cast aside the terms and conditions of their

grants and violate the Anti-Deficiency Act.  The Court should reject Plaintiffs' unlawful

termination theory, since it is impossible to "terminate" a grant that the agency has yet to award.

### A.  Plaintiffs' Interpretation of Their Awards Would Violate the ADA

Plaintiffs argue that HHS has violated the Anti-Deficiency Act, but it is Plaintiffs' request

for relief that would violate the ADA.  The Constitution gives Congress primary authority over

federal spending, *see* U.S. Const. art. 1, § 8, cl. 1, and the ADA enforces that authority.  *See* 31

U.S.C. § 1341.[5]  The ADA forbids agencies from "from entering into a contract for future

payment of money in advance or, or in excess of, an existing appropriation." *Hercules, Inc. v.*

---

[5] As relevant here, the ADA provides:

> (a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—
>    (A)    make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
>    (B)    involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law ....

*United States*, 516 U.S. 417, 427 (1996).  This prohibition applies to grants and cooperative

agreements.  *Md. Dep't of Human Res. v. Dep't of HHS*, 854 F.2d 40, 42 (4th Cir. 1988)

(applying ADA principles to an HHS grant program); GAO Principles of Federal Appropriations

Law, 3rd ed., vol. 2, ch. 10, at 10-43, GAO-06-382SP [hereinafter "*GAO Red Book*"] (3d ed.

2015), *available at* https://www.gao.gov/assets/210/202819.pdf.  Following Congress's

directive, "the Supreme Court … and other federal courts have explicitly and repeatedly held that

*all* contracts for future payments of money, in advance of or in excess of existing appropriations,

are void ab initio" unless Congress provides otherwise.  *Davis & Assocs., Inc. v. District of

Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007) (emphasis in original) (quoting *Williams v.

District of Columbia*, 902 A.2d 91, 94 (D.C. 2006)).  Absent congressional authority to make

"multi-year" commitments, any agreement that contemplates payment of money is valid only if

(1) the contract is contingent on "an appropriation be[ing] made available" and (2) "the

government … affirmatively continue[s] the [commitment] for such subsequent year; thereby, in

effect … making a new [commitment] under the authority of such appropriation for the

subsequent year."  *Leiter v. United States*, 271 U.S. 204, 206-07 (1926) (invalidating a multi-

year lease); *see also GAO Red Book*, vol. 2, ch. 6, at 6-52–6-56 (summarizing the *Leiter* rule).

The Supreme Court's decision in *Leiter* is the foundational case.  There, the plaintiff had

leased office space to government agencies that eventually merged into the Veterans' Bureau

"for terms of four and five years."  271 U.S. at 204.  The leases "stipulated annual rentals" and

were made contingent on Congress appropriating funds.  *Id.* at 205.  But before the full term of

the leases had expired, the Veterans' Bureau notified the plaintiff that it would cancel its lease

for future years, even though Congress eventually appropriated funds for the space.  *Id.* at 205-

06.  The Court held that because "at the time [the leases] were made there was no appropriation

available for the payment of rent after the first fiscal year," the leases violated the ADA and "created no binding obligation against the United States after the first year." *Id.* at 207. The only way the contract would be "binding for any subsequent year" is if the government, in addition to making the contract contingent on appropriations, had "affirmatively continue[d] the lease for such subsequent year … making a new lease under the authority of such appropriation for the subsequent year." *Id.*

After *Leiter*, unless another congressional directive states otherwise (and no such authority is invoked by Plaintiffs or the grant documents), a "subject to availability" clause is not sufficient to permit multiyear funding. *GAO Red Book*, vol. 2, ch. 6, at 6-55. The government must have a position akin to an option contract. *RCS Enterps. v. United States*, 57 Fed. Cl. 590, 595 (2003) (distinguishing a "true option" in a contract governed by *Leiter* as one the government can "decline to exercise" for future years). A "contract 'dies' at the end of the fiscal year" unless it is "revived … by affirmative action of the government" to create a "'new' contract." *GAO Red Book*, vol. 2, ch. 6, at 6-55.[6]

Plaintiffs' view of their TPP Program awards is inconsistent with the ADA. They insist that HHS obliged itself in 2015 to award unappropriated funds through 2020, but no multi-year

