# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| POLICY AND RESEARCH, LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 18-CV-346-KBJ |
| ) | |
| v. ) | |
| ) | |
| DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF
COMBINED MOTION FOR PRELIMINARY INJUNCTION
AND FOR EXPEDITED SUMMARY JUDGMENT AND
MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION
TO DISMISS OR FOR SUMMARY JUDGMENT**

Sean M. Sherman (D.C. Bar No. 1046357)
Allison M. Zieve (D.C. Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

April 9, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 3

I.    HHS terminated the TPPP grants when it shortened the five-year periods of performance by two years. ................................................................................ 3

    A.    HHS programmatically approved the TPPP grants for five-year periods of performance. ..................................................................... 3

    B.    HHS's decision to shorten the TPPP grants was a termination. .......................... 11

    C.    The five-year programmatic approval of TPPP grants does not implicate the Anti-Deficiency Act. ..................................................................... 13

II.    HHS's termination of the TPPP grants was arbitrary, capricious, and contrary to law.... 18

    A.    HHS's termination of the TPPP grants was arbitrary and capricious. .................. 18

    B.    HHS's termination of the TPPP grants was contrary to agency regulations. ....... 21

III.    HHS's decision to terminate the TPPP grants without explanation was not committed to agency discretion. ..................................................................... 25

CONCLUSION.................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alan Guttmacher Institute v. McPherson*,
    597 F. Supp. 1530 (S.D.N.Y. 1984) ............................................................27

*American Petroleum Tankers Parent, LLC v. United States*,
    943 F. Supp. 2d 59 (D.D.C. 2013) ..............................................................25

*Apter v. Richardson*,
    510 F.2d 351 (7th Cir. 1975) ......................................................................28

*Autonomy, Inc. v. TASC, Inc.*,
    No. 115-CV-505, 2015 WL 7313380 (E.D. Va. Nov. 19, 2015) ....................15

*Bennett v. Kentucky Department of Education*,
    470 U.S. 656 (1985) ...................................................................................16

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .............................................................................17, 28

*California Human Development Corp. v. Brock*,
    762 F.2d 1044 (D.C. Cir. 1985) .............................................................26, 28

*CC Distributors, Inc. v. United States*,
    883 F.2d 146 (D.C. Cir. 1989) ...................................................................26

*Cessna Aircraft Co. v. Dalton*,
    126 F.3d 1442 (Fed. Cir. 1997) ...................................................................15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .............................................................................25, 26

\**City of Kansas City v. HUD*,
    923 F.2d 188 (D.C. Cir. 1991) ........................................................18, 19, 20

*Cody v. Cox*,
    509 F.3d 606 (D.C. Cir. 2007) ...................................................................26

*Community Action of Laramie County, Inc. v. Bowen*,
    866 F.2d 347 (10th Cir. 1989) ...................................................................26

*Cray Research, Inc. v. United States*,
    44 Fed. Cl. 327 (1999) ...............................................................................15

*Dairy Maid Dairy, Inc. v. United States,*
    837 F. Supp. 1370 (E.D. Va. 1993) ..........................................................22, 27

*Davis & Associates, Inc. v. District of Columbia,*
    501 F. Supp. 2d 77 (D.D.C. 2007) ....................................................................15

*Grassetti v. Weinberger,*
    408 F. Supp. 142 (N.D. Cal. 1976) ...................................................................28

*Hercules, Inc. v. United States,*
    516 U.S. 417 (1996)...........................................................................................15

*Hymas v. United States,*
    810 F.3d 1312 (Fed. Cir. 2016).........................................................................17

*James Madison Ltd. by Hecht v. Ludwig,*
    82 F.3d 1085 (D.C. Cir. 1996)...........................................................................18

*Kletschka v. Driver,*
    411 F.2d 436 (2d Cir. 1969)..............................................................................28

*Kucana v. Holder,*
    558 U.S. 233 (2010)...........................................................................................26

*Leiter v. United States,*
    271 U.S. 204 (1926)......................................................................................14, 15

*Lincoln v. Vigil,*
    508 U.S. 340 (1984)......................................................................................27, 28

*Lummi Tribe of the Lummi Reservation, Washington v. United States,*
    870 F.3d 1313 (Fed. Cir. 2017).........................................................................17

*Magic Brite Janitorial v. United States,*
    72 Fed. Cl. 719 (2006) ......................................................................................15

*Maryland Department of Human Resources v. Department of Health & Human Services,*
    854 F.2d 40 (4th Cir. 1988) ..............................................................................17

*Maryland Department of Human Resources v. Department of Health & Human Services,*
    762 F.2d 406 (4th Cir. 1985) ............................................................................17

*Metzger, Shadyac & Schwarz v. United States,*
    12 Cl. Ct. 602 (1987) ........................................................................................16

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) .................................................................................28

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile*
    *Insurance Co.*,
    463 U.S. 29 (1983) .......................................................................................18, 21

*National Center for Manufacturing Sciences v. United States*,
    114 F.3d 196 (Fed. Cir. 1997) .............................................................................17

*National Environmental Development Association's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ............................................................................21

*Navajo Nation v. Azar*,
    No. 18-CV-0253 (DLF), 2018 WL 1092155 (D.D.C. Feb. 28, 2018) ................................8

*Northwest Rural Opportunities, Inc.*,
    1982 WL 189564, DAB 324 (1982) (H.H.S. June 30, 1982) ...........................................12

*Open Communities Alliance v. Carson*,
    No. 17-CV-2192 (BAH), 2017 WL 6558502 (D.D.C. Dec. 23, 2017)............................20

*Philadelphia Housing Authority v. United States Department of*
    *Housing & Urban Development*, 553 F. Supp. 2d 433 (E.D. Pa. 2008)...........................28

*RCS Enterprises v. United States*,
    57 Fed. Cl. 590 (2003) .......................................................................................15

*Sam Gray Enterprises v. United States*,
    250 F.3d 755 (table), 2000 WL 701733 (Fed. Cir. 2000)..................................15

*Southern Mutual Help Ass'n, Inc. v. Califano*,
    574 F.2d 518 (D.C. Cir. 1977) ................................................................ *passim*

*St. Bernard Parish Government v. United States*,
    134 Fed. Cl. 730 (2017) ......................................................................................16

*United States ex rel. Bauchwitz v. Holloman*,
    671 F. Supp. 2d 674 (E.D. Pa. 2009) ................................................................9

## Statutes

5 U.S.C. § 701(a)(2)...........................................................................................25

31 U.S.C. § 1341 ................................................................................................17

31 U.S.C. § 1341(a)(1)(B) ...........................................................................................13

31 U.S.C. § 1501(a)(5) ................................................................................................13

31 U.S.C. § 1512 .........................................................................................................17

31 U.S.C. § 6303 .........................................................................................................16

31 U.S.C. § 6304 .........................................................................................................16

31 U.S.C. § 6305 .........................................................................................................16

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141 ......................................2

Continuing Appropriations Act, 2018, Pub. L. No. 115-56 ...........................................2

**Rules and Regulations**

2 C.F.R. § 200.77 ..........................................................................................................7

42 C.F.R. § 51b.106 ....................................................................................................24

42 C.F.R. § 65.6 ..........................................................................................................24

42 C.F.R. § 65a.8 ........................................................................................................24

45 C.F.R. § 63.23 ........................................................................................................24

