**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| POLICY AND RESEARCH, LLC, *ET AL.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-00346-KBJ |
| | ) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN | ) |
| SERVICES, *ET AL.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION**
**<u>TO DISMISS OR FOR SUMMARY JUDGMENT</u>**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

   I.   The ADA and *Leiter* Preclude Agreements Purporting to Obligate The Government For More Than One Fiscal Year................................................................................. 3

  II.   Defendants Did Not Violate the APA or the Due Process Clause Because No Grant Award Was "Terminated"............................................................................................... 7

        A.  The Regulatory Text Supports Defendants' Position ............................................. 7

        B.  The Terms of the Grant Awards Support Defendants' Position ........................... 10

        C.  *Califano* Does Not Support Plaintiffs' Claim....................................................... 12

CONCLUSION.................................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1985) ............................................................................................... 2

*Chisom v. Roemer*,
   501 U.S. 380 (1991) ............................................................................................. 15

*E. Band of Cherokee Indians v. United States*,
   16 Cl. Ct. 75 (1988) ............................................................................................... 6

*Gov't Sys. Advisors, Inc. v. United States*,
   13 Cl. Ct. 470 (1987) ......................................................................................... 3, 12

*In re Nw. Rural Opportunities, Inc.*,
   DAB 324 (1982), 1982 WL 189564(June 30, 1982) ...................................... 14, 15

*\*Leiter v. United States*,
   271 U.S. 204 (1926) ....................................................................................... 3, 4, 12

*Md. Dep't of Human Res. v. HHS*,
   854 F.2d 40 (4th Cir. 1988) ................................................................................... 6

*Mil-Ka-Ko Research & Dev. Corp. v. Office Of Econ. Opportunity*,
   352 F. Supp. 169, 173 (D.D.C. 1972),
   *aff'd*, 497 F.2d 684 (D.C. Cir. 1974) ................................................................... 14

*Missouri Health & Med. Org., Inc. v. United States*,
   641 F.2d 870 (Ct. Cl. 1981) ................................................................................. 14

*Nat'l Consumer Info. Ctr. v. Gallegos*,
   549 F.2d 822 (D.C. Cir. 1977) ............................................................................. 14

*Nevada v. Dep't of Energy*,
   400 F.3d 9 (D.C. Cir. 2005) ................................................................................... 3

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ............................................................................................... 6

*S. Mut. Help Ass'n v. Califano*,
   574 F.2d 518 (D.C. Cir. 1977) ................................................................... 8, 12, 13

*St. Bernard's Par. Gov't v. United States,*
   134 Fed. Cl. 730 (2017) .................................................................................. 6

*United Auto., Aerospace & Agric. Implement Workers v. Donovan,*
   746 F.2d 855 (D.C. Cir. 1984) ....................................................................... 3

*Whitman v. Am. Trucking Ass'n,*
   531 U.S. 457 (2001) ...................................................................................... 8

**STATUTES**

5 U.S.C. § 701(a)(2) ........................................................................................ 16

31 U.S.C. § 1112(c) ......................................................................................... 3

31 U.S.C. 1341(a)(1)(A) .................................................................................. 6

The Congressional Budget and Impoundment Control Act of 1974,
   Pub. L. No. 93–344, § 801(a), 88 Stat. 297, 327 (1974) ............................ 3

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

42 C.F.R. § 50.404(a)(1) ......................................................................... 10, 11, 15

45 C.F.R. pt. 16, App'x A ....................................................................... 10, 11, 15

45 C.F.R. § 16.3(i) (1976) ............................................................................ 12, 13

45 C.F.R. § 74.110 (1979) ................................................................................ 14

45 C.F.R. § 74.110 (1976) ................................................................................ 13

45 C.F.R. § 75.2 ..................................................................................... 7, 8, 10

45 C.F.R. § 75.309(a) ...................................................................................... 9

45 C.F.R. § 75.372(a) ...................................................................................... 4

45 C.F.R. § 75.372 ....................................................................................... 8, 11

45 C.F.R. § 75.373 ........................................................................................... 8

45 C.F.R. § 75.374(b)(1) ................................................................................. 10

45 C.FR. § 75.210(b) ...................................................................................... 11

HHS, Uniform Administrative Requirements for Awards and Subawards to Institutions
of Higher Education, Hospitals, Other Non-Profit Organizations, and Commercial
Organizations; and Certain Grants and Agreements with States, Local Governments,
and Indian Tribal Governments,
59 Fed. Reg. 43,754-01 (Aug. 25, 1994) ................................................................. 15

