**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
POLICY AND RESEARCH, LLC, *et al.*,  )
                                    )
            Plaintiffs,              )
                                    )
            v.                       )    No. 18-cv-00346 (KBJ)
                                    )
UNITED STATES DEPARTMENT OF          )
HEALTH AND HUMAN SERVICES, *et al.*, )
                                    )
            Defendants.              )
_____     )

**<u>MEMORANDUM OPINION</u>**

As far as the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, is

concerned, this much is clear: a federal agency that changes course abruptly without a

well-reasoned explanation for its decision or that acts contrary to its own regulations is

subject to having a federal court vacate its action as "arbitrary [and] capricious," *id.*

§ 706(2)(A); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26

(2016); *Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 48–49 (1983); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d

999, 1009 (D.C. Cir. 2014).  Plaintiffs Policy and Research, LLC, Project Vida Health

Center, Sexual Health Initiatives for Teens North Carolina, and South Carolina

Campaign to Prevent Teen Pregnancy (collectively, "Plaintiffs") seek that remedy in the

instant lawsuit; they have filed a complaint that alleges arbitrary and capricious action

on the part of Defendants U.S. Department of Health and Human Services and Secretary

Alex Azar ("HHS" or "Defendants") with respect to HHS's administration of the federal

Teen Pregnancy Prevention Program ("the TPPP"), because, according to Plaintiffs, HHS suddenly and unlawfully terminated their TPPP grant funding without explanation and in contravention of applicable HHS regulations.  (*See* Compl., ECF No. 1, ¶¶ 71–75; *see also* Pls.' Mem. in Supp. of Combined Mot. for Prelim. Inj. & for Expedited Summ. J. ("Pls.' Mem."), ECF No. 6-1, at 33–39.)[1]  In the context of the cross-motions for expedited summary judgment that are before this Court at present, HHS responds that, first of all, it has not "terminated" Plaintiffs' TPPP awards; rather, it has merely exercised its authority to withhold funding for the two fiscal years that remain with respect to the five-year programmatic approval that Plaintiffs received in 2015.  (*See* Mem. in Supp. of Defs.' Cross-Mot. to Dismiss or for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Mem."), ECF No. 13, at 19–27.)  HHS also insists that its decision to stop funding Plaintiffs' projects two years shy of the initial award period is "committed to agency discretion by law" and thus not subject to judicial review.  (*See id*. at 27–30.)

Notably, HHS appears to have placed all of its eggs into the unreviewability basket, because the agency does not dispute that the one-sentence notice it provided to Plaintiffs announcing the shortening of Plaintiffs' TPPP project periods violates the APA.  (*See* Hr'g Tr., ECF No. 20, at 23:15–21.)  Consequently, the parties' cross-motions focus on the threshold inquiry into whether there are meaningful standards for this Court to apply when reviewing that agency decision, such that the Court can reach the merits of Plaintiffs' challenge to HHS's determination at all.  At bottom, *that* debate reduces to an argument about the appropriate characterization of the agency action at

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

issue: was it a "termination" of Plaintiffs' grants within the meaning of the framework set forth in the HHS regulations, or a withholding of grant funding under the agency's less-well-defined Grants Policy Statement, which appears to indicate that HHS can withhold funding non-competing continuation award if the agency determines that, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government"?  (Grants Policy Statement, Ex. B to Decl. of Michael Gerardi, ECF No. 13-1, at 13.)

To accommodate the parties' need for expeditious resolution of Plaintiffs' APA claim, this Court ruled on their cross-motions orally on April 19, 2018—the day after the motion hearing.  The Court announced its conclusion that HHS had terminated Plaintiffs' grants within the meaning of the agency's regulations, and thus Plaintiffs' APA claim is subject to judicial review.  (*See* Tr. of Oral Ruling, ECF No. 21, at 13:8–22.)  The Court also held that HHS's termination of Plaintiffs' TPPP grants was plainly arbitrary and capricious and in violation of the law for APA purposes.  (*See id.* at 21:6–14.)

The instant Memorandum Opinion provides a more comprehensive explanation of the Court's conclusions.  In short, it is clear to this Court that, while a federal agency's allocation of congressionally-appropriated grant funding is the type of discretionary action that is presumptively unreviewable, HHS's regulations provide clear and applicable standards for evaluating Plaintiffs' challenge to the agency's decision to shorten the project periods for Plaintiffs' federal awards, such that HHS's decision to shorten Plaintiffs' project periods is not unreviewable agency action.  And because HHS terminated Plaintiffs' grant funding within the meaning of the HHS

3

regulations without any explanation and in contravention of its own regulations, HHS's action easily qualifies as an arbitrary and capricious act under the APA.  Therefore, as detailed in this Court's April 19, 2018 Order (*see* ECF No. 19), Plaintiffs' motion for summary judgment has been **GRANTED** and Defendants' motion for summary judgment has been **DENIED**.  In addition, this Court has **VACATED** the agency's decision to shorten the project period for Plaintiffs' projects, and has ordered HHS to accept and process Plaintiffs' applications as if the agency had never terminated Plaintiffs' federal awards.

## I.    BACKGROUND

### A.    The History And Administration Of The Teen Pregnancy Prevention Program

The federal government has long recognized that teenage pregnancy carries "high economic, social, and health costs" for teen parents, their families, and society at large. Carmen Solomon-Fears, *Teenage Pregnancy Prevention: Statistics And Programs* 1, 2 (Jan. 15, 2016).[2]  In the late 1970s and early 1980s, Congress set out to address this problem.  By statute, Congress established a number of federal programs aimed at reducing the rate of teen pregnancy in America, and over the years, Congress has repeatedly increased the number of programs, and the amount of federal funding, directed toward those efforts.  *See id.* at 8–10.  Meanwhile, the teen pregnancy rate in the United States has steadily fallen.  *See id.* at 7.

Notably, although the federal government's commitment to reducing teenage pregnancy has never waned, its preferred method of addressing this societal concern has changed over time.  These shifts in policy roughly occurred during three separate

---

[2] *Available at* https://fas.org/sgp/crs/misc/RS20301.pdf.

periods.  First, between 1981 and 1996, the federal government funded programs that educated teenagers and their families about abstinence, contraceptives, sexual health, and the social services available to young mothers.  *See id.* at 8–9.  Then, from 1996 to 2009, Congress used "abstinence-only education as the primary tool" for lowering teen pregnancy rates, and did not authorize funding for preventative services that promoted the use of contraceptives or birth control.  *Id.* at 9.  Most recently, beginning in 2009, Congress once again provided funding that could be used for both "abstinence-only and contraception information/services" approaches.  *Id.* at 10.