---

[6] *See also Sam Gray Enterps. v. United States*, 250 F.3d 755 (table), 2000 WL 701733 (Fed. Cir. May 31, 2000) (rejecting claim of a five-year lease agreement with the government over housing the plaintiff purchased in the Bahamas because "'annual appropriations' can be obligated only in the specified fiscal year" and plaintiff failed to show any appropriations that could fund a multi-year contract); *Autonomy, Inc. v. TASC, Inc.*, No. 1:15-cv-505 (AJT/TCB), 2015 WL 7313380, at *5 n.7 (E.D. Va. Nov. 19, 2015) ("To the extent that Autonomy understood that TASC's agency authorized it to commit the federal government to purchase the Software in advance of obtaining appropriated funds, there is a strong argument that such an understanding concerning the scope of TASC's agency was unreasonable as a matter of law") (citing *Leiter*, 271 U.S. at 207, and the ADA, 31 U.S.C. § 1341); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327 (1999), 44 Fed. Cl. at 333 (rejecting plaintiff's argument that would have "obligate[d] the CIA to make payments for all five years of the contract, so long as Congress appropriates funds each year," without giving the government the option to renew); *Davis & Associates, Inc. v. District of Columbia*, 501 F. Supp. 2d at 80 (voiding contingency fee contracts between collection agencies and D.C. government entities because the contracts "provided for the payment of money that had not been previously authorized and appropriated," over plaintiff's argument that "no prior appropriations were necessary" under the agreement).

13

obligating authority exists for grants between HHS and TPP Program grantees.  The ADA

accordingly requires, and the TPP Program grant documents promise, only a "one-year contract

followed by a series of government renewal options" that can be "exercised only by the

government's affirmative action."  *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 332

(1999).  HHS could not have illegally committed the government to "a future payment of money

in advance of, or in excess of, an existing appropriation."  *Hercules*, 416 U.S. at 427; *see also*

*Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1449 (Fed. Cir. 1997) ("By its terms, the

Antideficiency Act restricts the ability of the government to enter into multi-year contracts

because funds generally cannot be obligated beyond the current fiscal year.").

Plaintiffs cannot rely upon statements in the funding announcements that future funding

would be "contingent upon the availability of funds, satisfactory progress of the project, and

adequate stewardship of Federal funds," *see, e.g.*, Pls.' Br. at 11 (quoting ECF No. 6-7 at 87), to

create a multiyear obligation for funding.  *See GAO Red Book*, vol. 2, ch. 6, at 6-55 ("If a

'subject to availability' clause were sufficient to permit multiyear contracting, the effect would

be automatic continuation from year to year unless the government terminated," which violates

the ADA).  The funding announcements must be read in the context of other grant documents

that explain the grantees' lack of legal rights to future continuation awards, and they must be

read in light of the ADA, which prohibits any obligation attaching to future funds unless the

government affirmatively exercises its option to continue the relationship.

Even if Plaintiffs were right about what the grant documents mean (and as demonstrated

below, they are not), the government cannot be bound by the acts of agents beyond the scope of

their actual legal authority.  *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).  HHS

is not authorized to agree to the future award scheme Plaintiffs describe.  Agreements that do not

14

comport with *Leiter* and the ADA are void ab initio. Moreover, the TPP Program appropriation specifically appropriates funds "for making *competitive* contracts and grants." Pub. L. No. 115-56, 131 Stat. at 536 (emphasis added). Plaintiffs cannot use that statute to *prohibit* HHS from competing FY 2018 funds. HHS did what it was legally obliged to do by reserving the option not to give continuation grants, and exercised that option by choosing to recompete the funds appropriated to the TPP Program by Congress.

### B. Plaintiffs' Award Documents Reserve HHS's Discretion Not to Continue Future Years' Funds

Plaintiffs' theory of their TPP awards is not only inconsistent with the ADA, it is inconsistent with the terms of those awards. The TPP Program grant awards explicitly reserved HHS's discretion to not continue future years of funding and to recompete such funding if HHS decides "for whatever reason, continued funding would not be in the interest of the federal government." Plaintiffs accepted these terms and cannot now demand equitable relief to receive future awards.