45 C.F.R. § 74.3 (1994) ..............................................................................................12

45 C.F.R. § 74.110 (1976) ..........................................................................................12

45 C.F.R. § 74.110 (1979) ..........................................................................................12

45 C.F.R. § 75.2 .................................................................................................. *passim*

45 C.F.R. § 75.105 ......................................................................................................23

45 C.F.R. § 75.203 ...................................................................................................4, 10

45 C.F.R. § 75.309 .....................................................................................................4, 8

45 C.F.R. § 75.372(a) ...........................................................................................14, 26

45 C.F.R. § 75.372(a)(1) .................................................................................... *passim*

45 C.F.R. § 75.372(a)(2) ............................................................................ *passim*

45 C.F.R. § 1305.2 .............................................................................................12

45 C.F.R. § 1336.10 ...........................................................................................24

45 C.F.R. § 1351.14 ...........................................................................................24

45 C.F.R. app'x I to pt. 75 ..............................................................................4, 10

OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements
    for Federal Awards, 78 Fed. Reg. 75589 (Dec. 26, 2013) ...........................7, 27

Executive Office of the President, Federal Awarding Agency Regulatory Implementation
    of Office of Management and Budget's Uniform Administrative Requirements,
    Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871
    (Dec. 19, 2014) ..............................................................................................7

**Miscellaneous**

Black's Law Dictionary (10th ed. 2014) .........................................................27

Carolyn Thompson, *Trump Administration Cuts Short Anti-Teen Pregnancy Grants*,
    Associated Press (July 25, 2017), https://apnews.com/5655d50080d648d9a32b2
    ae1ef489ef2 ...................................................................................................20

HHS, Grants Policy Statement (Jan. 1, 2007) ....................................... *passim*

HHS, *Frequently Asked Questions for OAH 2015 TPP FOAs*,
    https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-faqs.pdf .................5, 6

OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10, 2012),
    https://www.hhs.gov/ash/oah/sites/default/files/oah-grantee-guidance-requesting-
    carryover-funds-2012.pdf ..............................................................................8

U.S. Gov't Accountability Office, Principles of Federal Appropriations Law
    (3d ed. 2015) ....................................................................................... *passim*

## INTRODUCTION

Since first providing funding for the Teen Pregnancy Prevention Program (TPPP) in 2009, Congress has each year mandated the continuation of the program and appropriated funds to the Department of Health and Human Services (HHS) to administer it, using similar appropriations language. In mid-2017, HHS requested that Congress eliminate the TPPP in fiscal year 2018 and then informed the recipients of 81 TPPP grants, without explanation, that their five-year periods of performance would end two years early, on June 30, 2018.

As plaintiffs explained in their opening memorandum, HHS provided no contemporaneous explanation for its decision to end the TPPP grants two years early, and its termination of the grants was contrary to the relevant HHS regulations. For these reasons, HHS's action was arbitrary, capricious, and contrary to law. *See* Pls. Mem. 24–30. In opposition, HHS does not provide any evidence that the termination of the grants was based on reasoned decisionmaking or HHS regulations, and the administrative record the agency has now supplied only underscores that there is no record basis that could support termination of the grants under the applicable regulatory standard.

HHS's primary response is that it approved only one-year grants and had unreviewable discretion not to award new grants. The plain language of HHS regulations and plaintiffs' awards, however, demonstrate that the TPPP grants were programmatically approved for five-year periods of performance and that HHS's decision to end the grants was a "termination." HHS's assertion that it could not have approved grants for five-year periods of performance because doing so would have violated the Anti-Deficiency Act is based on a faulty comparison to multi-year government contracts, which are fundamentally different from grants with multi-year periods of performance and annual budget periods. The Anti-Deficiency Act presents no bar to the TPPP grants at issue

1

here, because each year of plaintiffs' grants is funded from that year's appropriations act, after HHS issues notices of award in response to non-competing continuation applications. HHS also claims a right to terminate plaintiffs' grants based on a determination that they were not in the government's "best interests," but such a basis for termination finds no support in applicable HHS regulations, and, in any event, HHS did not purport to make such a determination when it terminated plaintiffs' grants.

Finally, HHS argues that its decision to terminate the five-year grants after year three is a non-reviewable act of agency discretion. But the applicable HHS termination regulations provide meaningful standards allowing this Court to review the agency's decision.

In providing appropriations for fiscal year 2018, Congress did not accede to the Administration's request to terminate the TPPP. From the start of fiscal year 2018 until March 23, 2018, Congress mandated the continuation of the TPPP in fiscal year 2018 through the Continuing Appropriations Act, 2018, which provided that HHS continue to operate the TPPP at the same funding level, and to the same "extent and in the manner," as required by the Consolidated Appropriations Act, 2017. Pub. L. No. 115-56, 131 Stat. 1129, 1139–40. On March 23, 2018, Congress enacted the Consolidated Appropriations Act, 2018, which confirmed the continuation of the TPPP in terms identical to the Consolidated Appropriations Act, 2017. Pub. L. No. 115-141, H.R. 1625-386. HHS nonetheless has not reinstated the TPPP grants.[1]

---

[1] Plaintiffs also brought Administrative Procedure Act (APA) claims based on HHS's termination of the TPPP, in violation of the relevant appropriations acts, the Impoundment Control Act, and the Anti-Deficiency Act. Because HHS has now provided a declaration attesting that it will expend the funds appropriated for the TPPP, plaintiffs are not pursuing those claims at this time.

Because HHS terminated plaintiffs' grants without explanation and without a basis in HHS regulations, this Court must set aside the unlawful termination, reinstate plaintiffs' grants, and order HHS to administer the TPPP in accordance with agency regulations and the notices of award.

## ARGUMENT

I.    **HHS terminated the TPPP grants when it shortened the five-year periods of performance by two years.**

For at least forty years, federal agencies have approved grants with multi-year project periods, funded in annual budget periods. *See, e.g.*, *S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 519 (D.C. Cir. 1977) (describing the issuance of a multi-year grant under the project-period system by the Department of Health, Education, and Welfare (HEW), the forerunner to HHS). The plain language of HHS regulations and the HHS Grants Policy Statement demonstrate that HHS approved plaintiffs' grants for five-year periods, called periods of performance or project periods.

HHS regulations provide that a "termination" is the "ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." 45 C.F.R. § 75.2. Arguing, however, that it did not "terminate" plaintiffs' grants, HHS asserts that the "period of performance" is the same as the "budget period," which runs for one year. This assertion is contradicted by HHS regulations and HHS's Grants Policy Statement. HHS cannot avoid review of its termination decision by redefining the regulatory terms.

A.    **HHS programmatically approved the TPPP grants for five-year periods of performance.**

**1.** Under the project-period system, successful applications for competitive multi-year grants "are programmatically approved for support in their entirety, but are funded in annual increments called budget periods." Grants Policy Statement at I-34 (Jan. 1, 2007), https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf.

The "total time" for which support "has been programmatically approved" is defined as the "project period." *Id.* at B-8. The "project period" generally extends longer than one year:  It is divided into one-year budget periods. *Id.* at B-2 (definition of "budget periods"). HHS regulations define "project period" as "period of performance," 45 C.F.R. § 75.2 ("Project period (see Period of performance)"), and in turn define "period of performance" as "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award," *id.* Grantees may incur obligations throughout the project period, and they may pay for those obligations with funding from the current budget period *or* with "carryover balances" from a prior budget period. *See id.* § 75.309(a).