Executive Office of the President, Federal Awarding Agency Regulatory Implementation of
OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for
Federal Awards,
79 Fed. Reg. 75,871 (Dec. 19, 2014) .................................................................... 15

## OTHER AUTHORITIES

*Comptroller General Warren To The Postmaster General*,
28 Comp. Gen. 553, April 1, 1949 ............................................................................. 3

Gov't Accounting Office, Principles of Federal Appropriations Law, 3rd ed.,
GAO-06-382SP ["*GAO Red Book*"] (3rd ed. 2015), https://www.gao.gov/assets/
210/202819.pdf (last visited April 13, 2018) .................................................... *passim*

Grants Policy Statement (Jan. 1, 2007),
https://www.hhs.gov/sites/default/files/grants/grants/ policies-regulations/
hhsgps107.pdf (last visited April 13, 2018) ............................................................. 9

OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10, 2012),
https://www.hhs.gov/ash/oah/ sites/default/files/oah-grantee-guidance-requesting-carryover-
funds-2012.pdf (last visited Apr. 13, 2018) ............................................................. 9

## INTRODUCTION

Plaintiffs argue that their original grant award obligates the Department of Health and Human Services ("HHS") to continue funding their programs for two additional years unless Congress ends the TPP Program altogether or the Plaintiffs take actions justifying grant "termination." This contradicts the explicit terms they accepted in their awards. Those terms specify that HHS can reconsider the program's interests and compete future years of funds to the public (and to Plaintiffs), and does not characterize such decisions as a "termination." But Plaintiffs ask the Court both to deny the public the opportunity to compete for funds and to prohibit the Executive Branch from pursuing its views as to the program interests authorized by statute. Under Plaintiff's theory, one administration would have unfettered power to enter into long-term obligations with grantees whose projects are amenable to its policy preferences, unless Congress withdraws funding entirely. A subsequent administration would be blocked from reconsidering these programs, or from carrying out its delegated policymaking authority under an annual appropriation, unless it could show that the grantees are violating the terms of their grants. This would be so even though the annual appropriation at issue here calls for making "competitive" grants and gives HHS discretion over the types of programs it may choose to fund. For instance, under Plaintiffs' theory, after their funding expires at the end of FY 2019, Defendants could compete and obligate TPP Program funds from FY 2020 until FY 2025, precluding the next administration from enforcing its policy preferences on the TPP Program.[1]

Plaintiffs' view also contradicts appropriations law. Congress passed the Anti-Deficiency Act to prohibit executive agencies from involving the government in obligations before an appropriation is made for that obligation, unless Congress states otherwise. Plaintiffs'

---

[1] The HHS Grants Policy Statement notes that "project periods" "generally will be no longer than 5 years," but there is no statutory or regulatory limit on how long a "project period" could last. Gerardi Decl., Ex. B, at I-34.

theory of how their grant instruments operate violates that statute because it would guarantee their funding, absent termination or a lapse in appropriations, without giving the government the option to renew (or, instead, recompete) under the authority of a new appropriation. Consistent with HHS's regulations, the terms and conditions of its grant awards, and the ADA, HHS has maintained for years that it is under no legal obligation to provide continuation funding and that decisions not to extend further continuation funding are not "terminations." That position leads ineluctably to the dismissal of Plaintiffs' APA claims under § 701(a)(2) because the decision to recompete a grant program is committed to agency discretion by law. Accordingly, the Court should grant Defendants' cross-motion and dismiss this case with prejudice.

## ARGUMENT

Plaintiffs' theory of the case would have troubling consequences for the authority and political accountability of the Executive Branch in situations that go well beyond the present dispute. When Congress "delegate[s] policymaking responsibilities" to an agency, as it did with the TPP Program, it is understood that "the *incumbent* administration's views of wise policy" will govern those decisions. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1985) (emphasis added). Because the President is "accountable to the people," agencies operating under him are entitled to "resolv[e] the competing interests which Congress … intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities." *Id.* at 865-66. Plaintiffs' contrary view would require incumbent officials to administer the TPP Program in line with the priorities of the *previous* administration based on agreements they reached to issue non-competing awards for multiple years that are not expressly sanctioned by statute or regulation. Plaintiffs' brief highlights disagreements over the interpretation of scientific data between political appointees and career officials as a reason for calling the legality of Plaintiffs' conduct into question. Pls.' Resp. Br. at 20-21, 28-29, ECF No.

2

16.  But the ability of politically accountable administrators to exercise discretion when Congress delegates authority is a feature of administrative law, not a flaw.  Accordingly, their APA claim must be rejected.