Congress created the TPPP as part of this latest shift in policy.  The program was initially enacted through the Consolidated Appropriations Act of 2010, and most recently, the Consolidated Appropriations Act of 2018 reauthorized it.  In relevant part, the 2018 appropriations legislation provided that

> of the [$470,629,000] made available under this heading, $101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants . . . .

Consol. Appropriations Act of 2018, Pub. L. No. 115–141.  Through this appropriation, Congress further specifically stated that it was funding contracts and grants for two types of projects; namely, on the one hand, projects that seek to replicate successful evidence-based approaches that discourage teen pregnancy, *see id.* (specifying that the bulk of the $101 million "shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors"), and on the other hand, projects that involved the researching and developing of new evidence-

based approaches for lowering the teen pregnancy rate, *see id.* (reserving some of the funds "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy").

After Congress first appropriated funding for the TPPP in 2009, HHS undertook to authorize "cooperative agreements"—a type of funding agreement that involves substantial government monitoring—in order to administer Congress's directives with respect to the TPPP.  (*See, e.g.*, Funding Opportunity Announcement 2015–2020 ("FOA 2015–2020"), Ex. N to Decl. of Scott Sherman, ECF No. 6-7, at 87.)  In most cases, HHS "programmatically approved" selected TPPP projects "for support in their entirety."  (Grants Policy Statement at 12.)  And, indeed, the grants at issue in the instant case each involved five-year project periods.  (*See, e.g.*, FOA 2015–2020 at 88; Policy and Research Notice of Award FY 2015–2016 ("Notice of Award 2015–2016"), Ex. A to Jenner Decl., ECF No. 6-2, at 11.)

Significantly for present purposes, although HHS programmatically and prospectively approved the TPPP projects for up to five-year terms, the agency actually provided the grant funding for each project "in annual increments called budget periods."  (Grants Policy Statement at 12.)  Thus, each five-year project period contained five budget periods (*id.*), and the grant recipients' actual receipt of funding for the second, third, fourth, or fifth budget periods was conditioned upon its submission of what HHS calls a "noncompeting [continuation] application" (FOA 2015–2020 at 90; *see also* Grants Policy Statement at 10).  HHS reviews these applications to ensure that the project remains eligible for federal funding—i.e., that federal funding has been appropriated, that the project has been making satisfactory

progress, and that the grantee has maintained adequate stewardship of federal funds. (*See* FOA 2015–2020 at 88; Notice of Award 2015–2016 at 11 (listing projected grant payments for years two, three, four, and five, and indicating that such "future support" is "[s]ubject to the availability of funds and satisfactory progress of the project"); *see also* Guidance for Preparing a Non-Competing Continuation Grant Application, Ex. C to Gerardi Decl., ECF No. 13-1, at 18.)  Absent any of these circumstances, an entity's annual non-competing continuation application is ordinarily approved, and the agency then issues a legal document known as a "Notice of Award[,]" which authorizes the grant recipient to access the designated TPPP funding for the following fiscal year. (*See* Notice of Award 2015–2016 at 11.)

The most recent TPPP award cycle began in July of 2015, and was scheduled to have a five-year project period lasting from July of 2015 to June of 2020.  (*See, e.g.*, *id.*; *see also* FOA 2015–2020 at 88.)  However, in July of 2017, HHS issued notices of award for the 2017–2018 fiscal year that not only provided the 2015–2020 TPPP projects with funding for the ensuing budget year, but that also stated: "[t]his award . . . shortens the project period to end on June 30, 2018[,] at the end of this budget year." (*See, e.g.*, Policy and Research Notice of Award FY 2017–2018, Ex. J. to Jenner Decl., ECF No. 6-2, at 82.)  This was the first and only notice that Plaintiffs received indicating that the project period for their TPPP projects would end in 2018, two years earlier than expected, and that HHS would not be providing any additional funding for subsequent years.  Moreover, these notices provided no explanation for HHS's decision to shorten the project period for the 2015–2020 TPPP awards.  (*See, e.g.*, *id.*)

### B.    Facts Specific To Plaintiffs' Suit

This case concerns four organizations with TPPP grants that received the

aforementioned notice from HHS that their previously approved five-year project periods were being shortened.  Plaintiff Policy and Research, LLC had obtained two five-year funding awards for the 2015–2020 award cycle, which allowed it to run two programs that seek to decrease the prevalence of teen pregnancy among eighteen- and nineteen-year-old African American and Latina women, and among youths between the ages of fourteen and nineteen who have suffered trauma and are receiving outpatient counseling services.  (*See* Jenner Decl., ECF No. 6-2, ¶¶ 1, 5–7.)  Plaintiff Sexual Health Initiatives for Teens North Carolina also received two funding awards for the TPPP's 2015–2020 cycle (only one of which is at issue here); these grants fund the integration of what is known as "prevention programming" into North Carolina's foster care and juvenile detention systems.  (*See* Baird Decl., ECF No. 6-4, ¶¶ 2, 5.)  Plaintiff South Carolina Campaign to Prevent Teen Pregnancy used its two 2015–2020 TPPP awards to provide programs and services aimed at reducing teen pregnancy rates among youths in juvenile justice centers, foster care, and certain high-need counties within South Carolina.  (*See* De Santis Decl., ECF No. 6-3, ¶¶ 2, 5–7.)  Finally, Plaintiff Project Vida Health Center received one five-year award for the 2015–2020 funding cycle, which sustained three teen pregnancy prevention programs in middle schools and high schools located in rural, predominantly Hispanic communities with high teen birth rates.  (*See* Schlesinger Decl., ECF No. 6-5, ¶¶ 2–3.)

While Plaintiffs come from different states and use the TPPP money they have received in different ways, these organizations have a number of things in common.  It is undisputed that each has complied with all of the TPPP's requirements, and that each has submitted the routine non-competing continuation applications that HHS mandates.

(*See* Jenner Decl. ¶ 11; De Santis Decl. ¶ 11; Baird Decl. ¶ 10; Schlesinger Decl. ¶ 7.) Moreover, as mentioned, each organization learned in early July of 2017 that their five-year project periods would be discontinued at the close of year three on June 30, 2018. (*See* Jenner Decl. ¶ 16; De Santis Decl. ¶ 16; Baird Decl. ¶ 14; Schlesinger Decl. ¶ 11.) It is undisputed that these organizations are not able to obtain alternative sources of funding to offset the loss of funds from the TPPP grants (*see* Jenner Decl. ¶ 21; De Santis Decl. ¶ 21; Baird Decl. ¶ 20; Schlesinger Decl. ¶ 16), and the loss of funding will force Plaintiffs to cease ongoing studies, terminate programs currently taking place in various communities, and lay off employees (*see* Jenner Decl. ¶ 23; De Santis Decl. ¶ 22; Baird Decl. ¶ 23; Schlesinger Decl. ¶ 20).