Each Notice of Award received by the Plaintiffs stated—*twice*—that by drawing down money in that award, Plaintiffs accepted the terms referenced in that award. First, each Notice stated, "Acceptance of the grant terms and conditions is acknowledged by the grantee when funds are drawn or otherwise obtained from the grant payment system." (*See, e.g.*, Baird Decl., Ex. E, at 1.) Second, each Notice declared that, "[b]y drawing or otherwise obtaining funds for the award from the grant payment system or office, you accept the terms and conditions of the award and agree to perform in accordance with the requirements of the award." (*Id.* at 3.)

The terms and conditions further notified Plaintiffs that they were required to comply with "grant policy terms and conditions contained in applicable Department of Health and Human Services (HHS) Grant Policy Statements" and provided a link to the GPS. (*Id.*) The

GPS states that "[a]n [operating division] may decide not to make a non-competing continuation award within the current competitive segment" if "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." (Gerardi Decl., Ex. B, at II-89.)  It provides that "projected levels of future support [from project periods] are *contingent* on satisfactory progress, the availability of funds, and *the continued best interest of the Federal government*." (*Id.* at I-34.)

The GPS is controlling here.  The terms and conditions contained in the GPS bind the grantees, absent a statute or regulation to the contrary.  *See Navajo Nation v. Azar*, CV 18-0253 (DLF), 2018 WL 1092155, at *5 (D.D.C. Feb. 28, 2018) (applying GPS terms to grant dispute); *Siebert v. Gene Security Network, Inc.*, 75 F. Supp. 3d 1108, 1124 (N.D. Cal. 2014) (same).  No statute or regulation impairs HHS's authority to deny a continuation award to a grantee.  Indeed, as explained above, any regulation by HHS which interfered with its ability to decline a continuation award in these circumstances would run afoul of the ADA.  By accepting the Notices of Award, Plaintiffs acknowledged that HHS could decline to approve a continuation award for whatever reason, in its sole discretion, and HHS did not act arbitrarily, capriciously, or contrary to law by doing so.

Consequently, Plaintiffs are asking this court to negate the express, repeated terms of their own awards—terms that declare Plaintiffs are not entitled to any future years of continuation funds if HHS deems the interests of the government have changed.  Indeed, their position is even further removed from the terms of their grants, as Plaintiffs' 2017 awards explicitly declared that "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year." (*See, e.g.*, Baird Decl., Ex. E, at 1.)  After accepting those terms and drawing down their funds, Plaintiffs now wish to be free of them and insist that they need

16

urgent equitable relief in the form of an injunction from this Court.  But Plaintiffs have known

each year since 2015 that future years of funding might not be awarded on a continuation basis,

and each year they accepted funds subject to that condition.  Plaintiffs have not been injured by

HHS's decision to exercise that option.  Plaintiffs, like the rest of the public, are free to

participate in the competition for the newly appropriated funds, but Plaintiffs have no basis to

deprive the public of that same opportunity.

### C. The Regulations Governing "Termination" Do Not Negate the Plain Terms of Plaintiffs' Award Documents

The regulations themselves, when read in their entirety and applied properly to the grant

documents, confirm that HHS did not enter an arrangement that would violate the ADA.

Plaintiffs hinge their whole case on the phrase "period of performance," but their brief never

mentions the actual substantive definition of that term.  For good reason: "period of

performance" is defined as the "time during which the non-Federal entity may incur new

obligations to carry out the work authorized under the Federal award."  45 C.F.R. § 75.2.  And

for purposes of Plaintiffs' awards, "the amount of Federal funds authorized for obligation" is

limited to a particular budget period.  (Gerardi Decl., Ex. B, at I-33.)  Because Plaintiffs could

not incur any new obligations under the TPP awards beyond the year for which the funds were

appropriated, it is clear that the period of performance for those awards was the budget period.

Plaintiffs seek to escape that straightforward conclusion by relying on a lone cross-

reference in the regulations for "project period" to "period of performance," 45 C.F.R. § 75.2,

but that cross-reference cannot overcome the substantive definition of "period of performance"

in the regulations.  The "work authorized under the Federal award" by HHS is the one year of

work authorized by the Notice of Award, and "the time during which the non-Federal entity may

incur new obligations to carry out [that] work" is the "budget period," the only time period in

17

which funds are made available for obligation to the grantee.  The cross-reference in 45 C.F.R.