Thus, budget periods—"intervals of time (usually 12 months each) into which a project period is divided for budgetary and funding purposes," Grants Policy Statement at B-2—are subdivisions of the "period of performance" or "project period." Grantees "are required to submit a non-competing continuation application … as a prerequisite to approval and funding of each subsequent budget period … within an approved project period." *Id.* at I-34; *see also id.* at I-16 (stating that a "non-competing continuation application" is "a request for funding … the second or subsequent budget period within an approved competitive segment"). Unlike new competitive grants, which must be announced in public funding opportunity announcements (FOAs) that include, among other information, the "periods of performance for new federal awards," 45 C.F.R. app'x I to pt. 75; *see id.* § 75.203, non-competing continuation applications "do[] not compete with other applications for support," Grants Policy Statement at I-16.

The notice of award is the document issued to the grantee that "indicates an award has been made and that funds may be requested from the designated HHS payment system or office." *Id.* at I-33. A notice of award, "showing the amount of Federal funds authorized for obligation … is

issued for each budget period in the approved project period." *Id.* Distinguishing between the project period and budget period, the notices of award include the "[a]pproved project period and budget period start and end dates." *Id.*; *see* 45 C.F.R § 75.2 (requiring the agency to "include start and end dates of the period of performance in the Federal award").

**2.** Here, plaintiffs applied for and were approved for grants with five-year periods of performance. In accordance with the statutory requirement that HHS make "competitive" grants for the TPPP, and consistent with HHS regulations, HHS issued competitive FOAs for the TPPP grants in 2015. *See* Sherman Decl. Exs. M–P. The FOAs provided that "[a]wards will be in the form of a five-year cooperative agreement with the grantee." *See, e.g.*, *id.* Ex. N at 5. On a page entitled "Award Information," the FOAs provided that the grants would be "generally approved for a project period of up to five years," and correspondingly noted that the "period of performance" was "not to exceed five years." *See, e.g.*, *id.* Ex. N at 39. The "budget period length" was "12 months." *See, e.g.*, *id.* The FOAs included a section devoted to HHS's "expectations of grantees throughout the five-year project period," *See, e.g.*, Tier 2B FOA, at 13 (Second Sherman Decl. Ex. A), and provided that applications were required to include "a detailed work plan for the five-year project period," *id.* at 16, 46, 68.[2]

HHS issued a document to accompany the FOAs to answer frequently asked questions from potential applicants. *See* HHS, *Frequently Asked Questions for OAH 2015 TPP FOAs*, https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-faqs.pdf  (last  visited  Apr. 9, 2018). In response to the question, "What is a project period versus a budget period?," HHS

---

[2] Plaintiffs have included relevant excerpts of the FOAs as exhibits to the declarations of Sean Sherman. *See* Sherman Decl. Exs. E–F, M–P; Second Sherman Decl. Ex. A. The funding opportunity announcements are collectively hundreds of pages long, and are available in their entirety on the Office of Adolescent Health's (OAH) website, "Funding Announcements": https://www.hhs.gov/ash/oah/grant-programs/funding-opportunities/index.html.

explained that "[t]he project period is the total time for which support of a project has been programmatically approved by OAH. For budgetary and reporting purposes, funding is provided in annual increments called budget periods." *Id.* at 8. In response to the question, "How many years of funding can a grantee receive?," HHS explained that "[g]rants will be funded in annual increments (budget periods) and are generally approved for a project period of up to five years, although shorter project periods may be approved." *Id.*

Consistent with HHS regulations and the Grants Policy Statement, plaintiffs' grants were "programmatically approved for support in their entirety," Grants Policy Statement at I-34, for five years: The notices of award set forth the start and end dates of the five-year project period (July 1, 2015 to June 30, 2020) *and* separately set forth annual budget periods (July 1 to June 30 of each year). *See, e.g.*, Jenner Decl. Ex. A at 1. The notices of award included a schedule for reporting by the grantees on a quarterly and annual basis, for five full years. *See, e.g.*, *id.* Ex. A at 2. Because the "approved project period" for each of plaintiffs' grants was five years, with budget periods of one year, HHS required the TPPP grantees to submit non-competing continuation applications for each subsequent budget period. *See* Grants Policy Statement at I-34, I-16; *see also* Gerardi Decl. Ex. C (Guidance for Preparing a <u>Non-Competing </u>Continuation Grant Application, Nov. 2016) (emphasis in original)).

**3.** HHS agrees that a grant is "terminated" when the "period of performance" is shortened. But notwithstanding the language of the regulations, Grants Policy Statement, FOAs, and notices of award, HHS argues that it has not terminated the TPPP grants because the "period of performance" is the "budget period," which ends on June 30. Defs. Opp. 6–7, 17–18. HHS has not pointed to a single instance in which the regulations, the Grants Policy Statement, or other HHS grant material equates the "period of performance" with the "budget period."

HHS does not contest that its regulations define "project period" as "period of performance," 45 C.F.R. § 75.2, but dismisses this regulatory definition as a "lone cross-reference." Defs. Opp. 17. That "lone cross-reference," however, is in the "definitions" section of the HHS regulations—the same section where the definition of "period of performance" is located. And the definitional cross-reference assures consistency between HHS's regulations, as revised in 2014, and relevant portions of older HHS guidance materials like the 2007 Grants Policy Statement.

As reflected in the Grants Policy Statement, HHS has long used the project-period system. *See also Califano*, 574 F.2d at 519. In December 2013, the Office of Management and Budget (OMB) published guidance called Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590 (Dec. 26, 2013) (Uniform Guidance)—a framework for grants management. OMB stated that agencies could adopt the Uniform Guidance with agency-specific amendments. *See* Executive Office of the President, Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871, 75873 (Dec. 19, 2014). The Uniform Guidance does not use the term "project period," but uses the term "period of performance." *See* 2 C.F.R. § 200.77. In December 2014, HHS replaced its prior grant regulations to reflect the Uniform Guidance "with certain amendments, based on existing HHS regulations." 79 Fed. Reg. at 75875. Its regulations inserted into the OMB framework the term "project period," *id.* at 75876—a term that HHS had long used to describe the total period of the grant approval—and defined it as "period of performance," *id.*—the term used in the OMB Uniform Guidance to describe that same concept.

That is, HHS added a definition of "project period," defined as "period of performance," to make the new regulations correlate with the terminology in existing HHS grant materials.