## I.    The ADA and *Leiter* Preclude Agreements Purporting to Obligate The Government For More Than One Fiscal Year

The TPP Program, as conceived by Plaintiffs, is intended to cover the requirements of Plaintiffs' projects for more than one fiscal year through annual funds.  Because Congress has not exempted the TPP Program from the ADA or otherwise permitted HHS to make multi-year obligations in this context,  *Leiter v. United States*, 271 U.S. 204, 206 (1926), is controlling.  *See also Gov't Sys. Advisors, Inc. v. United States*, 13 Cl. Ct. 470, 473 (1987) (explaining that the government chose not to renew the lease at issue in *Leiter* because it "determined that it was in government's best interest not to renew").  A right to terminate based on the grantee's failure to comply with the terms and conditions of the grant is not sufficient under *Leiter* because it does not require the government to "affirmatively continue" the agreement.  *Leiter*, 271 U.S. at 207; GAO Principles of Federal Appropriations Law, 3rd ed., vol. 2, ch. 6, at 6-54, GAO-06-382SP [hereinafter "GAO Red Book"][2] (3rd ed. 2015), https://www.gao.gov/ assets/210/202819.pdf ("The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations."); *Comptroller General Warren To The Postmaster General*, 28 Comp. Gen. 553, April 1, 1949 (concluding thirty-day notice and one-day "for-cause" termination provisions did not cure an ADA violation).  And *Leiter* specifically

---

[2] The Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93–344, § 801(a), 88 Stat. 297, 327 (1974), gives the Government Accountability Office (GAO) specific oversight duties on budgetary matters. *See generally* 31 U.S.C. § 1112(c).  GAO publishes the *GAO Red Book* to advise the public of its views on appropriations law. "Although GAO decisions are not binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated experience and expertise in the field of government appropriations.'" *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

rejected the idea that conditioning future funding on appropriations was sufficient to ensure ADA compliance. *Leiter*, 271 U.S. 204, 206-07; *see also GAO Red Book*, vol. 2, ch. 6, at 6-55. HHS has not yet taken an "affirmative action" under the authority of the FY 2018 appropriation necessary to require payment by the government; instead, it will obligate the funds after a new competition.

Plaintiffs attempt to sidestep the ADA's strictures by arguing that the "project period" system does not impose a "financial obligation" on the government when the initial award is conferred. Pls.' Resp. Br. at 13-15. But the essence of Plaintiffs' argument is that when Defendants initially awarded the TPP Program grants, they had a legal duty to renew Plaintiffs' funding for five years without competing the funds, subject only to appropriations and the "termination" provisions of 45 C.F.R. § 75.372(a). Plaintiffs' case relies on that duty. Yet, in opposing the government's ADA argument, Plaintiffs claim the government did not incur a financial obligation beyond current appropriations. Plaintiffs cannot have it both ways. If, in July 2017, the government had incurred no obligation for FY 2018 and FY 2019 TPP Program funds, the government was entitled to announce it would not issue continuation awards in lieu of recompetition. If, instead, the government's announcement violated a promise to give those future funds to Plaintiffs, the promise was void *ab initio* as incurring financial obligations before an appropriation was in place.

Plaintiffs' argument on this point is derived from a section of the *GAO Red Book* that addresses "contracts with no financial obligations." *GAO Red Book*, vol. I, ch. 5, at 5-43. The example the *GAO Red Book* gives of such an arrangement is a three-year contract "for an agency with a requirement for a scheduled item to order it from the contractor if the contractor has offered the lowest price," with no minimum purchase requirement and the "free[dom] to procure

4

the item from [a lower-cost] source without violating the contract." *Id.* Such an arrangement creates no obligation because it places no restrictions *at all* on the government's future expenditure of money. That is a far cry from Plaintiffs' understanding of the TPP Program. On Plaintiffs' theory, the relevant "obligational event," Pls.' Resp. Br. at 13 (quoting *GAO Red Book*, vol. 2, ch. 10, at 10-107), is not the annual Notice of Award ("NoA"), but the *initial* NoA that inaugurates the grant and requires Defendants to renew funding in future appropriations that have yet to take place, so long as the Plaintiffs abide by the terms of their agreement.

Defendants do not dispute that the government's discretion in choosing whether to renew a grant may be cabined by statute or regulation. Pls.' Resp. Br. at 14-15. But as *Leiter* and other cases applying it show, one of the goals of the ADA is to prevent government agencies from entering arrangements that take away the government's ability to control whether an obligation will occur against funds that Congress has yet to appropriate. Plaintiffs' interpretation of the relevant regulations does not simply "limit" agency discretion; it wipes out that discretion by leaving incumbent agency officials at the mercy of discretionary decisions made years in advance of current appropriations. Those policy choices are not mandated by statute or regulation, but under Plaintiffs' theory, Defendants must accede to them because the only grounds for breaking off the relationship are tied to Plaintiffs' conduct as grantees. The ADA would be scant protection, indeed, if it was satisfied by an agency's automatic conferral of grant funding upon passage of a new appropriation.