### C.    Procedural History

On February 15, 2018, Plaintiffs filed the instant action in this Court,[3] challenging HHS's decision to shorten their project periods.  About a week after bringing this action, Plaintiffs filed a combined motion for a preliminary injunction and expedited summary judgment.  (*See* Pls.' Combined Mot. for Prelim. Inj. & for Expedited Summ. J., ECF No. 6.)  Because the parties subsequently agreed to move ahead with expedited summary judgment proceedings, the briefing and arguments featured at this Court's motion hearing of April 18, 2018 focused on the merits of Plaintiffs' complaint and Defendants' nonjusticiability contention.

---

[3] Notably, similar organizations across the country simultaneously filed three other lawsuits on the same day.  The other cases that pertain to these issues include *Healthy Teen Network v. Department of Health and Human Services.*, No. 18-cv-468 (D. Md. filed Feb. 15, 2015); *Planned Parenthood of Greater Washington and North Idaho, et al. v. Department of Health and Human Services*, No. 18-cv-55 (E.D. Wa. filed Feb. 15, 2018); and *King County v. Azar, et al.*, No. 18-cv-242 (W.D. Wa. filed Feb. 15, 2018).

In their complaint and summary judgment motion, Plaintiffs' primary contention is that HHS's termination of their TPPP grants violated the APA's prohibition on "final agency action that is arbitrary, capricious, [an abuse of discretion,] and [otherwise] not in accordance with law" (Compl. ¶ 3), because "HHS terminated [P]laintiffs' grants without explanation" and in contravention of the requirements set forth in its own regulations (*id.* ¶ 74; *see also* Pls.' Mem. at 33–39).[4]  HHS responded to Plaintiffs' substantive APA claim and summary judgment motion with its own motion for summary judgment, which argues that the agency's decision to shorten the project period and discontinue funding for Plaintiffs is an unreviewable decision committed to agency discretion (*see* Defs.' Mem. at 27–30), and further maintains that Plaintiffs have no legal right to continued funding under any statute, regulation, or award document issued by HHS (*see id.* at 19–27).  As noted, the Court announced its decision on the parties' cross-motions orally on April 19, 2018, and issued an Order granting summary judgment for Plaintiffs and denying HHS's summary judgment motion on that same date.  (*See* Order.)

## II.   STATUTORY FRAMEWORK AND LEGAL STANDARDS

### A.  The APA's Arbitrary And Capricious Standard

The APA provides that any person "adversely affected or aggrieved" by agency action may seek "judicial review thereof[,]" 5 U.S.C. § 702, if the agency's action

---

[4] Plaintiffs brought three additional counts in the initial complaint; they alleged that HHS intended to withhold funds appropriated by Congress in contravention of (1) the Consolidated Appropriations Act of 2017, Pub. L. No. 115-31; (2) the Impoundment Control Act of 1974, 2 U.S.C. § 683; and (3) the Anti-Deficiency Act, 31 U.S.C. § 1512(c)(1).  (*See* Compl. ¶¶ 76–88.)  But on April 6, 2018, the parties voluntarily stipulated to dismissing these counts based on HHS's representation that the funds were not being wrongfully withheld because the agency intended to "recompete" the funds to other projects under the TPPP.  (*See* Joint Stipulation of Partial Dismissal, ECF No. 15; Suppl. Decl. of Michon Krestchmaier, Ex. A to Joint Stipulation of Partial Dismissal, ECF No. 15-1.)

constitutes a "final agency action for which there is no other adequate remedy in a court[,]" *id.* § 704.  In the context of such a review, the court may be asked to determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  *Id.* § 706(2)(A).  And in so doing, the court must judge the propriety of the agency's action based "solely [on] the grounds invoked by the agency" when it made the challenged decision.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

The goal of such review is to assess whether or not the agency reached its decision through a "logical and rational" process.  *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (internal quotation marks and citation omitted).  Thus, it is axiomatic that the agency has to have "articulate[d] . . . a rational connection between the facts found and the choice[s] [it] made."  *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted).  Moreover, as the Supreme Court has repeatedly explained, "[i]t will not do for a court" (or for the parties affected by an agency decision, for that matter) "to be compelled to guess at the theory underlying the agency's action[.]"  *Chenery Corp.*, 332 U.S. at 196–97; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) ("[W]e insist that an agency . . . articulate a satisfactory explanation for its action." (internal quotation marks and citation omitted)); *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir 2004) (holding that a conclusion accompanied by "*no* explanation" is the epitome of "arbitrary and capricious" decision-making (emphasis in original)).

It is also clear beyond cavil that an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute.  *See*

*Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009; *see also United States v. Nixon*, 418 U.S. 683, 695–96 (1974).  Agencies have a duty to exercise their considerable discretion in a manner that conforms with the rule of law, which means that they cannot consider their decision-making to be constrained by some parts of a statute or agency regulation and not others.  *See Nixon*, 418 U.S. at 695–96.  Where applicable, *all* parts must be given effect; thus, while an administrative agency can certainly "amend or repeal its own regulations," it is not free to "ignore or violate its regulations while they remain in effect."  *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978).

## B. Committed To Agency Discretion By Law

Notably, even with respect to a plausible claim of purportedly unlawful agency action, the threshold question of whether the court has authority to consider a given APA claim sometimes arises.  That is, "before any review at all may be had, a party must first clear the hurdle of [section] 701(a)[,]" which sets forth certain circumstances under which an agency's decision (however arbitrary) is not reviewable.  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  Generally speaking, there exists "a basic presumption of judicial review" in APA cases, *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), but that presumption falls away if, *inter alia*, the challenged agency decision is "committed to agency discretion by law[,]" *NTCH, Inc. v. FCC*, 841 F.3d 497, 503 (D.C. Cir. 2016) (internal quotation marks and citation omitted); *see also* 5 U.S.C. § 701(a)(2).  Pursuant to this "very narrow" exception, *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (internal quotation marks and citation omitted), a court cannot review certain discretionary decisions taken by an agency,

*Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011).  However, and notably this circumstance does not arise and does not apply merely because "a statute grants broad discretion to an agency[.]"  *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam).  Rather, it is well established that an action is entirely committed to agency discretion only "where 'a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  *Seeger v. U.S. Dep't of Def.*, 17-cv-639, 2018 WL 1568883, at *7 (D.D.C. March 30, 2018) (quoting *Chaney*, 470 U.S. at 830)).