§ 75.2 between "project period" and "period of performance" does not negate the actual

substantive definition of "period of performance."  Plaintiffs cannot override that definition,

particularly when doing so would impose financial obligations on the government that go beyond

a single fiscal year, in violation of the ADA.

The cross-reference for "project period" also cannot overcome the plain terms of the

awards.  The GPS, incorporated in each award, states that the "amount of Federal funds

authorized for obligation by the recipient" are for the current budget period only.  (Gerardi Decl.

Ex. B at I-33.)  The Notice of Award under HHS's "project period" system accordingly "only

commit[ted] [HHS] to fund[] the grant for the current budget period due to dependency upon the

annual Congressional appropriations process."  *See United States ex rel. Bauchwitz v. Holloman*,

571 F. Supp. 2d 674, 681 (E.D. Pa. 2009).  The "projections of future funding levels" found in

the Notice of Awards "[we]re not guarantees that the project will be funded beyond the end date

of the current budget period."[7]  *Id.*

Agency practice confirms these straightforward points.  Grantees submit, and HHS

approves, budgets and work plans for continuing applications on a year-by-year basis.  (Gerardi

Decl., Ex. C, at 3.)  Remaining years of the "project period" are nothing more than

---

[7] The regulations and circumstances here do not correspond to those considered in *S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518 (D.C. Cir. 1977).  That case relied on different, now outdated regulations issued by HHS's predecessor, the Department of Health, Education and Welfare ("HEW") in a case involving a "for cause" determination and a claim for an administrative appeal, after HEW had decided to award the grantee's funds to a competing applicant.  574 F.2d at 520.  Under HEW's regulations and the grant language there, the Court agreed that HEW had "terminated" that grant by "termination of the grantee's authority to charge allowable costs to a grant prior to the grant expiration date in the grant award document."  *Id.* at 526.  It ordered a hearing to afford the plaintiff an opportunity to rebut the allegations against it and have them "stricken from the record, in whole or in part," if appropriate.  *Id.* at 528.  This case does not involve any alleged termination of HHS's "authority to charge allowable costs" to the existing grant.  *Id.* at 526.  Nor does it involve the due process required to be afforded in the event of a "for cause" termination.  *Califano* never reached the issue of multi-year funding under the ADA and is therefore not applicable here.

recommendations or projections of future support.  Such support is secured only after an applicant applies for a continuation award and HHS authorizes that new award.  Until that point, it is only "projected" support (if it is mentioned in the award at all).  *See supra* at n.2.  And the denial of a continuing award is treated very differently from the "termination" of grant funds that are already available for the grantee to obligate, as such terminations are afforded enhanced due process procedures and appeal rights.

In sum, Plaintiffs' view of the TPP grants would displace the regulations, the parties' mutual understanding of the law at the time of their agreement, and widespread agency practice. It must be rejected.

## II.  HHS's Decision Not to Issue Future Continuing Awards Is "Committed to Agency Discretion" and Unreviewable

Given that neither the agency's regulations nor the grant documents afforded Plaintiffs a right to multi-year funding, the choice whether to obligate appropriated TPP Program funds on a non-competitive basis or recompete those funds was committed to HHS's discretion and therefore unreviewable here.  Although the Administrative Procedure Act ("APA") presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption …. [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 831).

The discretionary nature of HHS's decision whether to approve a continuation award or recompete funds is evident from the absence of a meaningful standard by which a court could judge it. Neither the TPP program nor regulations provide any guidance about that decision. And grantees understood that continuation awards could be withheld if, "for whatever reason, continued funding would not be in the interest of the federal government." The absence of "law to apply" in this area strongly suggests it is committed to agency discretion. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