**4.** Arguing that the period of performance is not the project period, but the budget period, HHS looks to the regulation defining "period of performance" as "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." 45 C.F.R. § 75.2. HHS claims that "[p]laintiffs could not incur any new obligations under the TPP awards beyond the year for which the funds were appropriated," and, therefore, that the "period of performance" is the "budget period." Defs. Opp. 17–18. In fact, HHS regulations and the Grants Policy Statement provide the opposite: Within the period of performance, funding provided by HHS in one budget period may be carried over to pay costs incurred in a subsequent budget period. *See* 45 C.F.R. § 75.309; Grants Policy Statement at I-35, II-51, II-58, B-2 (defining "carryover" as "[u]nobligated Federal funds remaining at the end of any budget period that may be carried forward to another budget period to cover allowable costs of that budget period"); OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10, 2012), https://www. hhs.gov/ash/oah/sites/default/files/oah-grantee-guidance-requesting-carryover-funds-2012.pdf (last visited Apr. 9, 2018); *Navajo Nation v. Azar*, No. 18-CV-0253 (DLF), 2018 WL 1092155, at *5 (D.D.C. Feb. 28, 2018) (recognizing that HHS's current regulations and the Grants Policy Statement allow a grantee to request to carryover unobligated funds from one budget year to the next (citing 45 C.F.R. § 75.309 and Grants Policy Statement)). By permitting grantees to use funds that were not obligated during the budget period to pay new obligations incurred after the end of the budget period, the regulations contradict HHS's litigation position (at 17) that the reference to

"the time during which the [grantee] may incur new obligations," in the definition of "period of performance" has the effect of limiting the "period of performance" to the "budget period."[3]

The Government Accountability Office (GAO) "Red Book," on which HHS relies extensively, makes this same point: "It should be emphasized that the time availability of grant appropriations governs the grantor agency's obligation and expenditure of the funds; it does not limit the time in which the grantee must use the funds once it has received them." GAO Red Book, GAO-06-382SP, Principles of Federal Appropriations Law, Vol. II, 10-42–43 (3d ed. 2015), https://www.gao.gov/legal/red-book/overview (last visited Apr. 9, 2018). Accordingly, per HHS regulations and the Grants Policy Statement, plaintiffs have, with HHS's approval, used carryover funds from prior budget periods to pay for obligations incurred in subsequent budget periods within the period of performance/project period. *See, e.g.*, Second Jenner Decl. ¶¶ 2–7, Exs. A–D.

**5.** HHS's position that the "budget period" is the "period of performance" also does not square with the record of HHS's administration of the TPPP grants. Because HHS regulations define "project period" as "period of performance," HHS's position makes nonsense out of the distinction between the budget period and project period that pervades HHS's Grants Policy Statement. Had the period of performance/project period been only one year, for example, plaintiffs could not have submitted non-competing continuation applications, because those are,

---

[3] HHS relies on a sentence in *United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674 (E.D. Pa. 2009), a false claims act case that is not pertinent here. HHS quotes the court as stating, by way of background, that a notice of award "only commit[ted] [HHS] to fund[] the grant for the current budget period due to dependency upon the annual Congressional appropriations process" and "[t]he 'projections of future funding levels' found in the Notice of Awards '[we]re not guarantees that the project will be funded beyond the end date of the current budget period.'" Defs. Opp. 18 (quoting *Holloman*, 671 F. Supp. 2d at 680). Plaintiffs agree that funding is subject to congressional appropriations and HHS regulations, and that the project period is thus not a guarantee. Those points do not further HHS's argument.

9

by definition, requests for funding for a "subsequent budget period … within an approved project period." Grants Policy Statement at I-34; *see id.* at I-16. Yet HHS's guidance to TPPP grantees provides that "[e]ach year of the approved project period, grantees are required to submit a non-competing continuation application." Gerardi Decl. Ex. C at 3; *see id.* at 4 (noting the work plan should "span[] the life of the five-year grant project"). Further, if the period of performance/project period were only one year, HHS regulations would have required the agency to issue new FOAs each budget period. *See* 45 C.F.R. § 75.203 (requiring public FOAs for all new competitive grants); *id.* app'x I to pt. 75 (detailing the information required in each FOA, including the "periods of performance for new Federal awards"). HHS did not. And HHS would have had no reason to "shorten" the "project period," *see, e.g.*, Jenner Decl. Ex. J, because the budget period ending on June 30 would, under HHS's position here, have covered the entire period of performance/project period.[4]

In other words, all relevant sources, including HHS prior to this litigation, were in agreement that the "period of performance"—the "time during which the [grantee] may incur new obligations to carry out the work authorized under the Federal award"—is the project period, not the budget period. HHS's assertion that the "period of performance" is equivalent to the "budget period" is without merit. HHS's effort to avoid review of its decision to terminate the grants two years early by reframing the five-year period of performance as a one-year grant period should be rejected.

---

[4] HHS emphasizes the phrase "competitive" from the relevant appropriations acts to imply that the acts mandated HHS to publicly compete new TPPP grants each fiscal year. Defs. Opp. 3, 15. HHS cites no authority for its new interpretation of the statute, which if correct would render HHS's prior actions unlawful and most TPPP programs infeasible.

**B.    HHS's decision to shorten the TPPP grants was a termination.**

Because HHS has ended plaintiffs' TPPP grants "prior to the planned end of period of performance," it has "terminated" the grants, within the meaning of its regulations. *See* 45 C.F.R. § 75.2 (defining "termination"). HHS argues, however, that the termination regulations are "inapplicable to continuation awards." Defs. Opp. 6. In *Southern Mutual Help Ass'n v. Califano*, the D.C. Circuit rejected a substantially identical argument, and this Court should do the same.

In *Califano*, as here, the grantee, Southern Mutual Help Association (SMHA) was approved for a grant with a five-year project period and five annual budget periods. 574 F.2d at 519. After HEW notified SMHA that its non-competing continuation application for the third budget period would not be approved, SMHA attempted to appeal the "termination." *Id.* at 521. Like HHS here, HEW took the position there that the "administrative decision not to renew this grant at the end of the budget period does not constitute grant termination," and "those rules and regulations governing grant termination … do not apply." *Id.* The agency's appeals board agreed, concluding that it lacked jurisdiction because "the failure to issue an additional grant in support of a project is not a termination of an existing grant," but is "a pre-award decision related to an application for the additional grant." *Id.* SMHA filed suit under the APA claiming, among other things, that the termination violated HEW's regulations. *Id.*

HEW prevailed in the district court, but the D.C. Circuit reversed. In the court of appeals, the agency argued that the project "was composed of five individual one-year grants (and corresponding budget periods), for which [the grantee] had to apply each year." *Id.* at 526. Thus, according to HEW, its "decision in 1974 not to re-fund [the grantee] did not result in the termination of a grant, since the existing grant for fiscal year 1974 was not affected and the grants for fiscal years 1975 and 1976 had not been made." *Id.* The court of appeals disagreed. It found

that the agency's position was contradicted by the definition of "termination," *id.* at 527, which covered "the cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion," 45 C.F.R. § 74.110 (1976). Accordingly, the court of appeals held "that the action taken by HEW was a termination" subject to the agency's regulations governing the circumstances in which a grant may be terminated. 574 F.2d at 528.

HHS addresses *Califano* in a footnote, suggesting that it is distinguishable because it involved a "for cause" termination. Defs. Opp. 18 n.7. HHS fails to explain why the difference is significant to the issues presented here, and it is not. HHS also dismisses *Califano* as involving "outdated regulations." *Id.* The current regulatory definition of termination, however, is strikingly similar to the regulatory definition at the time. *Compare* 45 C.F.R. § 74.110 (1976) ("[T]he cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion."), *with* 45 C.F.R. § 75.2 (2018) ("[T]he ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance.").

Further, after *Califano*, HHS amended its regulations to specify that the agency's termination regulations did not apply to a "[r]efusal by the granting agency to extend a grant or award additional funds (such as refusal to make a competing or noncompeting continuation, renewal, extension, or supplemental award)." *Nw. Rural Opportunities, Inc.*, 1982 WL 189564, DAB 324 (1982) (H.H.S. June 30, 1982) (quoting 45 C.F.R. § 74.110 (1979)). Had HHS left that language in place with respect to the grants at issue here, the regulation would have supported the agency's position, but the agency did not do so. Rather, while retaining that language for grants not at issue in this case, *see* 45 C.F.R. § 1305.2 (HHS regulation applicable to Head Start grants), HHS in 1994 eliminated it in the regulations applicable here, *see* 45 C.F.R. § 74.3 (1994). And in 2014, HHS regulations reverted to language similar to that at issue in *Califano*, under which the

court held that the agency's termination regulations applied to denial of a non-competing continuation application.