Plaintiffs also try to distinguish the authority cited in Defendants' brief because there are "fundamental differences between government contracts and grants [that] render those cases inapposite in the context of the Anti-Deficiency Act." Pls.' Resp. at 15-18. But the ADA is not so limited; it prohibits all financial "obligations" beyond a lawful appropriation, which includes

grants. 31 U.S.C. 1341(a)(1)(A) ("[a]n officer or employee of the United States Government ... may not ... make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) ("It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress."); *cf. E. Band of Cherokee Indians v. United States*, 16 Cl. Ct. 75, 78-79 (1988) (Anti-Deficiency Act prohibited Interior Department from reallocating funds to satisfy Indian entitlement program); *Md. Dep't of Human Res. v. HHS*, 854 F.2d 40, 42 (4th Cir. 1988) ("The Secretary of HHS, while under a statutory duty to schedule the transfer of grant money, is also obliged to comply with the applicable provisions of the Antideficiency Act[.]"). And the *GAO Red Book*, which Plaintiffs rely upon for this argument, explicitly states that, "[o]f course, grant obligations and expenditures are subject to the [ADA]." *GAO Red Book*, vol. 2, ch. 10, at 10-43. There are distinctions between grants and contracts that matter for purposes of other areas of appropriations law. But for all of the distinctions Plaintiffs identify between contracts and grants—their purpose, the legal rules that govern them, and the available remedies in the event of a dispute—they cannot identify a substantive difference, as far as the application of the ADA is concerned, between a contract with provisions that violate the ADA and a grant instrument that, in conjunction with its governing regulations, creates a materially identical financial relationship between the government and the recipient of federal funds. [3]

---

[3] Plaintiff's reliance on *St. Bernard's Par. Gov't v. United States,* 134 Fed. Cl. 730, 732 (2017), is misplaced. Whether a different grant involving hurricane relief is enforceable has no bearing on the grant funding at issue here. Nor does *St. Bernard's* involve the fiscal year constraints of the ADA, which control here. Moreover, the grants here conferred intellectual property rights upon the United States as part of the grant, a direct benefit to the government. *See e.g.*, Notice of Award, Grubb Decl., Ex. A, at 11 (entitling HHS to "exercise . . . intangible property rights to copyrightable works and data"). Even assuming *arguendo,* however, that the grants here somehow fail for lack of consideration, the Notices of Award upon which Plaintiffs base their five-year entitlement would also be unenforceable (which would require dismissal of Plaintiffs' claims).

The arrangement Plaintiffs believe they have with the government is closely analogous to "a contract covering the needs or requirements of more than one fiscal year." *See GAO Red Book*, vol. 2, ch. 6, at 6-51 through 6-59.  Plaintiffs point to no source of law that would exempt this arrangement from the ADA's strictures.   The Court should therefore reject the Plaintiffs' misunderstanding of their grant instruments and interpret the corresponding regulatory provisions in accordance with the proper legal backdrop.

## II.   Defendants Did Not Violate the APA or the Due Process Clause Because No Grant Award Was "Terminated"

### A.  The Regulatory Text Supports Defendants' Position

With this backdrop in place, Plaintiffs' theory on the proper interpretation of the relevant regulations fails.  "Termination" refers to the withholding of grant funding before "the planned end of period of performance."  45 C.F.R. § 75.2.  A "period of performance" is "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award."  *Id.*  The only "time" period in the grant documents consistent with this definition is the "budget period."  Work is "authorized under the Federal award" on a "budget period" basis, and the "time during which the non-Federal entity may incur new obligations to carry out" that "work" is that same one-year "budget period."  *Id.* (defining "federal award," as relevant here, as "the instrument setting forth the terms and conditions" of the grant, such as the "cooperative agreement").  Future "budget periods" within a "project period" are not "authorized under the federal award" Plaintiffs receive annually; they are projections of future funding that will not be authorized until an appropriation is in place and HHS obligates those funds through a NoA entered under the authority of that appropriation.  Because Defendants have not ended

7

Plaintiffs' funding in the middle of a "budget period," there has been no "termination" here that would trigger the requirements of 45 C.F.R. § 75.372-73.