Within the D.C. Circuit, evaluating whether or not an agency's action is committed to agency discretion by law—and is therefore unreviewable as a threshold matter—involves a two-step inquiry.  *Sierra Club*, 648 F.3d at 855.  First, a court must consider "the *nature* of the administrative action at issue" to determine whether there is a presumption in favor of, or against, judicial review.  *Id.* (emphasis added) (internal quotation marks and citation omitted).  Indeed, although the APA ordinarily presumes that a federal court may review an agency's actions, *Abbott Labs*, 387 U.S. at 140, some types of administrative actions actually carry the *opposite* presumption—i.e., with respect to certain matters, a federal court presumptively *cannot* review the agency's decisions, *see, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (lump-sum appropriations); *Chaney*, 470 U.S. at 831 (enforcement decisions).

Once a court determines which presumption applies, it proceeds to the second step of the inquiry, by looking to "the language and structure" of the underlying statute and agency regulations relating to the agency's decision in order to assess the reviewability of the challenged agency action.  *Sierra Club*, 648 F.3d at 855 (internal quotation marks and citation omitted).  What a court is looking for at this point depends

13

entirely upon which way the presumption lies.  If the agency action is presumptively reviewable, a court will be able to review the action *unless* the relevant statute and regulations provide absolutely "no law to apply[.]"  *Sierra Club*, 648 F.3d at 855 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)); *see also Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 70 (D.C. Cir. 2002) (explaining that there is no law to apply if no "judicially manageable standards" exist and thus "discernable, meaningful judicial review is impossible").  If, on the other hand, an agency's action is presumptively *un*reviewable, then the Court can only review the agency's decision if the "operative" statute or regulations provide "clear guidelines by which to do so, or otherwise evince[] an intent to constrain the [agency's] discretion." *Drake*, 291 F.3d at 71; *see also Sierra Club*, 648 F.3d at 830 (evaluating whether a "meaningful standard against which to judge the agency's exercise of discretion" exists (internal quotation marks and citation omitted)).

### C. Summary Judgment In APA Cases

Although Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a), in APA cases, the summary judgment standard functions slightly differently, because "the reviewing court generally . . . reviews the [agency's] decision as an appellate court addressing issues of law."  *Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017).  Put another way, "[t]he entire case on review is a question of law, and only a question of law."  *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Therefore, whether the issue is one of reviewability or otherwise, the court must limit its review to the "administrative record" and the facts and reasons

contained therein to determine whether the agency's action was "consistent with the relevant APA standard of review." *Ho-Chunk, Inc. v. Sessions*, 253 F. Supp. 3d 303, 307 (D.D.C. 2017) (alteration, internal quotation marks, and citation omitted); *see also Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988).

## III.  ANALYSIS

In total, the parties' cross-motions for summary judgment present three questions of law for this Court's resolution: (1) whether HHS's decision to shorten the project periods for Plaintiffs' TPPP grant projects was a decision that is committed to agency discretion and is thus unreviewable; (2) whether HHS "terminated" Plaintiffs' grants; and (3) whether the agency's action with respect to Plaintiffs' grants was arbitrary and capricious under section 706(2)(A) of the APA.  (*See* Pls.' Mem. at 33–39; Defs.' Mem. at 19–30; Pls.' Reply Mem. in Further Supp. of Combined Mot. for Prelim. Inj. & for Expedited Summ. J. ("Pls.' Reply"), ECF No. 16, at 10–36; Reply Br. in Supp. of Defs.' Cross-Mot. to Dismiss or for Summ. J. ("Defs.' Reply"), ECF No. 18, at 8–21.)  As will become apparent below, whether or not HHS's grant decision is committed to agency discretion actually turns on whether or not HHS "terminated" Plaintiffs' grants within the meaning of the HHS regulations; therefore, the Court's analysis expressly addresses only the reviewability and arbitrariness issues.  For the following reasons, the Court has concluded that there are meaningful standards for it to apply—i.e., the HHS regulations regarding the termination of grants—such that the challenged action is reviewable despite its presumptive unreviewability.  Moreover, upon consideration of the challenged agency action, this Court finds that HHS's action in "shorten[ing]" Plaintiffs' project periods (Notice of Award 2017–2018 at 82), without explanation and in contravention of the regulations was an arbitrary and capricious act in violation of

the APA.

**A. HHS's Shortening Of Plaintiffs' Project Periods Is A Reviewable Agency Action, Despite Its Presumptive Unreviewability, Because The "Termination" Standards In The HHS Regulations Apply**

1. Agency Determinations Related To How To Best Use Appropriated Funds Are Presumptively Unreviewable

As explained, the threshold question of whether HHS's action is committed to agency discretion by law necessarily begins with an evaluation of the nature of the agency's action in order to determine the applicable presumption (*see* Part II.C., *supra*), which means that the agency decision at issue must be squarely identified. Here, it is the agency's decision to "shorten[] the [Plaintiffs'] project period[s] to end on June 30, 2018" (Notice of Award 2017–2018 at 82), and thereby stop the funding of those projects two years early (*see* Compl. ¶ 54). As the starting point for this Court's assessment of the applicable presumption, HHS points to the Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182 (1993), which arose from a lawsuit challenging the Indian Health Service's decision to discontinue the Indian Children's Program. Like the entirety of the Indian Health Service, that program (which provided diagnostic and treatment services to disabled Native American children in the southwestern United States) received its funding from Congress through "yearly lump-sum appropriations[.]" *Id.* at 185. But in 1985, the Indian Health Service decided to discontinue the program, and as relevant here, this agency maintained that its decision was unreviewable under section 701(a)(2) of the APA because the decision was committed to agency discretion by law. *See id.* at 189–90. The Supreme Court agreed, holding that, by its nature, an agency's decision regarding how it will spend funds from a lump-sum appropriation is an unreviewable exercise of agency discretion, unless Congress has somehow cabined

the agency's discretion in the authorizing text of the statute.  *See id.* at 192–93.

Moreover, in reaching this conclusion, a unanimous Court explained that an agency's

decision of what it will do with the funds that have been entrusted to it entails "a

complicated balancing of a number of factors which are peculiarly within [the agency's]

expertise[,]" and that an "agency is far better equipped than the courts to deal with the

many variables involved[.]"  *Id.* at 193 (internal quotation marks and citation omitted).