A choice by agencies as to how to spend appropriated TPP Program funds also falls peculiarly within their area of expertise. Section 701(a)(2) applies to an agency's decision to spend appropriated funds "as long as the agency allocates funds … to meet permissible statutory objectives" and Congress has not "put[] restrictions in the operative statutes" to prohibit particular expenditures. *Lincoln*, 508 U.S. at 193-94 (addressing lump-sum appropriations). Plaintiffs have not alleged a violation of any of the statutory guidelines for appropriated TPP funds, but merely the decision not to extend continuation awards to them. And "the allocation of grant funds among various eligible recipients, none of which has any statutory entitlement to them, is traditionally a matter 'committed to agency discretion by law'" because it "shares with agency decisions not to prosecute what the Supreme Court has called in the latter context a 'general unsuitability for judicial review.'" *Cal. Human Dev. Corp v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting *Heckler*, 470 U.S. at 823)). Unsurprisingly, courts presented with similar issues have concluded that decisions regarding the conferral of research grants or the renewal of contracts are committed to agency discretion.[8]

---

[8]  *See Cmty. Action of Laramie Cnty. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Without manageable substantive standards against which to judge HHS' exercise of discretion, our review would amount to nothing more than an impermissible ad hoc assessment of the fairness of agency action. We are not empowered to ask whether HHS's decision was wise in the absence of controlling guidelines . . . . Funding determinations are 'notoriously

The Southern District of New York's decision in *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530 (S.D.N.Y. 1984), *aff'd*, 805 F.2d 888 (2nd Cir. 1986), points to the proper result here. In *Guttmacher*, the plaintiff operated a publication funded by a grant awarded by the Agency for International Development ("AID") under the Foreign Assistance Act ("FAA"). *Id.* at 1534. AID chose not to renew the grant after concluding that it was "economic[ally] superfluous" and promoted "abortion as a family-planning tool," and plaintiff sued, alleging that the decision not to renew the grant violated the FAA. *Id.* at 1533. Like the TPP Program, the FAA gave substantive guidelines for administering funds under the program, but the Court nonetheless ruled that AID's decision was committed to agency discretion. *Id.* at 1535-36 (citing 22 U.S.C. § 2151b(d)). Even though the FAA "might … permit a court to decide whether a project was particularly inappropriate for funding," it did not "give courts any guidance in sorting among the many projects consistent with the goals stated." *Id.* at 1536. Because "it would be virtually impossible for a court to make a determination that [plaintiff's publication] served such an important role … that its rejection by [AID] was an abuse of discretion," such decision was not subject to review under the APA. *Id.* at 1537.

The same conclusion should apply to HHS's decision to recompete funds appropriated under the TPP Program. As Plaintiffs note, there were "nearly 500 applications" for the 81 grants HHS awarded from the TPP Program in its last competitive grant cycle. Pls.' Br. at 11-

unsuitable for judicial review.'"); *Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("[T]he medical merits of NIH decisions on training grants may be committed to the unreviewable discretion of the agency."); *Kletschka v. Driver*, 411 F.2d 436, 443 (2nd Cir. 1969) ("It would not be feasible for the courts to review decisions by the V.A. awarding or refusing to award research grants," which "involves a determination by the agency with respect to the relative merits of the many proposed research projects for which funds are sought."); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976)("It is probable that the medical merits of agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory or procedural directive."); *accord Phila. Hous. v. U.S. Dep't of Hous. & Urban Dev.*, 553 F. Supp. 2d 433, 439 (E.D. Pa. 2008) ("[Plaintiff] has cited no case law—and I have found none—even suggesting that the APA empowers a district court to review an agency's refusal to renew a contract or to accede to particular contract terms.").

12.  TPP Program's statutory authorization does not give any guidance by which a court could effectively evaluate whether HHS abused its discretion by declining to issue continuation awards in order to recompete the funds.  That decision is accordingly unreviewable under the APA.

### III.  Plaintiffs' Impoundment and ADA Claims (Counts II-IV) Must Be Dismissed

Plaintiffs' impoundment and ADA claims must be dismissed for three additional reasons. First, plaintiffs lack prudential standing to bring those claims, as they are not within the zone of interests protected by the ICA or the ADA.  Second, plaintiffs' claims are based on a fundamental misunderstanding of HHS's legal obligations under the Continuing Resolutions approved by Congress.  Third, HHS has not taken final action with respect to the TPP funds.

### A.  Plaintiffs Do Not Fall Within the "Zone of Interests" Protected By the ICA and ADA

Before the Court considers whether there has been an impoundment under the ICA or ADA, Plaintiffs must establish that they have a cause of action under the APA to bring such a claim by showing that their claim "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  (Neither the ADA nor the ICA creates a private right of action, so Plaintiffs may only proceed, if at all, under the APA.)  Plaintiffs have failed to meet this minimum threshold to assert a violation of either the ADA or the ICA.