### C.    The five-year programmatic approval of TPPP grants does not implicate the Anti-Deficiency Act.

In support of its argument that it has not terminated the TPPP grants because the "period of performance" is the one-year "budget period," HHS claims that grants with five-year periods of performance would violate the Anti-Deficiency Act. Defs. Opp. 11–14. The Act provides, in pertinent part, that an "officer or employee of the United States Government ... may not ... involve [the] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). Although many agencies and countless grantees have used the project-period system for decades, no court (including the D.C. Circuit in *Califano*) has identified such a "defect" with multi-year project period grants, and for good reason. The Anti-Deficiency Act poses no impediment because programmatic grant approval for a multi-year period of performance is neither a contract nor an obligation for the payment of money in advance of an appropriation.

**1.** A grant with a multi-year period of performance and annual budget periods is not an "obligation for the payment of money before an appropriation is made." *Id.* As previously described, under the project-period system, although grantees are approved for multi-year periods of performance, the agency issues a notice of award of funds each budget period from that year's appropriation. *See* Grants Policy Statement at I-34; *see also* GAO Red Book, Vol. II, at 10-107 (The 'obligational event' for a grant generally occurs at the time of grant award.") (citing 31 U.S.C. § 1501(a)(5)).

Plaintiffs' TPPP grants followed this model. As agency regulations, the notices of award, the Policy Statement, and the FOAs all provide, HHS agreed to obligate grant funding in each

13

budget period subject to appropriations for that year and the satisfaction of other specified criteria. For example, the FOAs stated: "Funding for all approved budget periods beyond the first year of the grant is generally level with the initial award amount and is contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of federal funds." Sherman Decl. Ex. N at 39; *see also, e.g.*, Jenner Decl. Ex. C (notice of award); *see* 45 C.F.R. § 75.372(a) (stating bases for agency to terminate grants); Grants Policy Statement at I-34.

In light of these contingencies, HHS is correct that "continuation awards are not guaranteed" and that "each year grantees must submit an 'official request to OAH for continued funding." Defs. Opp. 5. For that very reason, plaintiffs' grants do not implicate the concerns of the Anti-Deficiency Act and they satisfy the concerns of *Leiter v. United States*, 271 U.S. 204, 206–07 (1926), *cited in* Defs. Opp. 12: The funding for each budget period is obligated from that year's appropriation, and plaintiffs receive the funds for a given budget period after HHS issues the notices of award obligating the funds from that year's appropriation. *See* GAO Red Book, Vol. I, 5-10 (stating that no Anti-Deficiency Act issue is raised when the government's liability is "contingent upon the future availability of appropriations," so long as there is no requirement that the government obligate funds until the appropriation is made available and notice is to be given by the agency before the recipient proceeds). Thus, HHS's approval of grants with multi-year periods of performance does not impose a "financial obligation" on the agency in advance of an appropriation. *See id.* at 5-43 (stating that, for contracts, "[m]ultiyear arrangements may be permissible … if they are structured in such a way that the agency, at [the] time of … award, incurs no *financial* obligation") (emphasis added).

Although grants with five-year periods of performance are not guarantees of funding in advance of future appropriations, HHS does not have unfettered discretion to "shorten" the project

14

period, as it has purported to do here. *See, e.g.*, Jenner Decl. Exs. J, K (notices of award). Rather, the grants are governed by HHS regulations, which, as relevant here, limit the agency's discretion to terminate plaintiffs' grants in the middle of the periods of performance to two grounds: "for cause" or for a "fail[ure] to comply with the terms and conditions of the award." 45 C.F.R. § 75.372(a)(1)–(2); GAO Red Book, Vol. I, 3-47 ("By issuing regulations, an agency may voluntarily … limit its own discretion."); *Magic Brite Janitorial v. United States*, 72 Fed. Cl. 719, 721 (2006) (explaining with respect to contracts that "the government … could cabin its discretion … via statute, regulation, or the terms of a contract") (emphasis omitted). As discussed below, the agency invoked neither of these bases when it terminated the TPPP grants. *See infra* pp. 18, 21–25; Pls. Mem. 25–27

**2.** In arguing that the Anti-Deficiency Act prohibits the government "from entering into a *contract* for future payment of money in advance, or in excess of, an existing appropriation," Defs. Opp. 11 (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996) (emphasis added)), HHS cites no cases involving grants, relying instead exclusively on cases involving multi-year contracts, *see Hercules*, 516 U.S. at 419 (contract to manufacture Agent Orange could not have implied open-ended indemnification provision); *Leiter*, 271 U.S. at 206–07 (contract leasing office space to government could not have automatic renewal subject to appropriation); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997) (contract for training and maintenance with Navy flight school); *RCS Enterprises v. United States*, 57 Fed. Cl. 590, 591 (2003) (commission contract void where it required government to exercise option for additional years).[5] Grants are not

---

[5] The remaining cases HHS includes in a footnote also involve multi-year contracts. *See Sam Gray Enterprises v. United States*, 250 F.3d 755 (table) 2000 WL 701733, at *2 (Fed. Cir. 2000) (five-year housing lease); *Autonomy, Inc. v. TASC, Inc.*, No. 115-CV-505, 2015 WL 7313380, at *1 (E.D. Va. Nov. 19, 2015) (software contract); *Cray Research, Inc. v. United States*,

contracts, however, and fundamental differences between government contracts and grants render those cases inapposite in the context of the Anti-Deficiency Act.

As set forth in the Federal Grant and Cooperative Agreement Act, the government enters into contracts to acquire "property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6303. In contrast, grants and cooperative agreements are designed "to carry out a public purpose of support or stimulation authorized by a law of the United States" and not for the "direct benefit" of the government. *Id.* §§ 6304, 6305.[6] Where, as here, a grant or cooperative agreement provides no direct benefit to the government, the government itself has taken the position that the agreement is not a contract. *See St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 732 (2017) (concluding, in agreement with the government's position, that a cooperative agreement was not a contract because it provided no benefit to the government as consideration and no monetary remedy), *appeal docketed*, No.18-1204 (Fed. Cir. 2017); *see also Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987) ("[I]n the context of government contracts this court has held that consideration must render a benefit to the government….") (citations omitted).

Further distinguishing grants from contracts, grant disputes are generally governed by statutes and regulations enforceable through the APA and resolved with equitable remedies; they are not governed by contract principles or remediable by money damages. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) ("Unlike normal contractual undertakings, federal grant

---

44 Fed. Cl. 327, 328 (1999) (contract for purchase of computer system); *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 79 (D.D.C. 2007) (contingency fee contract).