Plaintiffs' primary response on the regulatory text is to point to the cross-reference in 45 C.F.R. § 75.2 between the terms "project period" and "period of performance."  Pls.' Resp. Br. at 6-7.  But as the regulation states, this cross-reference is for the "definitions for terms used in this part."  Had HHS wanted to rely on the term "project period" *as used in the grant instruments*, it could have done so (as it has done in the past). *See, e.g.*, *S. Mut. Help Ass'n v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977) (discussing prior version of grant regulations that defined "termination" as "the termination of the grantee's authority to charge allowable costs to a grant prior to the grant expiration date *in the grant award document*." (emphasis added)).  The upshot of Plaintiffs' argument would be that a grant recipient could "incur new obligations to carry out the work authorized under the federal award" for the entire five-year "project period" even though work is "authorized under the federal award" only for one-year "budget periods."  45 C.F.R. § 75.2.  That makes no sense.  Finally, reading "termination" in the manner Plaintiffs suggest would result in automatic renewal of the grant for the duration of the "project period" unless Congress fails to make the necessary appropriations or grounds for "termination" arise. That arrangement would be indistinguishable from the lease agreement the Supreme Court voided in *Leiter*.  Plaintiffs' discovery of five years of guaranteed funding in a cross-reference is the equivalent of finding an "elephant[] in [a] mousehole" and must be rejected.  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Plaintiffs further argue that Defendants' construction of the text must be wrong because grantees are allowed to "carryover" funds from one budget period to another.  Pls.' Resp. Br. at 3-4, 8-9.  It is true that the "[f]unds available to pay allowable costs during the period of

performance include both Federal funds awarded and carryover balances" expressly approved by the agency from previous budget periods. 45 C.F.R. § 75.309(a). But this narrow exception actually proves Defendants' point. Carryover is only permitted when it is expressly approved by a grants management officer, after receipt of a timely request by the grantee. Grants Policy Statement at II-56, II-57 (Jan. 1, 2007), https://www.hhs.gov/sites/default/files/grants/grants/ policies-regulations/hhsgps107.pdf (last visited April 13, 2018). A grantee that spends carryover funds without permission can be sanctioned by HHS. *Id.* at II-56. "Carryover" is therefore not an unrestricted license to spend awarded funds in future project periods; "[c]arryover of funds from one year to multiple years beyond the immediate budget period is not allowable." OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10, 2012), at 2, https://www.hhs.gov/ash/oah/sites/default/files/oah-grantee-guidance-requesting-carryover-funds-2012.pdf (last visited Apr. 13, 2018). Rather, when a carryover request is approved, the carryover is integrated into the "notice of award," either by "revis[ing] the NoA authorizing the grantee to spend the unobligated funds for additional approved purposes as requested" or "us[ing] the balance to reduce or offset funding for a future budget period." *Id.*; *see also* Notice of Award, Jenner Decl., Ex. C, at 1, box 12 (noting offset for "unobligated balance from prior budget periods"). Carryover funds are therefore closely tied to the "federal award" for the current "budget period" and support the position that the "period of performance" is the "budget period."

Defendants' position does not "make[] nonsense out of the distinction between the budget period and project period," as Plaintiffs claim. Pls.' Resp. Br. at 9-10. The Plaintiffs' absurdity argument assumes the point it is trying to prove: that the "project period," as used in the grant instruments, is equivalent to the "period of performance" in the regulations. Defendants' definition is perfectly compatible with issuing non-competing continuation applications during a

"project period" to fund an additional "period of performance," or "budget period," and would not require the agency to recompete funds annually.  By contrast, Plaintiffs' position creates genuine issues in interpreting other regulations.  For instance, HHS's internal appeal rules rely on the distinction between decisions to "terminate" a grant (which are always appealable) and the "denial of a noncompeting continuation award under the project period system" (which is only appealable "where the denial is for failure to comply with the terms of a previous award").  45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3) (stating jurisdiction of HHS's departmental appeals board); 42 C.F.R. § 50.404(a)(1), (4) (same).[4]  Plaintiffs' interpretation of "period of performance" would make the latter provision redundant because every refusal to extend continuing support would be a "termination."  Ultimately, Defendants' interpretation is more congruent with the regulatory text, other regulations, HHS's guidance, and background legal principles.  It should therefore govern this dispute.