The D.C. Circuit has extended *Lincoln*'s reasoning to agency decisions involving

*non*-lump sum appropriations as well.  *See Milk Train, Inc. v. Veneman*, 310 F.3d 747

(D.C. Cir. 2002).  In *Milk Train*, Congress had specifically appropriated funds to the

Secretary of Agriculture to help compensate farmers for certain losses in 1998 and 1999

due to "loss of markets" for their goods, but Congress had also expressly stated that the

funds were to be used "in a manner determined by the Secretary."  310 F.3d at 749.

Thus, even though the funds had been earmarked for a specific purpose, "[i]nsofar as

Congress [] left to the Secretary's sole judgment the determination of the manner for

providing assistance[,]" the D.C. Circuit held that the decision regarding how these

funds were to be used was committed to the agency's discretion.  *Id.* at 751; *see also id.*

at 752 (referencing the fact that, in exercising its discretion as Congress had intended,

the agency would have to, once again, perform "a complicated balancing of a number of

factors which are peculiarly within the Secretary's expertise" (quoting *Lincoln*, 508

U.S. at 193)).  *Milk Train* thus makes quite clear that even funding decisions relating to

a specific appropriation for a specific program can be properly deemed committed to

agency discretion.  *See id.*; *cf. Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d

347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for

judicial review, for they involve the inherently subjective weighing of large numbers of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (internal quotation marks and citation omitted)).

Given these precedents, which have been widely adopted and applied, this Court has little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable.  *See Milk Train*, 310 F.3d at 752 (establishing, at least within this jurisdiction, that agency decisions relating to the expenditure of funds that have been specifically appropriated by Congress entail the same considerations that the Supreme Court discussed in *Lincoln*); *see also Lincoln*, 508 U.S. at 193–94 (explaining that an agency's discretionary decision to *discontinue* funding a program was just as unreviewable as the agency's original decision to begin that program); *see also, e.g.*, *Serrato v. Clark*, 486 F.3d 560, 568–569 (9th Cir. 2007); *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1534–37 (S.D.N.Y 1984).

### 2. HHS's Regulations Provide Meaningful Standards That Cabin HHS's Discretion To Terminate Grant Funding

Be that as it may, Congress can, of course, "circumscribe agency discretion to allocate resources" through its statutory provisions.  *Lincoln*, 508 U.S. at 193; *see also Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006).  What is more, agencies themselves frequently cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA.  *See Block v. SEC*, 50 F.3d 1078, 1082 (D.C. Cir. 1995); *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987); *Seeger*, 2018 WL 1568883, at *12.  The parties in the

instant case have engaged in a pitched battle over whether any such cabining has actually taken place here—i.e., they vigorously dispute whether the HHS regulations that govern the "termination" of TPPP funding awards (45 C.F.R. § 75.372) actually apply to the challenged action here, and thus provide standards that can be used to evaluate HHS's decision to shorten Plaintiffs' project periods.

Specifically, and as noted above, HHS's regulations expressly address—and limit—the agency's discretion to "terminate" monetary awards. Per those regulations, HHS can only "terminate" a "Federal award . . . in whole or in part" if: (1) "the non-Federal entity fails to comply with the terms and conditions of the award"; (2) the agency has a "for cause" reason to terminate the award; (3) the non-Federal entity has provided its "consent" to the termination; or (4) the non-Federal entity requests the termination. 45 C.F.R. § 75.372. The question here is whether or not this provision of the HHS regulations *applies* to the agency's professed shortening of Plaintiffs' project periods, and it is clear to this Court that it does, for several reasons.

First of all, the language of the regulations plainly says so. By definition, the agency's "termination" of a grant award "means the ending of a Federal award in whole or in part at any time prior to the planned end of [the] period of performance." *Id.* § 75.2. When one also takes into account the fact that, per the regulations, a grant recipient's "period of performance" *is the same thing* as the "project period," *see id.* (cross referencing "project period" with "period of performance"), there really is no question that HHS's announcement that it was "shorten[ing Plaintiffs'] project period[s]" by two years (Notice of Award 2017–2018 at 82), prematurely ended Plaintiffs' TPPP awards prior to the planned end of their period of performance within

19

the plain meaning of the termination definition.

It is also clear from the record that the agency conceived of itself as doing just that at the time the challenged decision was made.  Again, HHS's Notice of Award stated unequivocally that, in addition to authorizing the funds for the 2017–2018 fiscal year, "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year."  (*Id.*)  To "shorten" commonly means to "reduce the length or duration of."  Webster's Third New International Dictionary 2102 (1993).  And lest there be any confusion, HHS fastidiously altered the "Project Period" date indicated on line 6 of the Notice of Award form, to reflect "06/30/2018" as the new project end date, therefore ending all speculation about whether the agency intended that result.  (*See* Notice of Award 2017–2018 at 82.)

These facts are sufficient to indicate that HHS decided to stop funding Plaintiffs' projects before the planned end of their "project periods."  Moreover, in making this decision, HHS was also presumably aware of the impact of this decision under its own regulations, which, as mentioned, equate the "project period" with the "period of performance."  45 C.F.R. § 75.2.[5]  Thus, the agency's announcement that it was

---

[5] HHS cross-referenced "project period" and "period of performance" in its regulations in 2014, apparently to emphasize that these terms are synonymous in the wake of a revamping of Federal award regulations by the Office of Management and Budget.  *See* Executive Office of the President, Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirement, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871, 75873 (Dec. 19, 2014) (enacting an OMB-proposed rule that contained the period of performance language).  Prior to that time, HHS had not used the phrase "period of performance[,]" preferring instead to use the term "project period."  (*See, e.g.*, Grants Policy Statement, available in full at https://www.hhs.go v/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf; Funding Opportunity Announcement 2010–2015, Ex. E to Sherman Decl., ECF No. 6-7, at 29–34, available at http://wayback.archive-it.org/3909/20140324182152/http://www.hhs.gov/ash/oah/grants/assets/funding_announcement _04012010.pdf.).  HHS inserted this cross reference into its definitions to eliminate any confusion that might result from this shift in terms.

"shorten[ing]" the grant recipient's project period to end earlier than planned was the functional equivalent of a statement that HHS was ending Plaintiffs' federal grants prior to the completion of the planned period of performance within the meaning of the termination definition.