This Court has already held in *Pub. Citizen v. Stockman*, 528 F. Supp. 824 (D.D.C. 1981), that private groups do not fall within the "zone of interests" of the ICA because it was "clearly enacted to safeguard Congress's interests, not those of private citizens."  528 F. Supp. at 830 n.1. There, a private plaintiff sought to challenge budget deferrals issued by OMB on which the Comptroller General had yet to report to Congress.  This Court rejected that challenge, explaining that the ICA "does not expressly vest in any person besides the Comptroller General

22

the right to bring suit to enforce the Act's provisions." *Id.* at 827. And it rejected the plaintiff's effort to proceed under the APA, concluding that its analysis of the absent private right of action "pretermit[ted] any contention that plaintiff's interest in preserving the flow of appropriations is within the zone of interest to be protected by the ICA." *Id.* at 830 n.1.

Plaintiffs' ADA claim fails for similar reasons. Like the ICA, the ADA does not create a private right of action. *See Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988) (finding that "[n]o private right of action for declaratory, mandatory or injunctive relief exists under this statute"). Instead, it authorizes (1) adverse personnel actions, 31 U.S.C. § 1349; (2) criminal penalties, *id.* § 1350, and (3) reports by agency heads to the President and Congress regarding violations of the act, 31 U.S.C. § 1351. Like the ICA, the purpose of the ADA is not to protect the right of private groups to receive money appropriated to them by Congress, but to enforce Congress's control over the spending activities of federal agencies. Plaintiffs cannot sidestep this design by bringing their ADA claims through an APA action for the same reasons given in the *Public Citizen* case with respect to the ICA.

In sum, Plaintiffs cannot use the APA to challenge agency actions when their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 401 (1987). Congress enacted the ADA and ICA to enforce its control over the federal purse, not to give private citizens a platform for second-guessing agency spending decisions. Accordingly, the Court should dismiss these claims for lack of standing.

**B.  HHS Has Not Taken "Final Agency Action" With Respect to TPP Funds**

Plaintiffs' impoundment claims also fail because they challenge non-final agency action. Judicial review under the APA is limited to "final agency action." 5 U.S.C. § 704. An agency

23

action is "final" if (1) it "mark[s] the consummation of the agency's decisionmaking process" and is therefore not tentative or interlocutory, and (2) it determines the "rights or obligations" of the parties. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). Although stated broadly, "[n]ot everything an agency does constitutes final agency action reviewable by the courts. 'Much of what an agency does is in anticipation of agency action. Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs.'" *Ass'n of Admin. Law Judges v. Office of Pers. Mgmt.*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)).

To date, neither HHS nor any executive branch official has taken no reviewable action that could be construed as an "impoundment" under either the ICA or the ADA. *See* 2 U.S.C. § 683 (describing procedure for President to institute a budget rescission); *id.* § 684(a) (setting forth process by which "the head of any department or agency of the United States … proposes to defer any budget authority provided for a specific purpose or project"); 31 U.S.C. § 1512(c)(1) (setting forth conditions under which an agency may create a reserve). All HHS has done is determine that it will not be awarding continuation grants under the TPP Program to those specific grantees for their existing projects and that any funds available under a new annual appropriation would be recompeted in a process in which this year's grantees would be free to participate. (Kretschmaier Decl. ¶¶ 2-4.)

HHS has been engaged in exactly the sort of activity that "anticipat[es] … agency action" and is accordingly not subject to judicial review. *Fund for Animals*, 460 F.3d at 19. Like Plaintiffs, HHS awaited final resolution of funding questions by Congress for months. Since the

24

start of FY 2018, HHS has been operating under continuing resolutions that restrict its ability to make grant awards that could undermine congressional spending prerogatives.  But HHS has always expressed an intent to spend appropriated TPP Program funds.  (*See* Gerardi Decl. Ex. G ("Should Congress continue to fund the TPP Program, decisions by the Department will be guided by science and a firm commitment to giving all youth the information and skills they need to improve their prospects for optimal health outcomes."); Letter from Barbara P. Clark, Acting Assistant Secretary of Legislation, U.S. Dep't of Health & Human Servs., to Sen. Patty Murray, Nov. 22, 2017, Gerardi Decl., Ex. H (stating HHS will "continue to distribute funds in accordance with the parameters set by Congress" if the TPP Program is refunded).)  Its decision to do so in a future recompete is consistent with its obligations under the ICA and ADA.