[6] When "substantial involvement" from an agency is expected, agencies use "cooperative agreements" rather than "grants." 31 U.S.C. §§ 6304, 6305. The two terms may be used interchangeably in the context of this case.

programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."); *Md. Dep't of Human Res. v. HHS*, 762 F.2d 406, 409 (4th Cir. 1985) (concluding that the relevant grant program was "governed by the applicable statute and implementing regulations," not contract principles);[7] *see also Bowen v. Massachusetts*, 487 U.S. 879, 898 (1988) (explaining that an APA action contesting an agency's decision to terminate a grant should not be regarded "as an action for damages"). Thus, as GAO has explained, "[w]hile grant relationships have certain 'contractual' relationships, the contract analogy has its limits." GAO Red Book, Vol. II, 10-9 ("Differences between Grants and Contracts"); *see id.* ("It does not follow … nor has GAO or (to our knowledge) any court suggested, that all of the trappings of a procurement contract somehow attach to a grant."). For these reasons, the Federal Circuit has repeatedly held, at the *government's* urging, that it lacks jurisdiction over suits involving cooperative agreements and grants. *See, e.g.*, *Lummi Tribe of the Lummi Reservation, Wash. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017) ("Here, the underlying claim is not for presently due money damages. It is for larger strings-attached [] grants—including subsequent supervision and adjustment—and, hence, for equitable relief."); *Hymas v. United States*, 810 F.3d 1312, 1329 (Fed. Cir. 2016); *see also Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997) (holding that an APA suit for funds authorized by an appropriations act for a

---

[7] HHS claims that *Maryland Department of Human Resources v. Department of Health & Human Services*, 854 F.2d 40, 42 (4th Cir. 1988), shows that the prohibition on multi-year contracts for money in advance of an existing appropriation applies to grants and cooperative agreements. Defs. Opp. 12. There, the State of Maryland sought to force HHS to pay an annual block grant in one lump sum, rather than quarterly. The court concluded that, under 31 U.S.C § 1512(a) of the Anti-Deficiency Act, HHS regulations, and OMB regulations exercising authority vested in OMB by that particular provision of the Act, HHS was required to apportion the one-year grant on a quarterly basis. The court therefore ruled against Maryland on its claim seeking the entire year's allotment at the outset of the year. *Id.* The case does not address the provision of the Anti-Deficiency Act invoked by HHS here, 31 U.S.C. § 1341.

specific entity but provided through a cooperative agreement was not for "money damages"). Importantly, "appropriations law restrictions may not apply to grants in the same manner as they apply to contracts." GAO Red Book, Vol. II, at 10-11 (citing GAO opinions). Thus, the contracts cases relied on by HHS do not advance its effort to reframe the five-year grants as one-year grants.

Accordingly, HHS cannot rely on the specter of an Anti-Deficiency Act violation to overcome the plain language of its regulations, guidance, FOAs, and notices of award, all of which demonstrate that plaintiffs were programmatically approved for grants with five-year periods of performance.

**II.    HHS's termination of the TPPP grants was arbitrary, capricious, and contrary to law.**

As plaintiffs explained in their opening memorandum, because HHS provided no explanation for its decision to terminate plaintiffs' grants at the time the decision was made, its action was arbitrary and capricious. Pls. Mem. 24–30. And because HHS did not invoke either of the two grounds in agency regulations authorizing a "termination" when it announced last summer that the TPPP grants would end two years before the planned end of the five-year project period, its action was contrary to law. *Id.* 25–27.

**A.    HHS's termination of the TPPP grants was arbitrary and capricious.**

"[A]n agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983). Accordingly, where, as here, an agency provides no contemporaneous "reasoned explanation" for its decision to terminate a grant, the action is arbitrary and capricious. *See City of Kansas City v. HUD*, 923 F.2d 188, 189, 194 (D.C. Cir. 1991).

The administrative record filed by HHS reinforces that its termination of the TPPP grants was arbitrary and capricious. That record comprises the information that was "before the agency

at the time the decision was made." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotation marks and citation omitted). Here, HHS's record includes only general HHS guidance materials, the FOAs for the grants, and plaintiffs' grant applications and notices of award. *See* Administrative Record, ECF No. 13-3. None of these materials provides a basis for HHS's decision to terminate the TPPP grants two years early.

For the most part, HHS does not disagree. It does not argue that the termination decision or the underlying administrative record reflect reasoned decisionmaking and does not claim that its decision comported with agency regulations. Instead, HHS claims that the 2007 HHS Grants Policy Statement allowed it to end the grants if it determined that, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." Defs. Opp. 28. As explained below, HHS regulations do not allow termination on this basis, and the regulations supersede the Grants Policy Statement to the extent that they are inconsistent. *See infra* pp. 21–25. But even if HHS could terminate the TPPP grants two years early for "whatever reason … in the best interests of the Federal government," as the administrative record reflects, HHS has offered no such reason—and offered no reason at all—when it terminated the grants.

Effectively acknowledging that the administrative record contains no evidence supporting its decision to terminate the grants, HHS claims that its concerns with the TPPP "are a matter of public record." Defs. Opp. 29 (citing Gerardi Decl. Exs. G & H). HHS's "public record[s]" consist of two documents that are not in the administrative record: an August 28, 2017 press release and a November 2017 letter from HHS to Senator Murray that does not appear previously to have been in the public domain. *Id.* As plaintiffs have explained, Pls. Mem. 26–28, however, the propriety of HHS's action must be judged by the grounds it invoked at the termination, *see City of Kansas City*, 923 F.2d at 194—of which there are none. And the action must be supported by evidence in the

administrative record, *see id.*; *Open Communities Alliance v. Carson*, No. 17- CV-2192 (BAH), 2017 WL 6558502, at \*14, \*18 (D.D.C. Dec. 23, 2017)—which it is not.

Even if HHS could permissibly rely on evidence outside the record, information before the agency contradicts the assertion in the November 2017 letter and August 2017 press release that the TPPP is not effective. Specifically, both the letter and the press release assert that the results from 41 evaluations of the first cohort of TPPP grants (for programs from 2010–2015) demonstrated that the TPPP is not working. *See* Gerardi Decl. Exs. G (more legible copy available online at https://www.hhs.gov/ash/about-ash/news/2017/teen-pregnancy-prevention-program-facts.html) & H. In July, 2017, an "HHS spokesman" was quoted in an Associated Press article as making the same assertion about the evaluations. *See* Carolyn Thompson, *Trump Administration Cuts Short Anti-Teen Pregnancy Grants*, Associated Press (July 25, 2017), https://apnews.com/ 5655d50080d648d9a32b2ae1ef489ef2 (Second Sherman Decl. Ex. B). The day after that article was published, however, the Director of OAH, Evelyn Kappeler, wrote an internal email to Tara Broido, the Acting Director of Communications in the Office of the Assistant Secretary for Health, stating that the article "contain[ed] several errors," and explaining that contrary to what the "HHS spokesman" had said, the evidence from the first cohort was "very strong."  Link Decl. Ex. B at 412; *see also id.* Ex. D at 173_17 (July 28, 2017, email from Kappeler to her superior, Don Wright, forwarding the email sent previously to Broido about the errors in the news article).

The Director of OAH was correct: As described in more detail in plaintiffs' opening memorandum (at 8–9), the 41 evaluations found four of the Tier 1 evidence-based programs to be effective in changing behavior when they were applied in new settings or with new populations, and many more programs reported changing participants' knowledge, attitudes, and intentions to avoid risky behaviors. They also found that eight of the Tier 2 new and innovative programs

showed an impact on behaviors that prevent teen pregnancy and met the criteria to be considered an HHS evidence-based program in the future—including one of the programs implemented by plaintiff Project Vida Health Center. Pls. Mem. 8–10. Moreover, the ratio of evaluations that produced positive results exceeded what experts typically expect from rigorous replications of social programs. *See* Sherman Decl. Exs. C, G, & I.