## B.  The Terms of the Grant Awards Support Defendants' Position

Plaintiffs also rely upon excerpts from HHS websites and the funding opportunity announcements ("FOAs") to support their understanding that Defendants committed HHS to five years of funding.  *See* Pls.' Resp. Br. 5-6.  But none of these statements expressly promise guaranteed funding absent grounds for termination or a lapse in appropriations.  For instance, the FOAs and materials available on HHS's website note that funding is only provided on a "budget period" basis, even though grants are "programmatically approved" for a longer period.  *See id.* Moreover, even if these statements could bind the government (they cannot), they must be read in harmony with the legal backdrop of the ADA and other guidance provided by the agency.

---

[4] *See also* 45 C.F.R. § 75.374(b)(1) (invoking these appeal rules in HHS's general grant administration principles); 45 C.F.R. § 75.2 (defining "Departmental Appeals Board" with respect to part 16 of title 45); Letter from Beth DeSantis to Evelyn M. Kappeler, DeSantis Decl., Ex. M, at 2 (invoking appeal procedures of § 50.406, which comes from the same subpart as § 50.404, to challenge decision not to issue further continuing support).

This includes the Grants Policy Statement ("GPS") referenced in the FOAs and incorporated into the NoAs,[5] which provides that the "projections of future funding levels" during a "project period" "are not guarantees that the project or program will be funded or will be funded at those levels" and "create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the NoA."  Gerardi Decl., Ex. B, at I-34.  HHS can choose to compete a grantee's funds instead of renewing continuing support if it concludes, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government."  *Id.* at II-89. That choice is different in kind from a "termination," which is treated separately in the GPS and the regulations.  *Id.* at II-89, II-90; *see also* 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3); 42 C.F.R. § 50.404(a)(1), (4).  Plaintiffs accepted these provisions when they drew down their funding and cannot ignore them when categorizing Defendants' representations about the conditions of their grant funding.

Plaintiffs take Defendants to task for their reliance on the GPS's statements about the lack of a legal obligation to provide continuation funding, arguing that "termination on the basis of 'best interests' is not permitted by the relevant HHS regulations."  Pls.' Resp. Br. 22-25.  But Defendants have never contended that HHS can "terminate" a grant on this basis; as Plaintiffs correctly point out, "termination" is limited to the circumstances defined by 45 C.FR. § 75.372. But a "termination" is not equivalent to a decision not to extend continuing support.  Absent some rule or regulation that guides the agency's discretion, the agency is free to choose recompetition if, in their discretionary judgment, it would serve the best interests of the

---

[5] Plaintiffs suggest that the certain provisions of the GPS do not apply because they were not included on the face of the grant instruments. Pls.' Resp. Br. at 23.  By regulation, HHS "must include wording [in the Notice of Award] to incorporate, by reference, the applicable set of general terms and conditions.  [T]he reference must be to the Web site at which the HHS awarding agency maintains the general terms and conditions."  45 C.F.R. § 75.210(b).  The Notices of Award do exactly that.  *See, e.g.,* Jenner Decl., Ex. A, at 1, 4 ("You must comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in [the] applicable [HHS GPS] ….").

government. *Leiter*, 271 U.S. at 205-06; *Gov't Sys. Advisors*, 13 Cl. Ct. at 473. And although other HHS grant programs incorporate a "best interests" provision into their regulatory criteria for considering whether to extend continuing support, *see* Pls.' Resp. Br. at 24, Plaintiffs do not conted that such a regulation applies here. The GPS correctly describes Defendants' rights with respect to these programs and points to the correct outcome here.

### C. *Califano* Does Not Support Plaintiffs' Claim

Plaintiffs place extensive reliance in their reply brief on *Califano*, a case they did not even cite, let alone discuss, in their opening papers. In that case, HHS's predecessor agency (the Department of Health, Education, and Welfare, or "HEW") denied the plaintiff's application for continuing funding on the basis of an allegation that the plaintiff had engaged in serious misconduct. *Califano*, 574 F.2d at 520-21. The D.C. Circuit agreed that HEW had "terminated" the plaintiff's grant by after reviewing the overall regulatory context and accompanying policy statements. *Id.* at 526. As relief, the Court ordered a hearing to afford the plaintiff an opportunity to rebut the allegations against it and have them "stricken from the record, in whole or in part[,]" if appropriate, in order to redress the reputational harm Plaintiff alleged as a result of HEW's allegations. *Id.* at 528. Plaintiffs urge the Court to reject Defendants' argument in this case because it is "substantially identical" to the situation facing the D.C. Circuit in *Califano*. There are many compelling reasons why that is not the case.