The fact that section 75.2 of Title 45 of the C.F.R. separately defines the "period of performance" (the "project period") as "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award[,]" 45 C.F.R. § 75.2, which HHS emphasizes (*see* Defs.' Mem. at 14–15), is entirely beside the point.  The agency was crystal clear that it was "shorten[ing] *the project period*" for Plaintiffs' awards.  (Notice of Award 2017–2018 at 82.)  And under the agency's regulations, *whatever* the "period of performance" is or means (pursuant to the "project period" definition or otherwise), "end[ing]" the grant award prior to the planned expiration date of the project period ends the grant prior to the planned end of the period of performance, and thus the agency has effected a "termination" of the recipient's grant.  45 C.F.R. § 75.2.  To be sure, in retrospect, it might seem productive to explore whether Plaintiffs were actually authorized to place orders "for property and services, contracts and subawards made," or to undertake "similar transactions . . . that require payment by the non-Federal entity" throughout their five-year project terms.  *Id*. (defining the "obligations" that a recipient can make during its period of performance).  But, regardless, there is no genuine dispute that HHS decided to truncate Plaintiffs' "project periods," and it is no answer to suggest now, as HHS does, that the definition of the term "period of performance" somehow overrides the fact that the HHS regulations equate the "project period" with the "period of performance," whatever that

latter term might mean.

This all means that the question of the applicability of the HHS regulations' termination provisions is a fairly straightforward one: given that "*[t]ermination* means the ending of a Federal award, in whole or in part[,] at any time prior to the planned end of [the] period of performance" (which is also known as "the project period"), 45 C.F.R. § 75.2, is that what happened here?  Both the plain language of the regulations and the agency's own characterization of its conduct with respect to Plaintiffs' projects (at least at the time of the action) clearly establish that the answer is "yes."  *Cf. S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 527–28 (D.C. Cir. 1977) (concluding that HHS's predecessor had "terminat[ed]" a grantee's project according to then-existing regulations because the agency withdrew support from the grantee prior to the project's "date of completion").

### 3.   The Agency's "Budget Period" Analysis Is Entirely Unpersuasive

To avoid the clear implications of HHS's decision to end Plaintiffs' TPPP grant funding two years early without regard to the termination standards that the agency's regulations prescribe, HHS counsel has laid out a series of arguments that are apparently intended to convince this Court that the agency has unfettered discretion to stop funding Plaintiffs' projects, without regard to the regulations' standards, as it did here.  The crux of the agency's contention is the theory that the relevant "period of performance" for the purpose of the termination definition is *not* HHS's five-year programmatically approved "project periods," but the recurring one-year "budget periods" during which HHS provides the grant funding.  (*See* Defs.' Mem. at 14–15.) The agency's argument proceeds as follows: because HHS doles out the grant funding on an annual basis, and because here it merely sought to stop doing so with respect to

Plaintiffs' projects *at the end* of the 2017–2018 budget period, the agency did not, in

fact, end the grant awards prematurely—i.e., "prior to the planned end of the period of

performance"—within the meaning of the "termination" definition.  (*See id.*)  In other

words, the agency takes the position that the "period of performance" for the purpose of

the termination provisions is the one-year budget period and not the five-year project

period that the agency said that it was shortening, the effect of which is to permit the

agency to point to a provision in its Grants Policy Statement (a policy document that

lays out HHS's practices with respect to grants) and argue that, instead of terminating

Plaintiffs' grants in a manner that triggers the regulations' standards, it was merely

exercising its unreviewable discretion to "decline to approve a continuation award for

whatever reason[.]"  (*See id.* at 24.)

HHS's argument is clever, but wrong.  To begin with, nothing in HHS's

regulations or in the relevant grant documents even *hints* at the conclusion that

the "period of performance" is synonymous with the "budget period" of a funded

project.  Again, for this duck to fly, HHS must establish that the "planned end of

[Plaintiffs'] period of performance[,]" as that phrase appears in the regulations'

"termination" definition, is the end of the then-ongoing one-year budget cycle

rather than the end of the five-year project period for which Plaintiffs' projects

had been programmatically approved (June 30, 2020), such that HHS was merely

withholding another (new) grant award rather than prematurely ending the grant

award it had previously approved.  But the word "budget period" does not appear

anywhere within the regulations that pertain to this case, much less in the manner

one would expect if the regulations actually contemplated that the "period of performance" is the one-year "budget period."

Truth be told, it actually makes no *sense* to equate these two timeframes in the TPPP context, as HHS apparently understood when it adopted the regulations and implemented the policies that pertain to the agency's receipt and evaluation of applications for TPPP grant funding.  Thus, when the agency prepared to accept applications for the 2015–2020 TPPP award cycle, it posted a funding opportunity announcement for tier 1B grants under the TPPP.  (*See* FOA 2015–2020 at 83–90.)  That announcement specifically explained that the "Period of Performance" for these awards is "[n]ot to exceed 5 years[.]"  (*Id.* at 88.)  On the other hand, according to the announcement, the "Budget Period Length[,]" was "12 months[.]"  (*Id.*)  This differentiation was entirely consistent with the fact that, although Congress appropriates money to agencies annually, it had also mandated that HHS use the TPPP appropriations to fund *research studies* and "medically accurate" programs "that reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."  Pub. L. No. 115–141 (2018); *see also* H.R. Rep. No. 111-366, at 1040–41 (2009).  Such programs and studies could not plausibly yield reliable results in a mere twelve months; accordingly, the longer period for recipients to design and implement medically accurate programs that change how individuals and local communities behave, or research and demonstrate innovative strategies to reduce teen pregnancy made sense. *Cf.* Joseph P. Allen & Susan Philliber, *Who Benefits Most from a Broadly Targeted Prevention Program? Differential*

*Efficacy Across Populations in the Teen Outreach Program*, 29 J. Cmty. Psychology 639, 641 (2001) (noting that the study "utilized data collected over a 4-year period").

And, indeed, in this very case, the record establishes that HHS envisioned a situation where a funded TPPP project's period of performance was *five times longer* than the budget periods through which the project would be funded. (*See* FOA 2015– 2020 at 88.) As a result, HHS's current contention that the agency considered itself to be supporting TPPP projects that could be completed within the one-year budget period, despite what the agency said in the funding announcement and without regard to Congress's clearly expressed interest in funding evidence-based programs that are actually aimed at reducing teen pregnancy, cannot be countenanced. There is nothing in the record that supports the assertion that HHS intended for the announced "period of performance" to be coextensive with the "budget period," and the contrast between these two terms becomes all the more stark when one considers that the same funding announcement that sets the "Period of Performance" as "[n]ot to exceed 5 years" also notes that TPPP "[g]rants . . . are generally approved for a project period of up to five years" (*id.*)—a timeframe that corresponds to the stated "period of performance" but also bears no relationship to the fixed 12-month budget period. (*Id.*)

HHS appears to have never before argued that the "period of performance" and the "budget period" are one and the same for the purpose of the termination provisions of its regulations. *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–59 (2012) (explaining why a new interpretation of an agency's regulations advanced during litigation does not receive deference). However, in fairness, HHS did not fashion the

term "budget period" out of whole cloth in the context of the instant case. That term *does* make an appearance in HHS's Grants Policy Statement (*see* Grants Policy Statement at 12), but, even there, the "budget period" is not made synonymous with the "period of performance." Instead, the Grants Policy Statement effectively *distinguishes* between a "budget period" and a "project period." That is, the Grants Policy Statement defines the "budget period" as "the interval[] of time . . . *into which a project period is divided* for budgetary and funding purposes" (*id.* at B-2 (emphasis added)), which suggests not only that the budget period and the project period are distinct, but also that the former concerns the timing of the grantees' access to available funds while the latter pertains to the work the grantees actually perform. Consequently, whether one considers the text of the regulations, the text of the Grants Policy Statement, or HHS's own funding announcements, HHS is mistaken to argue here that the agency intends for a grant recipient's "period of performance" to be the 12-month "budget period" when it comes to the approval, or termination, of grant funding.