        This case simply does not involve any impoundment of funds, and Plaintiffs' cited cases are readily distinguished.  In each of those cases, agencies affirmatively directed that funds appropriated for certain purposes not be spent on those statutorily-mandated purposes, even though no budget had been passed for a subsequent year that would justify a program wind-down.  *See State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1103-08 (8th Cir. 1973) (defendant ordered a deferment of authority to obligate highway funds based on the "status of the economy and the need to control inflationary pressures" that resulted in only "$3 billion in total project obligations during fiscal year 1967," despite "over $4 billion to be apportioned to the states for highway construction"); *National Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 899-900  (D.D.C. 1973) (citing directive from the Director of the National Institute of Mental Health not to issue new staffing grants after Congress appropriated funds to spend on such staffing); *Local 2677, Am. Fed'n Of Gov't Emp. v. Phillips*, 358 F. Supp. 60 (D.D.C. 1973) (defendant sent a detailed memorandum to all Office of Economic Opportunity

regional offices to terminate Community Action Agency funding while appropriations still existed for the program and before Congress passed a budget defunding the program for FY 1974).  HHS has issued no such decision.  By contrast, HHS has expressed its intent to spend funds appropriated for the TPP program through a recompete and is preparing to do so, consistent with the appropriation's call for "competitive contracts and grants" to combat teen pregnancy.  Although Plaintiffs would prefer for HHS to spend those funds through continuation awards, HHS's decision not to do so is well within its discretionary authority.  Unless HHS takes official action that actually commits the agency not to spend some or all of the money appropriated to the TPP Program, there is no "final agency action" qualifying as an impoundment and Plaintiffs' impoundment claims under the ADA and ICA must fail.

## C.  HHS Complied With the CAA While It Remained In Effect, and Did Not "Impound" Funds By Doing So

Even if Plaintiffs had standing to bring these claims and a final agency action to challenge, they would be due for dismissal.  Plaintiffs' arguments under the ICA and ADA rest on the theory that HHS is withholding funds that Congress appropriated to the program under section 101 of the CAA.  That section appropriated "[s]uch amounts as may be necessary, at a rate of operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017," including HHS's funding.  Pub. L. No. 115-56, 131 Stat. 1139.  But the critical flaw in that theory is that HHS is not withholding such funds.  It has simply decided not to issue continuation awards, but to proceed to a recompete of TPP funds.  No funds have been obligated by HHS to the grantees, and this language did not create an imperative on HHS's part to obligate the funds to any particular grantee.  Had Congress intended to direct funds to particular agencies or groups, it could have done so.  *See, e.g.*, *Nat'l Ctr. For*

*Mfg. Scis. v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997) (statute providing appropriation for cooperative agreement specifically stated that "not less than $40,000,000 of the funds appropriated in this paragraph shall be made available only for the National Center for Manufacturing Sciences (NCMS)").

Plaintiffs' theory also misunderstands HHS's obligations under the continuing resolutions. According to the GAO, an agency operating under a continuing resolution "may determine the pattern of its obligations … so long as it operates under a plan which will keep it within the rate for operations limit set by the resolution." *GAO Red Book*, vol. 2, ch. 8, at 8-15. Therefore, "[i]f an agency usually obligates most of its annual budget in the first month or first quarter of the fiscal year, it may continue that pattern under the resolution." *Id.* HHS typically obligates TPP Program funds by issuing notices of award in late June, towards the end of the fiscal year. It did not need to obligate funds for the TPP Program while the continuing resolutions were in effect because those programs were still drawing down their funds from the previous fiscal year. HHS has not breached its obligations under the CAA simply because no funds for FY 2018 have been obligated for the Plaintiffs.