Further reflecting that the evaluations are not the basis for the agency's decision to terminate the TPPP grants, HHS did not include those evaluations in the administrative record filed in this case. And the contention that the evaluations of the first cohort of grants justified termination of the second cohort is also contrary to HHS's own prior statements that the grants were terminated because of HHS's budget request to terminate the TPPP. *See* Pls. Mem. 27–30 Thus, to the extent these statements issued months after HHS informed the grantees of its decision are even pertinent, they "offer an explanation for [HHS's] decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The decision, therefore, is arbitrary and capricious.

**B.**   **HHS's termination of the TPPP grants was contrary to agency regulations.**

It is "axiomatic … that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted). "[A]n agency is not free to ignore or violate its regulations while they remain in effect," and "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Id.* (internal quotation marks and citations omitted). HHS's grant regulations enumerate the grounds on which HHS can unilaterally "terminate" a grant: "(1) if the [grantee] fails to comply with the terms and conditions of the award" or "(2) for cause." 45 C.F.R. § 75.372(a)(1)–(2). HHS violated its own regulations governing the grounds for

"termination" of grants when it ended plaintiffs' grants two years early without explanation. Pls. Mem. 25–27; *supra* pp. 18–21.

HHS relies heavily on a portion of the Grants Policy Statement that purports to authorize "withholding a non-competing continuation award" if HHS determines that, "for whatever reason, continued funding would not be in the best interests of the Federal government." Grants Policy Statement at II-89. Yet, as explained above, *supra* p. 19, HHS did not invoke this standard when it terminated the grants, and it has not offered—either now or when it terminated the TPPP grants—a cogent explanation, supported by the administrative record it proffers, of why termination is in the best interests of the government. *Cf. Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1377 n.1 (E.D. Va. 1993) (concluding that the court need not address whether a "best interest" standard is susceptible to judicial review "because the Army failed to make any finding … let alone a finding that performance would be in the best interests of the United States").

In any event, notwithstanding the Grants Policy Statement, termination on the basis of "best interests" is not permitted by the relevant HHS regulations. HHS's termination regulations authorize HHS to terminate grants unilaterally only "for cause" or because of a "fail[ure] to comply with the terms and conditions of the award." 45 C.F.R. § 75.372(a)(1)–(2). As the notices of award state, although the awards are governed by the grant terms and conditions, including the 2007 Grants Policy Statement, and by HHS regulations, the agency regulations supersede any "inconsistent" terms in the notices or Policy Statement. *See, e.g.*, Baird Decl. Ex. E, at 1 ("In the event there are conflicting or otherwise inconsistent policies applicable to the grant, the above order of precedence shall prevail … a. The grant program legislation[,] b. The grant program regulations[,] c. This award notice including terms and conditions."). HHS's statement that "the regulations governing 'termination' do not negate the plain terms of plaintiffs' award documents"

is thus incorrect. Defs. Opp. 17. To the extent that the award documents or Grants Policy Statement are inconsistent with the regulations, the regulations take priority. As the regulations specify, "all administrative requirements, program manuals, handbooks, and other non-regulatory materials that are inconsistent with the requirements of this part are superseded." 45 C.F.R. § 75.105.

The Grants Policy Statement likewise acknowledges that it does not apply to the extent that there are "statutory, regulatory, or award-specific requirements to the contrary." Grants Policy Statement at i. It further notes that "[t]he information in this document is subject to change following its issuance due to changes in statutes, regulations, or policies adopted subsequent to its effective date," and that "[t]o ensure that applicants and recipients are aware of changes, recipients should refer to the Federal Register and Code of Federal Regulations (Titles 45 and 42)." *Id.* at iii. Mirroring the language in the notices of award and HHS regulations, the Grants Policy Statement provides that "[i]n the case of a conflict, statutes and regulations take precedence over requirements or restatements of statutory or regulatory requirements in the HHS [Grants Policy Statement]." *Id.* at II-2.

Because HHS regulations governing TPPP grants permit unilateral termination only "for cause" or because of a "fail[ure] to comply with the terms and conditions of the award," 45 C.F.R. § 75.372(a)(1)–(2), HHS is not authorized to "withhold[] a non-competing continuation award" if HHS determines that, "for whatever reason, continued funding would not be in the best interests of the Federal government." Tellingly, consistent with HHS regulations, the notices of award themselves omit the "best interest" ground from the standard for continuing future support. *See* Jenner Decl. Ex. A at 1 ("Recommended Future Support (*Subject to the availability of funds and satisfactory progress of the project*)").

23

Notably, HHS includes "best interest" as a ground for termination in regulations addressing *other* grant programs. *See, e.g.*, 42 C.F.R. § 65.6 ("In all cases, continuation awards require a determination by the [National Institute of Environmental Health Sciences of HHS] that continued funding is in the best interest of the Federal Government."); *id.* § 65a.8 (same, regarding certain programs for research and training concerning exposure to hazardous substances); *id.* § 51b.106 (same, regarding certain HHS preventive health service programs); 45 C.F.R. § 63.23 (providing with respect to certain HHS awards concerning delivery of health information, "an application for assistance to continue a project during the project period will be reviewed on a non-competitive basis to determine … [i]f continuation of the project would be in the best interests of the Government."); *id.* § 1336.10 (providing with respect to certain Native American Program grants that the "project period" is "subject to the availability of funds, satisfactory progress, and a determination by HHS that continued funding is in the best interest of the Government"); *id.* § 1351.14 (providing that for Runaway and Homeless Youth Program grants, "[c]ontinuation awards within the project period will be made provided the grantee has made satisfactory progress, funds are available, and HHS determines that continued funding is in the best interest of the Government."). HHS's failure to include similar language in the regulations applicable here underscores that the "best interest" standard in the Grants Policy Statement is inconsistent with the regulatory grounds for termination of the TPPP grants.

HHS also argues that it had "no legal obligation to provide funding beyond the ending date of the current budget period." Defs. Opp. 28, *id.* at 4 (quoting Grants Policy Statement). While HHS had no legal obligation to provide funding absent an appropriation and grantee compliance with program-specific criteria, it could not terminate the grants in a manner that was arbitrary, capricious, and contrary to its regulations. *See supra* pp. 14–15. The language HHS cites from the

24

Grants Policy Statement is both inconsistent with the regulations governing terminations and the notices of award, and a mischaracterization of the relevant portion of the Grants Policy Statement on which HHS relies. The sentence of the Statement quoted by HHS is included in a section explaining the "Project Period and Budget Period" and provides:

> [P]rojected levels of future support are contingent on [1] satisfactory progress, [2] the availability of funds, and [3] the continued best interests of the Federal government. They are not guarantees that the project or program will be funded or will be funded at those levels, and they create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the [notice of award].

Grants Policy Statement at I-34. The context shows that the policy statement is not making a general assertion that HHS can terminate multi-year grants at will, but that continued funding is contingent on the three items listed. *Id*. at II-89. As explained above, the "best interests" ground is inconsistent with and superseded by HHS regulations. *See supra* pp. 22–24. The other two grounds stated are consistent with those in the regulations and notices of award.

In short, because the relevant regulations do not provide for terminations based on the "best interest of the Federal government," HHS could not rely on that basis here as justification for terminating the TPPP grants, even if it had purported to do so at the time of termination.