To begin with, the regulatory language at issue in *Califano* is materially different from the language in today's regulations. The operative language in *Califano* defined "termination" as "termination of the grantee's authority to charge allowable costs to a grant prior to the grant expiration date in the grant award document." *Id.* at 526 (citing 45 C.F.R. § 16.3(i) (1976)). Plaintiffs assert that the "current regulatory definition of termination … is strikingly similar to

the regulatory definition at the time," Pls.' Resp. Br. at 12, but the definition they point to was not directly at issue in *Califano*. It was a "secondary definition" that the "district court conceded would, if applicable, lead to the conclusion that [plaintiff] had suffered a termination." *Califano*, 574 F.2d at 528 (discussing 45 C.F.R. § 74.110 (1976)). The Court accepted this concession and used it as evidence in interpreting § 16.3(i), which was the disputed definition in *Califano*. *Id.* at 526. Even if one assumes the D.C. Circuit's comments on § 74.110 were not dicta, the current definition of "termination" incorporates the terms "federal award" and "period of performance," which do not appear in the older definition. *Califano* therefore does not compel Plaintiffs' preferred interpretation of the modern regulations.

The specifics of the asserted injury in *Califano* further shaped the D.C. Circuit's decision in ways that make it inapposite here. The plaintiff's entitlement to additional funding in the two remaining fiscal years covered by its "project plan" was not at issue in *Califano* because the "fiscal years [had already] passed[.]" *Id.* at 522 n.22. The D.C. Circuit grounded standing not on the possibility of future grant awards under its "project plan," but on "the assertion … that its good name and reputation have been damaged." *Id.* at 524. HEW took the position that the regulations only provided for an administrative appeal in the event of a "termination." *Id.* at 521. In order to ensure "maximum due process" and "avoid deciding constitutional questions" regarding the plaintiff's right to a hearing, the D.C. Circuit read HEW's regulations at the time "in the light most favorable to the grantee" to reach the conclusion that a "termination" had occurred and guarantee the plaintiff a hearing to contest the misconduct charges. *Id.* at 525, 527.

The posture of this case could not be more different. Unlike the plaintiff in *Califano*, Plaintiffs are seeking additional grant funding, not a hearing. Courts in this District have already ruled that grantees lack a due process right to continued funding, which would be necessary to

13

extend *Califano*'s logic to the facts of this case.  *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d

822, 828 & n.6 (D.C. Cir. 1977) ("four years of funding" of grants on a "year-to-year basis,"

coupled with "ambiguous representations" regarding continued funding, did not create a right to

continued funding for due process purposes); *Mil-Ka-Ko Research & Dev. Corp. v. Office Of*

*Econ. Opportunity*, 352 F. Supp. 169, 173 (D.D.C. 1972) ("A denial of an application for

refunding … is merely the disappointment of a 'unilateral expectation' of a benefit and is

unencumbered with the constitutionally required burden of procedural due process."), *aff'd*, 497

F.2d 684 (D.C. Cir. 1974).  Another contemporaneous decision from the Court of Claims

considered an argument similar to the one presented in *Califano* as a basis for extracting further

funding, rather than mere procedural protections, but rejected it on the grounds that a grantee had

no legal entitlement to future years of funding within a "project period."  *See Missouri Health &*

*Med. Org., Inc. v. United States*, 641 F.2d 870, 873-74 (Ct. Cl. 1981) (holding that "[the]

regulations make it clear that HEW was under no obligation to renew [plaintiff's] grant ….").

And Plaintiffs understandably do not suggest a legal basis under which it would be proper in this

case to read the regulations at issue in the light most favorable to them, as no rule of

administrative law mandates such deference.

Finally, HHS's reaction to *Califano* after it was decided should remove any doubt that the

case is relevant today.  After the decision, HEW "clarified its regulations" in order "to

specifically distinguish a termination of previously awarded funds from a denial of further

funding" and "explicitly exclude[] refusal to extend a grant or award new funds" from the scope

of the regulatory "termination" clause, "citing, as an example, the refusal to make a non-

competing continuation award."  *In re Nw. Rural Opportunities, Inc.*, DAB 324 (1982), 1982

WL 189564, at *1 & n.1 (discussing 45 C.F.R. § 74.110 (1979) and *Califano*)).  The changes

14

further buttressed "the policies stated in the PHS Grants Administration Manual and PHS Grants Policy Statement" in effect at the time. *Id.* And the distinction between "terminations" and decisions to not offer continuing support persists in both the regulations and the Grants Policy Statement to this day. 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3); 42 C.F.R. § 50.404(a)(1), (4); Gerardi Decl., Ex. B, at I-33, I-34, II-89, II-90.