This Court's certainty about all this means that the agency's insistence that the HHS regulations and policies must be read to equate "period of performance" with "budget period" in order to avoid an egregious violation of the Anti-Deficiency Act ("ADA"), 31 U.S.C. § 1341 (*see* Defs.' Mem. at 19–23; Defs.' Reply at 8–12), need not detain the Court for long. HHS quotes *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996), to contend that "[t]he ADA forbids agencies 'from entering into a contract for future payment of money in advance, or in excess of, an existing appropriation'" (Defs.' Mem. at 19), and based on this principle, the agency argues that one cannot view Plaintiffs' grants as conferring five years of funding for Plaintiffs' approved

projects without endorsing a violation of the ADA (*id*. at 23).  But given HHS's clearly

expressed intention to set up conditional cooperative agreements with "periods of

performance" that are funded in one-year increments, and its express statement that the

annual distributions are contingent, *inter alia*, on "the availability of funds" (FOA

2015–2020 at 88; *see also* Notice of Award 2015–2016 at 11; Grants Policy Statement

at 12), it is not at all clear that an Anti-Deficiency Act violation is at stake.  *See also*

*The Honorable Alan Cranston*, B-239435, 1990 WL 10007871, at *3 (Comp. Gen. Aug.

24, 1990) (recognizing that "in certain instances an agency may enter into a [funding

activity] that is binding on the United States" for multiple years "to the extent [that]

future appropriations" are available "to cover [those obligations]"); 1 U.S. Gov't

Accountability Office, GAO-04-261SP, *Principles of Federal Appropriations Law*, ch.

5, at 10 (3d ed. 2004) (indicating that, when the underlying congressional statute

envisions agency activity that will necessarily exceed the scope of a single fiscal year,

the agency can make a contingent award that is subject to Congress's future

appropriation of funds).

　　　Even if there is a lurking Anti-Deficiency Act problem, that fact would only be

"strong evidence" that the agency did not intend to construct a grant funding scheme

that spanned multiple years, *Hercules*, 516 U.S. at 428, but surely that evidence does

not justify ignoring the plain language of the agency's regulations and grant documents,

or "constru[ing]" its rules and policies "in a way that negates [their] plain text[,]"

*Honeycutt v. United States*, 137 S. Ct. 1626, 1635 n.2 (2017); *see also Hardt v.*

*Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244–46 (2010) ("We reject this

interpretation as contrary to [the statute's] plain text.").  In other words, even if one

accepts HHS's questionable proposition that the conditions and qualifications that HHS attached to the TPPP grants were insufficient to avoid breaching 31 U.S.C. § 1341, the clarity of HHS's regulations and grant documents compels the conclusion that the "period of performance" is not equivalent to the "budget period."  *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, at 1355 (2018) (explaining that when a regulation's language "carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer").[6]

This Court is also entirely unmoved by HHS's attempts to invoke the agency's Grants Policy Statement as a basis for characterizing its actions as something other than a termination of Plaintiffs' grants.  The language that the agency points to—"[a]n OPDIV may decide not to make a non-competing continuation award within the current competitive segment" (Grants Policy Statement at 13)—reads more like a reservation of rights clause, than a term of the grant agreement that affirmatively authorizes the agency to refuse to disseminate previously approved grant funding indiscriminately. (*See also id*. at 12 (stating similarly that the "projected levels of future support" listed on the Notice of Award "are contingent on satisfactory progress, the availability of funds, and the continued best interests of the Federal government[,]" and "are not guarantees that the project or program will be funded or will be funded at those levels, and they create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the NoA").  Consistent with the view that the

---

[6] The Court also notes that an Anti-Deficiency Act violation is not the apocalyptic scenario that HHS makes it out to be.  Apparently, agencies violate the Anti-Deficiency Act with some frequency, *see, e.g.*, *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012); *Navajo Nation v. U.S. Dep't of Interior*, 852 F.3d 1124, 1128−29 (D.C. Cir. 2017); *Commodity Futures Trading Commission*, B-328450, 2018 WL 1168509, at *2–3 (Comp. Gen. Mar. 6, 2018), and the fact that these things happen is an additional reason to be skeptical of HHS's avoidance-at-all-costs argument.

language HHS relies upon merely preserves the agency's ability to withhold promised funding without incurring legal liability, this Court notes that the Grants Policy Statement says *nothing* about HHS's process for reaching the conclusion that the listed circumstances exist and thus that a withholding is warranted, nor does it suggest that HHS routinely engages in a wholesale review of the appropriateness of continued funding of a previously approved project at the end of each budget period in order to determine whether or not to withhold the funding.  (*See* Grants Policy Statement at 13.) To the contrary, the policies and past practices of the agency strongly suggest that if a grant recipient submits a non-competing continuation award, as it is required to do in order to receive funding for the ensuing budget year, that application is routinely granted, so long as Congress appropriates the funds, the project has made satisfactory progress, and the recipient has not breached any of the terms or conditions of the grant. (*See* Guidance for Preparing a Non-Competing Continuation Grant Application at 18 (explaining that HHS does not want TPPP "performance measure data" or "evaluation progress reporting" as part of non-competing continuation applications).)

Two more points bear emphasis with respect to the agency's references to its Grants Policy Statement.  First, even if it was clear that the Grants Policy Statement authorized HHS to engage in the routine withholding of funding with respect to a non-competing continuation application when doing so is "in the best interests of the Federal government" (Grants Policy Statement at 13), there is no factual basis for concluding that any such "withholding" happened here.  Plaintiffs had not even *submitted* non-competing continuation applications for fiscal year 2018–2019 at the time HHS announced that it would not be proceeding to fund Plaintiffs' projects for that

fiscal year, which means that, at the point of the relevant agency action, there were no funds to withhold.  Moreover, as has already been highlighted repeatedly, HHS did not *say* that it was "withholding" anything with respect to Plaintiffs' grants.  Instead, it quite clearly asserted that it was "shorten[ing] [Plaintiffs'] project period" (Notice of Award 2017–2018 at 82), which is entirely consistent with the steps that it took—and with what its own regulations say that the agency cannot do without making certain findings.