More critically, Plaintiffs' theory of section 101 would run afoul of other provisions in the continuing resolution intended to preserve the control of Congress and the President over spending while a final appropriations bill was negotiated. Section 109 stated that "no grants shall be awarded for such programs funded by this Act that would impinge on final funding prerogatives." And section 110 required that the CAA be "implemented so that only the most limited funding action of that permitted in the joint resolution shall be taken." Plaintiffs' complaint and motion papers amply demonstrate that the TPP Program was a significant point of disagreement in the FY 18 budget talks, and obligating funds for FY 18 during the continuing

resolution would have impinged on final funding prerogatives.  In addition, obligating funds to

the grantees before March, when grants are typically issued in late June and do not have to be

awarded until the close of the fiscal year, would also not be "the most limited funding action

possible" while awaiting a final budget from Congress that would resolve the political question

surrounding the TPP Program.  HHS could not simply arrogate the authority to resolve the

budget impasse that belonged to Congress and the President by issuing awards to new grantees

or continuation awards to former grantees.  And it is inconceivable that Congress, while in the

middle of a tense debate about the future of the TPP Program, required HHS to do so.

### IV.  HHS's Decision Was Not Arbitrary and Capricious Under the Administrative Procedures Act

As noted above, numerous doctrines preclude APA review of HHS's decision to hold a

recompete for TPP Program funds.  Even if that decision were reviewable, Plaintiffs could not

establish it was arbitrary and capricious.  That standard is "very deferential," requiring only a

"rational connection between the facts found and the choice made." *Rural Cellular Ass'n v.

F.C.C.*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "Moreover, the party challenging an agency's action as

arbitrary and capricious bears the burden of proof." *San Luis Obispo Mothers for Peace v. U.S.

Nuclear Reg. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

HHS did not act arbitrarily or capriciously by exercising its rights under the terms and

conditions of the Plaintiffs' grants.  The Grants Policy Statement, which controls the parties'

conduct, emphasized that (1) HHS carried "no legal obligation to provide funding beyond the

ending date of the current budget period" and (2) future continuation awards could be denied

with no opportunity to appeal if, "[f]or whatever reason, continued funding would not be in the

best interests of the Federal government."  (Gerardi Decl., Ex. B, at I-34, II-89.)  HHS's policy

concerns with the current TPP Program are a matter of public record.  (*See* Gerardi Decl., Ex. G,

Ex. H.)  In accepting and drawing down the funds of their grants, Plaintiffs agreed that HHS

could decline to issue continuation awards in its sole discretion, and HHS did not act arbitrarily,

capriciously, or contrary to law by doing so.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for summary judgment, grant

HHS's cross motion to dismiss or for summary judgment, and either dismiss Plaintiffs'

complaint with prejudice or enter judgment in favor of HHS.

Dated:  March 26, 2018                        Respectfully submitted,

                                              CHAD A. READLER
                                              Acting Assistant Attorney General

                                              JESSIE K. LIU
                                              United States Attorney

                                              JOEL McELVAIN
                                              Assistant Branch Director, Federal Programs
                                              Branch

                                              RUTH A. HARVEY
                                              Director, Commercial Litigation Branch

                                              MICHAEL J. QUINN
                                              Senior Litigation Counsel, Commercial
                                              Litigation Branch

                                              /s/ *Michael J. Gerardi*
                                              Michael J. Gerardi
                                              Trial Attorney
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              20 Massachusetts Ave. NW, Room 7223
                                              Washington, D.C. 20530
                                              Tel: (202) 616-0680
                                              Fax: (202) 616-8460
                                              E-mail: michael.j.gerardi@usdoj.gov

                                              /s/ *Jonathan E. Jacobson*
                                              Jonathan E. Jacobson
                                              Alicia M. Hunt
                                              Trial Attorneys
                                              United States Department of Justice
                                              Civil Division, Commercial Litigation Branch
                                              1100 L St. NW, 10th floor
                                              Washington, D.C. 20005
                                              Tel: (202) 353-7971
                                              Fax: (202) 514-9163
                                              E-mail: jonathan.e.jacobson@usdoj.gov

                                              *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2018, a true and correct copy of the foregoing was served on plaintiffs via their counsel of record through the Court's Electronic Case Filing (ECF) system.

/s/ *Michael J. Gerardi*_____
Michael J. Gerardi

31