## III.    HHS's decision to terminate the TPPP grants without explanation was not committed to agency discretion.

Seeking to avoid review of its decision to terminate the TPPP grants, HHS invokes 5 U.S.C. § 701(a)(2), which excludes from the APA's judicial review provisions agency actions "committed to agency discretion by law." Defs. Opp. 19–22. That exclusion "is a very narrow exception" to the presumption of judicial review of agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *see also Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2d 59, 66 (D.D.C. 2013). It applies only in "rare instances," *Citizens to Preserve*

*Overton Park*, 401 U.S. at 410, where the relevant statute or regulation "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (internal quotation marks and citation omitted); *CC Distributors, Inc. v. United States*, 883 F.2d 146, 153 (D.C. Cir. 1989). And even where the question of reviewability is "reasonably susceptible to divergent interpretation," courts must "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Kucana v. Holder*, 558 U.S. 233, 251 (2010) (internal quotation marks and citation omitted).

HHS does not argue that the "termination" regulation is not a "meaningful standard." Instead, HHS's claim that there is "no law to apply" here rests on its argument that its decision to end plaintiffs' grants was not a "termination" and, therefore, that "[n]either the TPP program nor regulations provide any guidance about that decision." Defs. Opp. 20; *see id.* at 19. HHS does not disagree, however, that, "[e]ven if the action of the agency is discretionary by statute, the agency's own regulations must be complied with by the agency after they are issued." *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1049 (D.C. Cir. 1985); *see id.* at 1052 (Scalia, J., concurring) ("Since the statutory provisions establish 'no law to apply' by which we might review the Secretary's discretionary judgment, it remains to consider whether the Secretary's regulations do so."); *see also Cmty. Action of Laramie Cty., Inc. v. Bowen*, 866 F.2d 347, 352 (10th Cir. 1989) ("[I]f HHS discontinued financial assistance to [the grantee] without sufficient evidence to conclude that federal statutory or regulatory law had been violated, a federal court might determine the agency's action to be 'arbitrary, capricious or an abuse of discretion.'").

Here, the text of 45 C.F.R. § 75.372(a) cabins HHS's termination authority in ways that provide a "meaningful standard" for this Court's review. Under the regulation, HHS could

terminate plaintiffs' grants unilaterally only "for cause" or because a grantee "fail[ed] to comply with the terms and conditions of the award." 45 C.F.R. § 75.372(a)(1)–(2). "[F]or cause" is a common standard that generally means "for a legal reason or ground." Black's Law Dictionary (10th ed. 2014). Courts regularly review decisions where the standard is whether an action was taken "for cause," and here, where "for cause" is meant to address circumstances "beyond the Federal agency's … control" that may require awards to be terminated, courts are especially able to engage in meaningful review. *See* Pls. Mem. 27 (citing 78 Fed. Reg. at 78599). Courts are similarly well-equipped to determine whether a grantee "fail[ed] to comply with the terms and conditions of the award." 45 C.F.R. § 75.372(a)(2). Either straightforward inquiry is particularly easy here, where HHS has not claimed that any of the TPPP grants were terminated "for cause" or for failure to comply with award terms and conditions. And even if a court could not review an agency's determination that there was cause or non-compliance justifying termination, it *could* do so where, as here, HHS did not even purport to make such a determination. *See Dairy Maid Dairy*, 837 F. Supp. at 1377 n.1.

Because HHS's action with respect to plaintiffs' grants was a termination, for which HHS regulations provide mandatory standards, the cases HHS invokes, all of which involved plaintiffs that failed to point to any applicable regulatory standards, Defs. Opp. 19–21, are inapposite. For example, in *Alan Guttmacher Institute v. McPherson*, 597 F. Supp. 1530 (S.D.N.Y. 1984), the plaintiffs challenged the termination of a grant but did not invoke any statutory or regulatory standard that could guide the court's review. *See id.* at 1535 & n.1 (explaining that the relevant statute authorized the President to take actions "on such terms and conditions as he may determine"). Likewise in *Lincoln v. Vigil*, 508 U.S. 340 (1984), *cited in* Defs. Opp. 19–20, the Court held that "an agency decision to cease allocating funds from a lump-sum appropriation,

which contained no restrictions on use of the funds, for a program not mentioned in a statute or the agency's regulations, was committed to agency discretion and likewise unreviewable." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (describing holding of *Lincoln*). *See also Bowen*, 866 F.2d at 353 (concluding that because no regulation or guideline limited HHS's discretion with respect to choosing the remedy for a program violation, the decision of the appropriate remedy for a violation was committed to agency discretion); *Brock*, 762 F.2d at 1052 (Scalia, J., concurring) (arguing that the agency's allocation of a lump-sum appropriation without a meaningful regulatory standard was committed to agency discretion); *Kletschka v. Driver*, 411 F.2d 436, 444 (2d Cir. 1969) (concluding that the court could not review a grant determination "given the absence of any guidelines for the control of the V.A.'s discretion"); *Phil. Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 553 F. Supp. 2d 433, 439 (E.D. Pa. 2008) (noting that the agency had "wide discretion" under the applicable statute to refuse to renew a contract and not indicating that any regulations cabined that discretion).[8]

Finally, HHS states that agency action is less likely to be subject to judicial review where the agency decision "'involves a complicated balancing of a number of factors [that] are peculiarly within its expertise.'" Defs. Opp. 19 (quoting *Lincoln*, 508 U.S. at 191). However, neither the determination whether the agency made the requisite finding of cause or non-compliance with grant terms, nor review of a finding of cause or non-compliance, calls for a "complicated balancing" of factors "peculiarly within [HHS's] expertise." Indeed, here, the expert staff at the

---

[8] In the other cases HHS cites, the courts declined to rule on the issue. *See Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) (dealing exclusively with standing to challenge denial of National Institute of Health grant and expressly making no judgment on the merits); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976) (declining to make a definitive determination of whether "the medical merits of agency decisions on research grant applications are committed to agency discretion" but stating that to the extent the agency there had "violated an express statutory or procedural directive," the action would be reviewable).

OAH neither made the decision nor, it appears, were even consulted. *See* Pls. Mem. 15–16; Zuniga Decl. ¶ 3 (describing telephone call with OAH staff); Link Decl. Ex. A at 449 (note to file by OAH Director Kappeler noting that it was a "true statement" that the "recent decisions with regard to shortened or discontinued grants was made outside of OAH" and that the program officers "were surprised by the decision that was handed down to OAH"); *id.* Ex. C at 452 (note to file by Director Kappeler noting that OAH staff "were not aware of the grant action until the last minute and … were provided with the official talking points on July 13 at an OAH All Hands meeting").

## CONCLUSION

This Court should grant plaintiffs' motion for expedited summary judgment, deny defendants' motion to dismiss or for summary` judgment, declare that defendants' termination of the TPPP grants was unlawful, and order HHS to reinstate plaintiffs' grants and to continue administering the grants to the same extent and in the same manner as provided for in the notices of award and HHS regulations.

Dated: April 9, 2018                           Respectfully submitted,

                                               /s/ Sean M. Sherman
                                               Sean M. Sherman (D.C. Bar No. 1046357)
                                               Allison M. Zieve (D.C. Bar No. 424786)
                                               Public Citizen Litigation Group
                                               1600 20th Street NW
                                               Washington, DC 20009
                                               (202) 588-1000

                                               *Counsel for Plaintiffs*

29