Plaintiffs acknowledge HEW's reaction to *Califano* and try to avoid its implications by pointing to the numerous revisions to the definition of "termination" that have taken place since the late 1970s. Pls.' Resp. Br. at 12-13. But neither the 1994 revisions to the regulations (which were intended to implement OMB Circular A-110) nor the 2014 revisions to the regulations (which repealed and replaced OMB Circular A-110 with a standard set of rules for the management of federal grant programs that individual agencies implement) say anything about *Califano* or the specific changes to the regulation that are at issue here, much less endorse a decision that HEW repudiated nearly forty years ago.[6] It is unlikely that HHS adopted *Califano* through implementation of Circular A-110 while remaining ignorant of the policy implications for decades. *Cf. Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("In a case where the [proposed] construction of legislative language … makes so sweeping and so relatively unorthodox a change … judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.") (citation omitted). Such a change would require significant modifications to at least the GPS and the appeal regulations to reflect the differences—changes HHS has not made to date.

---

[6] *See* Executive Office of the President, Federal Awarding Agency Regulatory Implementation of OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871, 75,873 (Dec. 19, 2014); HHS, Uniform Administrative Requirements for Awards and Subawards to Institutions of Higher Education, Hospitals, Other Non-Profit Organizations, and Commercial Organizations; and Certain Grants and Agreements with States, Local Governments, and Indian Tribal Governments, 59 Fed. Reg. 43754-01 (Aug. 25, 1994).

In summary, *Califano* is based on different regulations that were interpreted in a novel way to avoid a legal issue not present in this case.  Those differences, and the subsequent reaction to the opinion by HEW, make it an unreliable basis for a ruling in favor of the Plaintiffs.

**III.    Because No Grant Was "Terminated," Plaintiffs' APA Claim Fails**

With these background legal questions resolved, the proper adjudication of Plaintiffs' APA claim is straightforward.  The Plaintiffs' "arbitrary and capricious" argument takes as its premise that Defendants "terminated" the Plaintiffs grants.  Pls.' Resp. Br. at 18-21. But there was no "termination" in this case; Defendants merely chose not to issue further continuing support to Plaintiffs in order to recompete TPP Program funds. Plaintiffs point to no other statute or regulation that Defendants violated as a result of the decision to recompete the TPP Program at the end of the 2017-18 "budget period."

As a consequence, this decision is committed to agency discretion by law under 5 U.S.C. § 701(a)(2).  Defendants' opening brief showed that decisions regarding the allocation and selection of participants in a grant program fit squarely within this narrow exception to APA review.  Defs.' Opp'n Br. at 19-22, ECF No. 13.  Plaintiffs only distinguish the authority supporting this proposition on the grounds that they do not contemplate cases in which a decision regarding grant funding violates a statute or regulation.  Pls.' Resp. Br. at 27-29.  But as shown, no such violation exists.  Accordingly, the Court lacks jurisdiction under the APA to review the dispute over Defendants' decision to recompete the grants.[7]

---

[7] Alternatively, Defendants request entry of summary judgment on the administrative record because it was not "arbitrary and capricious" to choose to recompete TPP Program funds under the terms and conditions of the grant award that Plaintiffs' accepted by drawing down their TPP Program funds.  *See* Defs. Op. Br. at 28.

**CONCLUSION**

For these reasons, the Court should respectfully grant Defendants' motion to dismiss or for summary judgment.

Dated:  April 13, 2018                     Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          JESSIE K. LIU
                                          United States Attorney

                                          JOEL McELVAIN
                                          Assistant Branch Director, Federal Programs
                                          Branch

                                          RUTH A. HARVEY
                                          Director, Commercial Litigation Branch

                                          MICHAEL J. QUINN
                                          Senior Litigation Counsel, Commercial
                                          Litigation Branch

                                          /s/ *Michael J. Gerardi*
                                          Michael J. Gerardi
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Ave. NW, Room 7223
                                          Washington, D.C. 20530
                                          Tel: (202) 616-0680
                                          Fax: (202) 616-8460
                                          E-mail: michael.j.gerardi@usdoj.gov

                                          /s/ *Jonathan E. Jacobson*
                                          Jonathan E. Jacobson
                                          Alicia M. Hunt
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division, Commercial Litigation Branch
                                          1100 L St. NW, 10th floor
                                          Washington, D.C. 20005
                                          Tel: (202) 353-7971
                                          Fax: (202) 514-9163
                                          E-mail: jonathan.e.jacobson@usdoj.gov

                                          *Attorneys for Defendants*

18

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2018, a true and correct copy of the foregoing was served on plaintiffs via their counsel of record through the Court's Electronic Case Filing (ECF) system.

/s/ *Michael J. Gerardi*_____
Michael J. Gerardi