This brings the Court to the second point that compels the conclusion that the agency's reliance on its Grants Policy Statement is woefully misplaced.  Whatever that statement's "withholding" language might be read to authorize, its authority does not, and cannot, trump the agency's formal regulations.  As explained above, the regulations themselves contain a provision that speaks directly to the circumstances at issue here, and they make clear that when HHS wishes to end a Federal grant award, in whole or in part, prior to the planned end of the period of performance, it can only do so if the specified conditions—i.e., a violation of the terms of the conditions of the award, or "cause," or consent— exists.  45 C.F.R. § 75.372.  Thus, any language in the Grants Policy Statement that suggests that HHS can stop providing grant funding "for whatever reasons[,]" or, apparently, no reasons, has no force or effect, and HHS certainly cannot insist that this Court consider such a statement to be lawful authority for terminating Plaintiffs' grant awards under circumstances other than those the regulations prescribe.

In short, this Court rejects HHS's creative attempt to equate the "period of performance" / "project period" (as those terms appear in the HHS regulations), with the "budget period" (as that term exists in the Grants Policy Statement), as is necessary to support the agency's argument that what HHS did to Plaintiffs' projects did not qualify as a "termination."  To the contrary, as explained earlier (*see* Part III.A.2, *supra*), HHS's shortening of the project period for Plaintiffs' awards ended the period of performance prior to its planned end, which is all that is required to conclude that the agency "terminated" Plaintiffs' grants for the purpose of the HHS regulations.  And that leads inexorably to the conclusion that the termination provisions in the HHS regulations—which involve the type of legal analysis that courts routinely perform, *see, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958) (determining whether the President has removed a member of an independent agency "for cause"); *Donald Marshall Berlin v. Bank of Am., N.A.*, 101 F. Supp. 3d 1, 11–12 (D.D.C. 2015) (determining whether a party has breached the terms and conditions of a contract)—are meaningful standards that this Court can apply to review HHS's shortening of Plaintiffs' project periods, *see Chaney*, 470 U.S. at 830.

## B. HHS Violated The APA, Because It Failed To Explain Its Reasoning And Acted Contrary To Its Regulations When It Terminated Plaintiffs' Grants

The most striking thing about the agency action that Plaintiffs challenge in this case is the fact that HHS *provided no explanation whatsoever* for its decision to "shorten[]" the project periods pertaining to Plaintiffs' grants.  (*See* Notice of Award 2017–2018 at 82.)  The agency merely announced the change as a foregone conclusion,

31

an *ipse dixit* if you will, and presumably expected Plaintiffs not to notice that their

grants were being terminated two years early without any statement of cause or a

finding that any of the other circumstances set forth in HHS's termination rules existed.

In its summary judgment brief, the agency breezily contends that its "policy concerns

with the current TPPP Program are a matter of public record." (Def.'s Mem. at 37.)

But as far as the *administrative* record is concerned, HHS said nothing to Plaintiffs at

the time that it cut short their project periods, and it certainly did not undertake the kind

of reasoned analysis of potential causes that the APA and its own regulations require.[7]

HHS's unmistakable and inexplicable silence at the time that it acted on its

intention to shorten Plaintiffs' project periods makes the remaining analysis of

Plaintiffs' APA claims quite easy.  Under the most elementary precepts of

administrative law, an agency has no choice but to provide a reasoned explanation for

its actions, *see State Farm*, 463 U.S. at 43; *Sierra Club v. EPA*, 863 F.3d 834, 839 (D.C.

Cir. 2017), and it cannot undertake to act in a manner that is contrary to its own

regulations, *see Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009.  HHS's

own counsel has admitted that, if this Court determined that the termination regulations

applied, then the agency has committed both of these cardinal sins with respect to

Plaintiffs' grants (*see* Hr'g Tr., ECF No. 20, at 44:24–45:12)—and given this well-

supported concession, there is no need to belabor the point any further.  It suffices to

note that the law demands this result.  *See Commc'ns & Control, Inc.*, 374 F.3d at

---

[7] To the extent that the agency has since provided an explanation for its termination of Plaintiffs' grants, the Court notes that those explanations do not cure the agency's original failure to explain its reasoning.  *See New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018) (emphasizing that "*post hoc* rationalizations" for agency action that was not contemporaneously explained will not be accepted (internal quotation marks and citations omitted)).

1335–36 ("The [agency's] departure from this practice, with no explanation, renders its void ab initio rationale arbitrary and capricious." (emphasis omitted)); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1525 (D.C. Cir. 1994) ("[I]t is a well settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." (internal quotation marks and citation omitted)).  And quite frankly, this concession is the one statement of agency counsel with which this Court wholeheartedly agrees.

## IV.    CONCLUSION

The issues presented in the parties' cross-motions for summary judgment boiled down to a choice between characterizing HHS's shortening of Plaintiffs' project periods as a "termination" of their grants within the meaning of the agency's own regulations, or as something else—i.e., what HHS says is an unregulated and unreviewable exercise of agency discretion to withhold previously approved grant funding for the remaining two years of the five-year project period.  For the reasons explained above, the agency's effort to shoehorn its action into the latter category defies not only the agency's past practices and the realities of federally funded scientific research projects, but also the plain language of the regulations that govern HHS's decision-making with respect to the grant-making process.  Moreover, it is clear to this Court that HHS acted to "end" Plaintiffs' federal awards "prior to the planned end of the period of performance[,]" and thereby "terminated" Plaintiffs' grants under the regulations.  45 C.F.R. § 75.2.  This means that the meaningful standards set forth in the HHS regulations regarding grant terminations apply, such that HHS's action is reviewable.  And because HHS terminated Plaintiffs' grants without any explanation whatsoever, much less the "for cause" finding that the agency's own regulations prescribe, the Court concludes that HHS acted

arbitrarily and capriciously, and in violation of the law, such that its action must be set

aside.  In its Order of April 19, 2018—which **GRANTED** Plaintiffs' motion for

summary judgment, **DENIED** Defendants' cross-motion for summary judgment, and

**VACATED** the agency's decision to shorten Plaintiffs' project period—this Court did

just that.

DATE: May 11, 2018              *Ketanji Brown Jackson*
                               KETANJI BROWN JACKSON
                               United States District Judge